

### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

UNIROYAL CHEMICAL COMPANY, INC.,
d/b/a CROMPTON MANUFACTURING COMPANY

         Plaintiff,

v.

SYNGENTA CROP PROTECTION, INC.

         Defendant.

Civil Action No.
3:02cv02253 (AHN)

August 19, 2004

**GRANTED ABSENT OPPOSITION**
**(LOCAL RULE 9 (A) )**
Alan H. Nevas, USDJ

### MOTION TO STRIKE AND DISMISS COUNTERCLAIMS

Pursuant to Federal Rules of Civil Procedure 12(f) and 12(b)(6), the plaintiff,

Uniroyal Chemical Company, Inc., d/b/a Crompton Manufacturing Company, hereby

moves to strike, or in the alternative, to dismiss, the defendant's counterclaims dated July

16, 2004. The defendant's filing of its counterclaims without permission from the court

was improper and the counterclaims should therefore be stricken. In addition, the

defendant's purported counterclaims fail to state claims upon which relief may be

granted. A memorandum of law in support of this motion is submitted herewith.

Respectfully submitted,
THE PLAINTIFF, UNIROYAL CHEMICAL
COMPANY, INC. d/b/a CROMPTON
MANUFACTURING COMPANY

By: _____
Charles F. Corcoran, III (ct 04299)
David S. Hardy (ct 20904)
Carmody & Torrance LLP
195 Church Street, P.O. Box 1950
New Haven, CT 06509-1950
Tel: (203) 777-5501
Fax: (203) 784-3199
E-mail: ccorcoran@carmodylaw.com
E-mail: dhardy@carmodylaw.com
*Its Attorneys*

{N0721188}

CARMODY & TORRANCE LLP   195 Church Street
Attorneys at Law          Post Office Box 1950
New Haven, CT 06509-1950
Telephone: 203 777-5501

# Transcript of the Deposition of
# **Charles Buffington**
September 15, 2004

Uniroyal Chemical Company, Inc. v. Syngenta Crop
Protection, Inc.
3:02cv02253(AHN)

Mildred P. Jones, CVR
Westmoreland Reporting, Inc.
800-617-4543
Fax: 888-797-1791
www.WestmorelandReporting.com

Charles Buffington

September 15, 2004      Uniroyal Chemical Company, Inc. v. Syngenta Crop Protection, Inc.      3:02cv02253(AHN)

Page 121

1          to introduce into the PGR market for purposes of -- for

2          the purpose of competing with Bonzi.  Uniroyal gave no

3          notice to Syngenta that it was taking this action,

4          unquote.

5               That's not true, is it?

6     A.   That is true.

7     Q.   All right.  Haven't we just looked at some memos,

8          including a memo from Mr. Dickinson which we marked this

9          morning in which Mr. Dickinson said, if we take back

10         Bonzi, you can count on Uniroyal introducing its own

11         generic paclobutrazol?

12    A.   That was our anticipation, yes.

13    Q.   Right.  And in fact Uniroyal told this to Syngenta

14         during the course of the discussions, did they not?

15    A.   The disconnect I think here is that, while in June they

16         specifically spoke to the availability of paclobutrazol

17         globally, that they could access that, is earlier in

18         2002 they were actively engaged in discussions, both

19         internally and with some outside Uniroyal people, about

20         the opportunity to bring generic paclo into the

21         marketplace.

22    Q.   Is there anything in the agreement between the parties

23         -- either of the agreements between the parties which,

24         in your opinion, would forbid Uniroyal from exploring

25         this possibility?

Charles Buffington

September 15, 2004    Uniroyal Chemical Company, Inc. v. Syngenta Crop Protection, Inc.    3:02cv02253(AHN)

Page 143

1    A.    So they knowingly took it in to damage us.

2    Q.    They knowingly purchased -- anything more you want to

3          say?

4    A.    No.

5    Q.    Okay.  So what you are saying is they exercised their

6          rights under the supply agreement to buy Bonzi, and you

7          are claiming that that interfered with Syngenta's

8          business relationships?

9              Was buying Bonzi under the supply agreement a

10         violation of the supply agreement?

11             MR. MEO:  Objection to form.

12   A.    Buying the product was not a violation of the agreement.

13         Selling the product into the marketplace was certainly

14         done with the intent to harm Syngenta's sales in 2003.

15   Q.    Selling the product in the market pursuant to the then

16         existing marketing and sales agreement was a violation

17         of the agreement?

18             MR. MEO:  Objection to form.

19   A.    I did not say that them selling was a violation.  I said

20         it certainly -- by them selling it, it was certainly

21         interference with our business relationships with our

22         channel and our end users.

23   Q.    If they had -- if they had not bought it and sold it,

24         then, theoretically, you could have sold it yourself;

25         correct?

## Charles Buffington

Page 144

1  A.  Correct.

2  Q.  But there was nothing improper or immoral or wrong about

3      their buying Bonzi during the period of the supply

4      agreement, was there?

5  A.  They --

6  Q.  Was there?

7  A.  They did have the opportunity --

8  Q.  Okay.

9  A.  -- to purchase the product.

10 Q.  And there was nothing --

11     MR. MEO:  Excuse me.  I do not think the

12     witness has finished his answer.

13 A.  But they -- it did not go to their ethical and moral of

14     dumping it in the marketplace as they were exiting the

15     market.

16 Q.  So you are saying they had a right to buy it under the

17     supply agreement, but they didn't have a right to sell

18     it; is that your argument?

19     So they just should have bought it and kept it?

20 A.  I'm not --

21     MR. MEO:  Objection to form.

22 A.  I'm not speaking to their rights.  I'm saying they

23     certainly did it to interfere with our business

24     relationships.

25 Q.  There was nothing wrongful about the purchase or the

809fa27a-f40d-46fe-b663-21a1b068d459

Charles Buffington

Page 145

1        sale of Bonzi during the period of the agreement, was

2        there?

3            MR. MEO:  Objection to form.

4    A.    Repeat the question.

5    Q.    There was nothing wrongful or improper about the

6        purchase of Bonzi during the period of the supply

7        agreement or its resale by Uniroyal?

8            That was exactly what the agreement contemplated,

9        wasn't it --

10            MR. MEO:  Objection to --

11    Q.    -- that Uniroyal would buy it and they would sell it --

12        market it and sell it?

13            MR. MEO:  Objection to form.

14            You can answer.

15        (WHEREUPON, Ms. Laureen Treu left the

16        deposition room.)

17    A.    While they had the right to buy it, and they had the

18        right to sell it in 2002, is they certainly did sell

19        with the intent to disrupt our business relationships

20        and disrupt our customers in the marketplace due to

21        their strategies.

22    Q.    How do you know --

23    A.    It certainly was a disruptive strategy.

24    Q.    How do you know what their intent was?

25            Did they tell you that was what their -- how do you

809fa27a-f40d-46fe-b663-21a1b068d459

Charles Buffington

September 15, 2004       Uniroyal Chemical Company, Inc. v. Syngenta Crop Protection, Inc.       3:02cv02253(AHN)

Page 146

1          know what their intent was, sir?  Did they tell you that

2          was their intent, that they weren't trying to make a

3          profit; they were just trying to hurt you?

4     A.   They did not call me up and ask me what -- tell me what

5          their intent was.

6     Q.   All right.  And you didn't ask them, when they put in an

7          order for 6,000 gallons, "What do you want to do with

8          this," did you?

9     A.   No.

10    Q.   You knew they wanted to sell it, of course?  They

11         weren't going to sit on it, were they?

12    A.   I was not -- since I was not privy to their inventory

13         situation, they certainly could have been backordered or

14         had customer orders that needed filling before year end,

15         which then would have certainly made sense.

16              But to go out in December, like they did, and cut

17         the price and load customers with three to six months'

18         worth of product does seem reckless behavior.

19              THE REPORTER:  This will be Number 9.

20              (WHEREUPON, Plaintiff's Exhibit Number 9

21              was marked for identification.)

22         MR. MEO:  Do you have --

23         MR. CORCORAN:  I do.  Sorry.  I forgot.

24         MR. MEO:  No problem.

25              Mr. Corcoran, is there any particular

809fa27a-f40d-46fe-b663-21a1b068d459

Charles Buffington

Page 148

1   A.   It says here that they are willing to pay $4,000 a

2       pound.

3   Q.   Right.

4   A.   Later on, they actually wouldn't even offer us $4,000 a

5       pound.

6   Q.   But then she says, "Pricing significantly above this

7       point is likely to push us towards an economic decision

8       point similar to what you are currently undertaking.

9       Uniroyal is" a strong -- "in a strong position to lead

10      the PGR market towards a generic product.  On the flip

11      side, our strong market position can also work towards

12      the successful defense of the Bonzi brand leading the

13      market away from generic products."  Do you see that?

14  A.   Yes, I do.

15  Q.   Did you think Ms. Treu was not telling you the truth

16      when she made those representations?

17  A.   In April of 2002, when she sent this, is I think she was

18      representing what she said here that, if pushed, they

19      would evaluate a generic brand, but I don't think it

20      states here that they were testing a generic brand.

21  Q.   But there was no violation of the agreement for them to

22      be testing it as an insurance or a defense -- self-

23      defense policy in the event that Syngenta decided to

24      pull the trigger and pull Bonzi in house, was there?

25         MR. MEO:  Objection to form.  Also, asked and

1          answered.

2    Q.    You can answer.

3    A.    So where is the question.  Repeat the question.

4    Q.    It was not in violation of the agreements between the

5          parties at this point for Syngenta to protect itself

6          against the possibility -- withdrawn.

7              It was not in violation of the agreements between

8          the parties for Uniroyal at this point to attempt to

9          protect itself against the possibility, which ultimately

10         became a reality --

11   A.    I would --

12   Q.    -- that -- I'm not finished -- that Syngenta would

13         terminate Uniroyal's supply by exploring this in house;

14         correct?

15             MR. MEO:  Objection to form.

16   A.    It was not a violation for them to explore.  It was a

17         violation for them to purchase or import part of their

18         needs, which may have been used for research purposes,

19         into the country and put into the market.

20   Q.    But you have no evidence that they did that?

21   A.    We have not looked for the evidence.

22   Q.    And you don't have it, therefore; correct?

23   A.    We might find it.

24   Q.    But you haven't yet, have you?

25   A.    We haven't looked for it.

809fa27a-f40d-46fe-b663-21a1b068d459

Charles Buffington

Page 152

1  A.  Myself?

2  Q.  Yeah.

3  A.  Yes.

4  Q.  "Uniroyal has developed and positioned Bonzi in the

5      market to a level that has exceeded annual contract

6      minimums and targets by an average of over 120% and 53%

7      respectively.  The annual growth rate has averaged in

8      the range of 15%."

9          Do you have any evidence to dispute those claims,

10     sir?

11 A.  I don't have any evidence to affirm them either.

12 Q.  So the answer is no, you have no evidence to dispute the

13     claims; correct?

14 A.  I have no evidence to dispute nor affirm that statement.

15 Q.  Did you, on or after April 24, 2002, write a letter to

16     Ms. Treu disagreeing with any of those comments?

17 A.  I don't recall.

18 Q.  You don't recall having done so?

19 A.  I don't recall now.

20 Q.  You fully understood that if Uniroyal were not

21     successful in persuading Syngenta to continue the supply

22     agreement or to renew it -- you fully understood, as of

23     late May, that there was a distinct possibility that

24     Uniroyal would develop its own generic paclobutrazol,

25     did you not?

## Charles Buffington

Page 153

1   A.   We saw that as a potential --

2   Q.   Okay.

3   A.   -- threat.  Yes.

4   Q.   I'll show you this document.

5        THE REPORTER:  This is Number 10.

6        (WHEREUPON, Plaintiff's Exhibit Number 10

7        was marked for identification.)

8   Q.   And this e-mail message of May 30, 2002, records that

9        expectation on the part of Syngenta; correct?

10       MR. MEO:  Objection to form.

11  Q.   You may answer.

12  A.   No, I don't think that this speaks to the expectation.

13       Is the -- calculating the Uniroyal generic position on

14       the profitability was to look at the agreement through

15       Uniroyal's eyes in regards to profit and loss, and,

16       financially, to see what their business case looked like

17       in regards to continuing on with us or then -- or going

18       at it alone.  So it was purely a financial analysis that

19       needed to be done.

20       (WHEREUPON, Plaintiff's Exhibit Number 11

21       was marked for identification.)

22  Q.   Take a look at Exhibit 11, if you would.

23  A.   Okay.  (Witness peruses document.)

24  Q.   Only the first -- only the message at the top is

25       necessary.

# Transcript of the Deposition of
# **Travis Dickinson, Jr.**
September 13, 2004

Uniroyal Chemical Company, Inc. v. Syngenta Crop
Protection, Inc.
3:02cv02253 (AHN)

Sherry L. Malia, RPR
Westmoreland Reporting, Inc.
800-617-4543
Fax: 888-797-1791
www.WestmorelandReporting.com

Travis Dickinson, Jr.

September 13, 2004    Uniroyal Chemical Company, Inc. v. Syngenta Crop Protection, Inc.    3:02cv02253 (AHN)

Page 102

1        question.

2            MR. CORCORAN:  Paclobutrazol.

3            (WHEREUPON, the court reporter read back

4            the previous question.)

5    A.    I'll try.  I'm still not sure I have absolute clarity.

6    Q.    Well, let me restate it.  You have no evidence

7            yourself personally to show that any exploration that

8            Uniroyal was undertaking was for any purpose other

9            than self-defense in the event that Syngenta decided

10           to terminate this supply agreement?

11   A.    That's correct.  I would not have personal access

12           to --

13   Q.    Okay.

14   A.    -- any factual information to that effect one way or

15           another.

16   Q.    And you know of no such evidence?  You, yourself, know

17           of no such evidence?

18   A.    I haven't seen any such evidence.

19   Q.    Okay.  Let's take the second sentence in Paragraph

20           16.  "Uniroyal gave no notice to Syngenta that it was

21           taking this action."  I guess action refers to

22           exploration; correct?

23            MR. MEO: Well, objection to form.

24   Q.    Well, we're trying to interpret counsel's language

25           here.  Can we agree that the word "action" apparently

Page 103

1        refers back to the exploration?

2    A.   They were exploring for the purpose of competing with

3         Bonzi.  The complete statement, I think, is more

4         accurate, yeah.

5    Q.   Okay.  So is there anything in the supply or

6         development agreement that you're aware of that

7         requires Uniroyal to give notice to Syngenta if

8         Uniroyal decides that it wants to explore the

9         possibility of marketing generic paclobutrazol as

10        insurance against the possibility that Syngenta may

11        terminate its supply?

12   A.   I don't recall seeing any language to that effect in

13        the supply agreement, no.

14   Q.   Okay.  And there would be nothing wrong with that,

15        would there?

16             MR. MEO: Objection to form.

17   A.   From a legal perspective, no.  From a spirit and

18        intent and good will perspective, I would say yes,

19        there probably would be something wrong with that.

20   Q.   Well, if, if Uniroyal's first choice is to partner

21        with Syngenta forever on Bonzi and Syngenta says no,

22        we don't want to partner with you, then what's wrong

23        with Uniroyal, as its second choice, saying, okay, I

24        guess we better explore the marketing of generic

25        paclobutrazol?  What's wrong with that?

## Travis Dickinson, Jr.

September 13, 2004    Uniroyal Chemical Company, Inc. v. Syngenta Crop Protection, Inc.    3:02cv02253 (AHN)

Page 113

1    Mr. Dickinson.  Are you aware of any evidence that

2    Uniroyal has engaged in a scheme to interfere with

3    Syngenta's business relationships with existing and

4    prospective customers?

5  A.    What I'm saying is that is the net effect in my view

6    and opinion of the activities which Uniroyal has

7    undertaken with their claims against Syngenta.

8  Q.    Because the lawsuit is a distraction?

9  A.    Yes.

10 Q.    All right.  Anything other than that, sir, in addition

11    to that?  Any scheme aimed at interfering with

12    Syngenta's business relationship with its customers?

13 A.    In addition to that, no.  I have no direct knowledge.

14 Q.    All right.  Paragraph 26.

15        (Ms. Treu conferring with counsel.)

16 Q.    What's your understanding of the meaning of the

17    term "bad faith"?

18        MR. MEO: Excuse me?  What term?

19        THE REPORTER:  "Bad faith".

20 A.    I wouldn't know the strict legal definition.  That's

21    not my training or background.

22 Q.    I'm not asking for a legal definition.

23 A.    So the, the best I can come up with, a personal

24    rendition would be inconsistent with the spirit and

25    good will associated with a business relationship, and

d92e4113-33ac-4594-b117-5581b180dae4

Travis Dickinson, Jr.

September 13, 2004    Uniroyal Chemical Company, Inc. v. Syngenta Crop Protection, Inc.    3:02cv02253 (AHN)

Page 118

1          generic paclobutrazol?

2    A.    I'm uncertain whether Uniroyal has actually entered

3          the market with their own product.

4    Q.    You don't know?

5    A.    I'm not aware, as of today, whether that's true.

6    Q.    Okay.  Is anybody else marketing generic

7          paclobutrazol?

8    A.    I believe there is at least one other generic

9          entrant, yes.

10   Q.    Okay.  Who's that?

11   A.    I believe, I believe it's Vine Chemical, but I'm not

12         absolutely certain of that.

13   Q.    Are you aware of anything Uniroyal has done to impede

14         Syngenta's ability to sell Bonzi?

15   A.    Well, bringing these legal claims has had that effect

16         of diverting our attention from our customers and the

17         marketing of our product and to that extent, yes.

18   Q.    We've distracted you by filing a lawsuit?

19   A.    Yes.

20   Q.    Okay.  Anything else?

21   A.    Not that I'm aware of, no.

22   Q.    Okay.  Are you aware of anything Uniroyal has done to

23         interfere with Syngenta's current customers?

24   A.    I wouldn't be aware of that, no.

25   Q.    So you are not aware of it?

Travis Dickinson, Jr.

September 13, 2004    Uniroyal Chemical Company, Inc. v. Syngenta Crop Protection, Inc.    3:02cv02253 (AHN)

Page 120

1            in that same time and resource is not allocated toward

2            bettering our business and our offer to our customers.

3    Q.    That wasn't my question.  Has Syngenta suffered any

4            financial loss as a result of Uniroyal's actions?  Any

5            ascertainable financial loss?

6    A.    I believe the answer to be yes.

7    Q.    What's the ascertainable financial loss?

8    A.    I believe I just described it.

9    Q.    How many dollars?

10    A.    I don't know the answer to that specifically.  I

11            haven't sat down --

12    Q.    Do you know it generally?

13    A.    I haven't sat down and quantified it.

14    Q.    How could you?  You're saying by virtue, just because

15            the lawsuit has been filed; correct?

16    A.    I'm not sure I understand the question.

17    Q.    You're saying there has been some sort of a loss by

18            virtue of distraction because the lawsuit has been

19            filed.  That's all you're saying; correct?

20    A.    That's what I just said.  That's correct.

21    Q.    All right.  Has Syngenta lost any Bonzi customers or

22            sales because of Uniroyal's conduct as alleged in the

23            counterclaim?

24    A.    I would not be aware of that.

25    Q.    You don't know of any?

Travis Dickinson, Jr.

Page 121

1    A.    I wouldn't see it in the course of my role at

2          Syngenta.

3    Q.    Please don't answer in the conditional.  Tell me what

4          you know.  Not what you would know or might know or

5          could know.

6    A.    I do not know.

7    Q.    Thank you.  Let's talk about the costs of producing

8          Bonzi.  What condition --

9                MR. MEO: Can we just take a short break, 5

10               minutes or less?

11               MR. CORCORAN: Yes.  Okay.

12               THE VIDEOGRAPHER: Off the record at 3:30.

13               (WHEREUPON, there was a brief recess taken.)

14               THE VIDEOGRAPHER: This begins Tape 3 of the

15               deposition of Travis Dickinson.  On the record at

16               3:43.

17   Q.    Hello again, Mr. Dickinson.  I would like to do just

18         some, a little bit of exploration with you about

19         sources of information within the corporation where I

20         could go to to find out about costs of producing and

21         marketing Bonzi.

22               Who keeps track of the financial aspects of the

23         product?  In other words, if I were going to notice

24         a deposition of somebody to tell me about the hard

25         costs and the soft costs of producing this product,

Travis Dickinson, Jr.

Page 136

1           if you agree with it, which is --

2   A.   Well, no, I do not agree with him.

3   Q.   So who was it precisely, please identify this person

4           for me so that I can depose him, who Syngenta had on

5           staff as of November, 2001, who had the technical

6           expertise necessary so that if Syngenta decided to

7           take back paclobutrazol, they wouldn't need to hire --

8           ornamentals, yeah, wouldn't need to hire somebody

9           new.  Who was that person?

10  A.   I wouldn't have first hand knowledge of that.

11  Q.   Do you know of any such person?

12  A.   I'm not. . .

13  Q.   As you sit here today, do you know of any such person

14          who existed on Syngenta's payroll as of November of

15          2001 or not with respect to ornamentals?

16  A.   No, I don't know.

17  Q.   Okay.  And, so, that's sent to you and you sent a

18          message back. "Tripp, please contact Chuck to make

19          certain any third party activity is coordinated.

20          Again, it seems to me we need to decide the strategic

21          direction with paclo, keep or sell, before we make any

22          tactical moves with Uniroyal or others."  And then you

23          say, "Keep in mind that Uniroyal has indicated that

24          they will go generic if we sell the asset to someone

25          other than them".  Do you see that?

Travis Dickinson, Jr.

Page 137

1  A.   Yes, I do.

2  Q.   And that last sentence is from you; correct?

3  A.   Yes, it is.

4  Q.   And that's the opposite of what's being claimed in the

5       counterclaim which we just read, isn't it?

6  A.   I didn't recall the earlier discussion.

7  Q.   The counterclaim alleges, in Paragraph 23 --

8          MR. CORCORAN:  Withdrawn.

9  Q.   16, I think.  The counterclaim alleges in Paragraph 16

10      that "Uniroyal began exploring whether to market its

11      own generic paclobutrazol product to introduce into

12      the PGR market for the purpose of competing with

13      Bonzi"; correct?

14 A.   That's how it reads, yes.

15 Q.   Right.  But what you're saying here is that Uniroyal

16      has indicated to Syngenta that they are going to go

17      generic if Syngenta sells the asset to somebody other

18      than Uniroyal; correct?

19 A.   That's what I wrote, yes.

20 Q.   And that's different from what the counterclaim says,

21      isn't it, sir?

22          MR. MEO: Well, objection to form.

23 Q.   That's different than what the counterclaim says, is

24      it not?

25 A.   I don't know that I would conclude that.

Travis Dickinson, Jr.

September 13, 2004    Uniroyal Chemical Company, Inc. v. Syngenta Crop Protection, Inc.    3:02cv02253 (AHN)

Page 138

1    Q.    How is it the same?  Is it the same?

2    A.    Well, in this instance, the November of 2001, it's

3          saying that Uniroyal will go generic if Syngenta sells

4          the asset --

5    Q.    Right.

6    A.    -- to someone other than Uniroyal.  We hadn't sold the

7          asset --

8    Q.    Right.

9    A.    -- as of early 2002 nor were we contemplating doing

10         so.  At that point in time we had concluded that we

11         would not sell the assets.  So I'm --

12   Q.    The question is is that different?

13   A.    I think those are two different situations.

14   Q.    Exactly.  It's different, isn't it, from what's

15         alleged in the counterclaim?

16   A.    They are two different situations.

17   Q.    All right.  That's all I wanted to know.

18               Look at the bottom of Exhibit 4.  Who is Buddy?

19   A.    Buddy Camors headed our industry sales group at this

20         time, in November of 2001.

21   Q.    Okay.  The last line there is:  "Chuck, I suggest to

22         speed up the project - please check with legal ASAP".

23         Can you tell with respect to what that suggestion is

24         being made?

25   A.    No, I cannot.

### Travis Dickinson, Jr.

September 13, 2004    Uniroyal Chemical Company, Inc. v. Syngenta Crop Protection, Inc.    3:02cv02253 (AHN)

Page 144

1    A.    Not me personally, no.

2    Q.    Okay.  Let's go up the chain of e-mails to the one

3          which you sent to Mr. Lemmich on January 4th.  Do you

4          see what it says?

5    A.    Yes, I do.

6    Q.    "You can count on Uniroyal bringing in generic paclo

7          if we exit the Bonzi marketing agreement." Do you see

8          that?

9    A.    Yes, I do.

10   Q.    Again, different than what the counterclaim says?

11              MR. MEO:  Objection to form.

12              MR. CORCORAN:  What's objectionable?

13              MR. MEO:  Again, I don't know what you mean by

14          the word "different".

15              MR. CORCORAN: Not the same as.  How is that?

16              MR. MEO: Well, I think we can all agree that the

17          words are different.

18   A.    That statement doesn't contradict.

19   Q.    I'm not asking, the question is not "does your

20         statement contradict Paragraph 16".  That's not my

21         question, Mr. Travis -- Mr. Dickinson.  I get to ask

22         the questions and you give the answers.

23              Can you answer the question that I asked, please?

24   A.    Would you please restate the question?

25              MR. CORCORAN: Could the reporter read it back?

d92e4113-33ac-4594-b117-5581b180dae4

Travis Dickinson, Jr.

September 13, 2004    Uniroyal Chemical Company, Inc. v. Syngenta Crop Protection, Inc.    3:02cv02253 (AHN)

Page 145

1            (WHEREUPON, the court reporter read back
2            the previous question.)
3   Q.    Okay.  So it's different; right?  Is it different,
4         sir?
5   A.    Yes, it is different.
6            MR. CORCORAN: All right.  Now, my next exhibit
7            has got a 7 on it.  We can use the exhibit
8            numbers and skip one, if you want to put that on
9            the record, or you can rewrite them all.
10           THE REPORTER:  Why don't we just skip one.
11           MR. CORCORAN: All right.  We're going to skip
12           Exhibit 6.
13           MR. MEO:  No objection.
14           MR. CORCORAN: I've spared us all Exhibit 6 so
15           that we can focus on Exhibit 7.
16                (WHEREUPON, Exhibit Number 7
17                was marked for identification.)
18                (Witness reviewing document(s).)
19  A.    Yes, sir.
20  Q.    Done?  Okay.  This is an e-mail from you to the
21        president of your division, correct, Bob Woods?
22  A.    Yes, it is.
23  Q.    All right.  And it's May of 2002, which brings us into
24        the period when you were talking about the future of
25        the relationship with Uniroyal and when you were

d92e4113-33ac-4594-b117-5581b180dae4

Travis Dickinson, Jr.

September 13, 2004    Uniroyal Chemical Company, Inc. v. Syngenta Crop Protection, Inc.    3:02cv02253 (AHN)

Page 158

1          difficult as possible in exiting these agreements in

2          any way, shape, or form that they could.  And that was

3          a very real consideration in my view and one that was

4          consistent with human nature and one that was

5          consistent with the rather terse exchange which I had

6          around paclobutrazol, with Mr. Ingulli and others, at

7          the Crop Life meeting in October of 2001, which I

8          recaptured at the top of this message.  So I had some

9          other reasons to be concerned about our ability to

10         exit these agreements reasonably cleanly.

11    Q.   But that never happened?  Uniroyal didn't take any

12         other actions other than to institute a lawsuit to

13         protect its right; correct?  And that's been your

14         testimony this afternoon.  That's the only thing they

15         did, is they brought a lawsuit saying you violated our

16         rights; correct?

17              MR. MEO: Objection to form.

18    Q.   You don't know of anything else that happened; you've

19         already told us that.  Do you?

20              MR. MEO: Objection to form.

21    A.   I'm sorry.  Could you restate the question?

22    Q.   Was there anything that Uniroyal did, because of its

23         unhappiness at this termination, other than bring a

24         lawsuit to enforce its legal rights under the

25         agreements between the parties?

Travis Dickinson, Jr.

Page 159

1    A.    Not that I'm aware of --

2    Q.    Right.

3    A.    -- but that would be one of the actions that I was

4          concerned about at the time here that would flow from

5          this enmity or taking issue with our unilateral

6          decision to terminate the agreement.

7    Q.    You're not claiming that Uniroyal doesn't have the

8          right to go into court if it feels that its rights

9          have been violated by virtue of the breach of the

10         supply and development agreements, do you?

11            MR. MEO: Objection to form.

12   A.    No, of course not.

13   Q.    Okay.  Now, the last bit of this paragraph:

14         "Separately I have discussed with John Goggin".  Who

15         is John Goggin?

16   A.    John is a product manager, brand manager, for

17         Syngenta Crop Protection.

18   Q.    Okay.  So you've discussed with the brand manager for

19         Syngenta Crop Protection "what we might do with prime

20         plus flumetralin pricing in the market to help them

21         regret the decision to enter with added benefit of

22         collateral damage on butralin which Uniroyal sources

23         from Nufarm". Collateral damage is a military term,

24         isn't it?

25   A.    It's also a term used routinely in business, as are a