1    itself somewhere else?

2        A.    No.

3        Q.    Never internally discussed that?

4        A.    Repeat your question.  The first question.

5        Q.    Did --

6               MR. CORCORAN:  Can that be read back,

7         please.  So there's question, answer and then

8         subsequent question.

9               (Whereupon the record was read by the

10        Court Reporter.)

11              MR. CORCORAN:  That's not a really very

12        carefully put question.  If you're asking the

13        witness does she recall whether or not that

14        was ever discussed internally, she can answer

15        that question.

16              THE WITNESS:  I need clarification

17        because we flipped from 1995, a question that

18        was specific to 1995 to something other than

19        that.

20              MR. CORCORAN:  To ever.

21              THE WITNESS:  So I'm confused.

22              MR. CORCORAN:  You changed the time

23        frame.

24              MR. RUSKIN:  I just feel that you're

25        interrupting with my questions and you're

1            giving her coaching and I think it's

2            improper.

3                    MR. CORCORAN:   That's not intended and

4            if that's the impression I'm giving, I

5            apologize.

6                    MR. RUSKIN:   That's what I'm getting.

7                    MR. CORCORAN:   Absolutely not.

8     BY MR. RUSKIN:

9         Q.   Let's start with 2000.

10            In 2000, when you were getting -- hearing

11    in the marketplace that there might be a Zeneca

12    merger with Novartis, did the company internally

13    discuss coming out with a generic product?

14        A.   We discussed coming out with a generic

15    product in and around that time frame, not

16    necessarily related to the Zeneca/Novartis merger.

17    It was more closely related to signals we were

18    clearly getting from within Zeneca.

19        Q.   From Zeneca, not from any potential

20    Novartis merger?

21        A.   It happened around the time frame.  It

22    never occurred to me that it was specifically due

23    to the merger at that point in time.

24        Q.   What were the signals you were getting from

25    Zeneca?

1                    CERTIFICATE

2            I hereby certify that I am a Notary

3    Public, in and for the State of Connecticut, duly

4    commissioned and qualified to administer oaths.

5            I further certify that the deponent

6    named in the foregoing deposition was by me duly

7    sworn, and thereupon testified as appears in the

8    foregoing deposition; that said deposition was

9    taken by me stenographically in the presence of

10   counsel and reduced to typewriting under my

11   direction, and the foregoing is a true and accurate

12   transcript of the testimony.

13           I further certify that I am neither of

14   counsel nor attorney to either of the parties to

15   said suit, nor am I an employee of either party to

16   said suit, nor of either counsel in said suit, nor

17   am I interested in the outcome of said cause.

18           Witness my hand and seal as Notary

19   Public this 15th of January, 2004.

20

21           Melissa J. Kelly

22           Melissa J. Kelly, RPR, CRR

23           Licensed Shorthand Reporter #00307

24

25   My Commission expires:  September 30, 2008

Exhibit C

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-----------------------------X

UNIROYAL CHEMICAL COMPANY,   :
INC. d/b/a CROMPTON
MANUFACTURING COMPANY        :

          Plaintiff,   :

     VS.                    :   NO. 3:02CV02253 (AHN)

SYNGENTA CROP PROTECTION,    :
INC.
                    :

         Defendant.

-----------------------------X     **ORIGINAL**


D E P O S I T I O N


      THE DEPOSITION OF ALFRED F. INGULLI,
taken on behalf of the Defendant, before Kevin
Lombino, Registered Professional Reporter,
Notary Public within the State of Connecticut
License Number 191, on the 14th day of April,
2004, at 10:00 a.m., at the offices of Shipman &
Goodwin LLP, 300 Atlantic Street, Stamford,
Connecticut.


GOLDFARB AND AJELLO (203) 972-8320

177

1  BY MR. MEO:

2      Q.   Mr. Ingulli, is one the purposes of this lawsuit

3  to limit how Syngenta may label its Bonzi product?

4              MR. CORCORAN:  Objection to the form of the

5              question.  The relief which is -- that's a legal

6              question which relates to the relief, I think,

7              what you are seeking, which is really something

8              Mr. Ingulli may not be familiar with.

9              MR. MEO:  He may not.  I think it's fair to

10             ask Mr. Ingulli what UniRoyal's goals are in

11             this lawsuit separate and apart from whatever

12             relief it may be seeking from that legal

13             perspective.

14     Q.   So I pose the question.

15             MR. CORCORAN:  You may answer it if you can.

16     A.   We have two objectives.  One is either to be

17  compensated for what we perceived as a violation of the

18  development agreement by Syngenta, or absent that return

19  of Bonzi to us under the terms and conditions that allow

20  us to re-enter the market in a competitive way.

21     Q.   Have you discussed with anyone, other than your

22  attorneys, UniRoyal's goals in bringing this lawsuit that

23  you just articulated to me?

24     A.   With Laurie Treu I have.

25     Q.   Anybody else?

GOLDFARB AND AJELLO (203) 972-8320

178

1    A.   No, with Laurie Treu.

2    Q.   Have you discussed it with Kevin Donovan?

3    A.   No.

4    Q.   Can you describe the conversations you have had

5    with Laurie Treu about that subject?

6    A.   They were exactly what I stated to you, that our

7    objective is to either get compensated for appropriation

8    of our property by Syngenta or to get the product back,

9    which is the nature of the conversation.

10    Q.   If Syngenta were limited in how it could label

11    its Bonzi product, that would decrease Syngenta's sales

12    of Bonzi; wouldn't it?

13    A.   Yes, it would.

14    Q.   If Syngenta were limited in how it could label

15    its Bonzi product, that would enhance the sales of

16    Bonzi's competitors; wouldn't it?

17    A.   It's reasonable to make that assumption.

18         MR. MEO:  Mark this attorney's eyes only.

19         (Continued on the next page to the

20         attorney's eyes only portion of the transcript.)

21

22

23

24

25

179

1            FOR ATTORNEY'S EYES ONLY

2

3

4

5                    **REDACTED**

6

7

8

9       MR. MEO:  Back on, remove the designation.

10      (End of highly confidential portion of the

11   transcript.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GOLDFARB AND AJELLO (203) 972-8320

196

1  STATE OF CONNECTICUT   )

2                         )   ss:   WALLINGFORD

3  COUNTY OF NEW HAVEN    )

4

5          I, Kevin Lombino, a Registered Professional

6  Reporter and Notary Public within and for the State of

7  Connecticut, do hereby certify that the within deposition

8  of ALFRED F. INGULLI was held before me on the 14th day

9  of April, 2004.

10          I further certify that the witness was first

11 sworn by me to tell the truth, the whole truth and

12 nothing but the truth, and was examined by counsel, and

13 his testimony was recorded stenographically by me, it was

14 reduced to typewriting under my supervision, and I hereby

15 submit that the within contents of said deposition are

16 true and accurate to the best of my ability.

17          I further certify that I am not a relative of

18 nor an attorney for any of the parties connected with the

19 aforesaid examination, nor otherwise interested in the

20 testimony of the witness.

21          Dated at Wallingford, Connecticut, the 4th day

22 of May, 2004.

23          _____
           Kevin Lombino    License#LSR00191
24

25 (My commission expires October 31, 2007.)

**GOLDFARB AND AJELLO (203) 972-8320**

Exhibit D

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------X

UNIROYAL CHEMICAL COMPANY,   :
INC. d/b/a CROMPTON
MANUFACTURING COMPANY        :

            Plaintiff,  :

      VS.                     :   NO. 3:02CV02253 (AHN)

SYNGENTA CROP PROTECTION,     :
INC.
                             :
            Defendant.

----------------------------X          **ORIGINAL**


D E P O S I T I O N


        THE DEPOSITION OF ALFRED F. INGULLI,

taken on behalf of the Defendant, before Kevin

Lombino, Registered Professional Reporter,

Notary Public within the State of Connecticut

License Number 191, on the 14th day of April,

2004, at 10:00 a.m., at the offices of Shipman &

Goodwin LLP, 300 Atlantic Street, Stamford,

Connecticut.


**GOLDFARB AND AJELLO** (203) 972-8320

62

1      Q.   So you don't believe that that sentence pertains

2   to new uses developed by UniRoyal for Bonzi?

3            MR. CORCORAN:   Objection to the form of the

4            question.

5      A.   It specifically says "new use or formulation."

6   However, in the agricultural chemical business, it takes

7   a substantial amount of time to get a new use or

8   formulation registered with the EPA, and the concept here

9   is that the clock would start running for five years

10  after the registration was secured to reflect the fact

11  that it might take two, three, four years to get a

12  registration.

13     Q.   When you say the clock would start running, what

14  clock are you referring to, the clock with respect to

15  what?

16     A.   On the five years' supply of Bonzi for the new

17  use or formulation.

18     Q.   Now, the first sentence of Paragraph 4 says,

19  "For each new use or formulation developed by UniRoyal

20  for use in the development field, ICIA will grant to

21  UniRoyal marketing and sales rights as defined in Section

22  1.2 of the Bonzi chemical supply agreement."

23           Now, the next sentence that we have been talking

24  about, which says "Said marketing and sales rights shall

25  be granted for five years from date of registration,"

63

1    what is your understanding as to what marketing and sales

2    rights are being referred to in this second sentence of

3    Paragraph 4?

4                    MR. CORCORAN:  Objection to the form of the

5            question.

6        A.    Marketing and sales rights in the development

7    field.

8        Q.    That are developed by UniRoyal, correct?

9        A.    That's correct.

10        Q.    Aren't the marketing and sales rights that are

11    referred to in the second sentence of Paragraph 4 the

12    very same marketing and sales rights that are being

13    referred to in the third sentence of Paragraph 4?

14                    MR. CORCORAN:  Objection the form of the

15            question.  You are arguing with the witness.

16        A.    Please ask the question again.

17                    MR. MEO:  Can you read it back.

18            (The question was read.)

19        A.    I would say yes.

20        Q.    Those marketing and sales rights are rights with

21    respect to new uses and formulation developed by UniRoyal

22    for use in the development field, right?

23        A.    Yes.

24        Q.    Now, if you turn to the next page of the

25    development agreement, Paragraph 8, the second sentence

196

1  STATE OF CONNECTICUT  )

2                       )   ss:   WALLINGFORD

3  COUNTY OF NEW HAVEN   )

4

5        I, Kevin Lombino, a Registered Professional

6  Reporter and Notary Public within and for the State of

7  Connecticut, do hereby certify that the within deposition

8  of ALFRED F. INGULLI was held before me on the 14th day

9  of April, 2004.

10       I further certify that the witness was first

11  sworn by me to tell the truth, the whole truth and

12  nothing but the truth, and was examined by counsel, and

13  his testimony was recorded stenographically by me, it was

14  reduced to typewriting under my supervision, and I hereby

15  submit that the within contents of said deposition are

16  true and accurate to the best of my ability.

17       I further certify that I am not a relative of

18  nor an attorney for any of the parties connected with the

19  aforesaid examination, nor otherwise interested in the

20  testimony of the witness.

21       Dated at Wallingford, Connecticut, the 4th day

22  of May, 2004.

23       _____
         Kevin Lombino  License#LSR00191
24

25  (My commission expires October 31, 2007.)

GOLDFARB AND AJELLO (203) 972-8320

Exhibit E

Uniroyal Chemical v. Syngenta Crop

May 14, 2004                                          Kevin Donovan

Page 1

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
 2

      CASE No. 3:02 CV 02253
 3    - - - - - - - - - - - - - - - - -X
 4    UNIROYAL CHEMICAL COMPANY, INC.
 5    d/b/a CROMPTON MANUFACTURING
      COMPANY, et al.,
 6
                       Plaintiffs,
 7
                 vs.
 8
      SYNGENTA CROP PROTECTION,
 9    INC., et al.
10                     Defendants.
      - - - - - - - - - - - - - - -X
11
12
13
14             D E P O S I T I O N
15        The deposition of KEVIN DONOVAN was taken pursuant
16    to Notice at the law offices of Shipman & Goodwin, LLP,
17    300 Atlantic Street, Stamford, Connecticut, before
18    Viktoria V. Stockmal, License #00251, a Notary Public in
19    and for the State of Connecticut, on Friday, May 14, 2004
20    at 10:01 a.m.
21
22
23
24
25
```

ORIGINAL

Uniroyal Chemical v. Syngenta Crop

May 14, 2004                                                    Kevin Donovan

Page 43

1    rights shall be granted for five years from the date of

2    registration of any new use or formulation?

3                      MR. CORCORAN:  Can that question be

4    read back, please?

5                             (Whereby, the pertinent question was

6               read.)

7    BY THE WITNESS:

8         A      No.

9         Q      So you don't have any understanding of what

10   the five years clause refers to?

11                     MR. CORCORAN:  Asked and answered.

12   BY THE WITNESS:

13        A      No.

14        Q      Is it your understanding, from reading the

15   development agreement and reading the chemical supply

16   agreement, that whatever rights Uniroyal may have as a

17   result of developing new uses, that those rights are

18   limited to those uses and use sites specifically

19   delineated in Section 1.2 of the supply agreement?

20                     MR. CORCORAN:  Same objection.

21   BY THE WITNESS:

22        A      Could you repeat the question?

23                             (Whereby, the pertinent question was

24               read.)

25   BY THE WITNESS:

Uniroyal Chemical v. Syngenta Crop

May 14, 2004                                          Kevin Donovan

Page 44

1      A      Yes.

2      Q      So am I correct that this agreement of the

3   development agreement in paragraph four does not give

4   Uniroyal any rights for developing new uses for

5   ornamentals?

6                    MR. CORCORAN:  Objection to the form

7   of the question.

8   BY THE WITNESS:

9      A      I didn't understand it.  Could you repeat

10  it?

11     Q      Well let me withdraw it and let me rephrase

12  it.

13        The uses and use sites discussed in Section

14  1.2 of the supply agreement do not include perennials?

15                    MR. CORCORAN:  Can that be read back,

16  please.

17                         (Whereby, the pertinent question was

18            read.)

19                    MR. CORCORAN:  Objection to the form

20  of the question.

21  BY THE WITNESS:

22     A      That would be your opinion.

23     Q      Well are perennials included within the

24  ambient of those use and use sites?

25     A      Yes.

1                         CERTIFICATE

2
STATE OF CONNECTICUT  )
3                         )     SS    NEWTOWN
COUNTY OF FAIRFIELD   )
4

5

6
        I, VIKTORIA V. STOCKMAL, a Notary Public duly
7  commissioned and qualified in and for the county of New
   Haven, State of Connecticut, do hereby certify that
8  pursuant to the notice of deposition, the said witness
   came before me at the aforementioned time and place and
9  was duly sworn by me to testify to the truth and nothing
   but the truth of his/her knowledge touching and
10 concerning the matters in controversy in this cause; and
   his/her testimony reduced to writing under my
11 supervision; and that the deposition is a true record of
   the testimony given by the witness.
12
        I further certify that I am neither attorney of
13 nor counsel for, nor related to or employed by any of the
   parties to the action in which this deposition is taken,
14 and further that I am not a relative or employee of any
   attorney or counsel employed by the parties thereto, or
15 financially interested in the action.

16         IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my notarial seal this ___25___ day of
17 ___May___, 2004.

18

19         ___Viktoria V. Stockmal___
           VIKTORIA V. STOCKMAL, RMR, CRR
20                 Notary Public
               CSR License #00251
21
   My commission expires October, 2005.
22

23

24

25

Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

UNIROYAL CHEMICAL COMPANY, INC.,  )
d/b/a CROMPTON MANUFACTURING       )
COMPANY,                           )
                                   )
                Plaintiff,         )    Civil Action No.
                                   )    3:02cv02253(AHN)
        vs.                        )
                                   )
SYNGENTA CROP PROTECTION, INC.,    )
                                   )
                Defendant.         )
_____   )

VIDEO DEPOSITION

OF

CHARLES BUFFINGTON

Wednesday, September 15, 2004
At Greensboro, North Carolina
Reporter:  Mildred P. Jones, CVR



WESTMORELAND REPORTING, INC.

704-892-8172
Post Office Box 489
Cornelius, North Carolina  28031

WestmorelandReporting.com

704-333-3831
Post Office Box 32243
Charlotte, North Carolina  28232

MR. BUFFINGTON                                                    120

1   A.   We did not roll the label back ten years.

2   Q.   Right.

3              MR. CORCORAN:   Was that --

4              THE REPORTER:   This will be Number 8.   Pardon

5              me?

6              MR. CORCORAN:   That's 8?

7              THE REPORTER:   This is Number 8.

8              MR. CORCORAN:   Okay.

9              (WHEREUPON, Plaintiff's Exhibit Number 8

10             was marked for identification.)

11  A.   (Witness peruses document.)

12  Q.   You don't need to read all ten pages, Mr. Buffington,

13       unless you feel that you need to in order to answer my

14       questions.

15             My first question is going to relate to Paragraph

16       16, which is on --

17  A.   28?

18  Q.   -- Page 28.   Right.

19             Have you had a chance to read that?

20  A.   Yes.

21  Q.   All right.   The paragraph says, quote, beginning no

22       later than early 2002, while the Supply Agreement was

23       still in effect and Uniroyal was still the exclusive

24       marketer and seller of Bonzi, Uniroyal began exploring

25       whether to market its own generic paclobutrazol product

MR. BUFFINGTON                                                  121

1          to introduce into the PGR market for purposes of -- for

2          the purpose of competing with Bonzi.  Uniroyal gave no

3          notice to Syngenta that it was taking this action,

4          unquote.

5               That's not true, is it?

6     A.   That is true.

7     Q.   All right.  Haven't we just looked at some memos,

8          including a memo from Mr. Dickinson which we marked this

9          morning in which Mr. Dickinson said, if we take back

10         Bonzi, you can count on Uniroyal introducing its own

11         generic paclobutrazol?

12    A.   That was our anticipation, yes.

13    Q.   Right.  And in fact Uniroyal told this to Syngenta

14         during the course of the discussions, did they not?

15    A.   The disconnect I think here is that, while in June they

16         specifically spoke to the availability of paclobutrazol

17         globally, that they could access that, is earlier in

18         2002 they were actively engaged in discussions, both

19         internally and with some outside Uniroyal people, about

20         the opportunity to bring generic paclo into the

21         marketplace.

22    Q.   Is there anything in the agreement between the parties

23         -- either of the agreements between the parties which,

24         in your opinion, would forbid Uniroyal from exploring

25         this possibility?



MR. BUFFINGTON                                              122

1  A.  Either the supply or development agreement most likely

2      draws into an exclusive purchasing from Syngenta.

3  Q.  I don't think your answer is responsive to my question.

4          MR. MEO:  Well, I object.  I think it's very

5          responsive to your question.

6          MR. CORCORAN:  I don't think it is.

7              Let's have it read back.

8          (WHEREUPON, the answer was read back, as

9          requested.)

10 Q.  Can you find anything in the agreement which forbids

11     Uniroyal from exploring the possibility of marketing

12     paclobutrazol?

13         MR. MEO:  Objection.  Asked and answered.

14             You can answer.

15 A.  Section 1.1 of the chemical supply agreement states ICI

16     agrees to sell and deliver exclusively to Uniroyal, and

17     Uniroyal agrees to purchase and receive ICI product

18     exclusively from ICIA in sufficient quantities to

19     satisfy 100 percent of Uniroyal's requirements of the

20     ICIA product according to the sales target forecast.

21 Q.  Do you understand the difference between buying

22     something and exploring the possibility of marketing

23     something?

24 A.  Yes.

25 Q.  Okay.  Did Uniroyal ever purchase generic paclobutrazol



MR. BUFFINGTON                                     123

1      before Syngenta terminated its supply of Bonzi?

2              MR. MEO:  Objection to form.

3  A.   My understanding from outside sources is that Uniroyal

4      had generic product in testing in early 2002.  I do not

5      know if they purchased it, but they would have had to

6      import it into the United States.

7  Q.   So the answer is you do not know --

8              MR. MEO:  Objection to form.

9  Q.   -- that Uniroyal has ever purchased generic

10     paclobutrazol prior to December 31, two thousand --

11 A.   If you import it into the United States, I would assume

12     you purchased it.  It may have been given to them by a

13     generic supplier.

14 Q.   So you don't know?

15 A.   My sources say that they did.

16 Q.   Who are your sources?

17 A.   So --

18 Q.   Who are your sources?

19 A.   So what we had picked up in the field from a university

20     person and a former employee of Uniroyal.

21 Q.   All right.  So your sources are a university person and

22     a former employee of Uniroyal?

23 A.   Uh-huh (yes).

24 Q.   You have to say yes.

25 A.   Yes.



MR. BUFFINGTON                                          124

1    Q.   Okay.  Who was the university person?

2    A.   Jim Barrett.

3    Q.   Okay.  And when did you have your conversation with Mr.

4         Barrett?

5    A.   I don't know.

6    Q.   It was a conversation you personally had?

7    A.   Yes.

8    Q.   Was it in 2005?

9    A.   I do not --

10   Q.   I'm sorry.  2004?

11        Unlikely.  2004?

12   A.   I can't recall the exact date, but it was probably 2003,

13        2004.

14   Q.   Okay.  And what were the circumstances of the

15        conversation?  Who called who?

16   A.   I don't -- I don't recall the circumstances.

17   Q.   How many conversations have you had with Mr. Barrett

18        during the last two years?

19   A.   I don't -- seven, approximately.

20   Q.   How many of them have dealt with Uniroyal?

21   A.   One to two.

22   Q.   And what was discussed during those one or two

23        conversations between you and Mr. Barrett regarding

24        Uniroyal?

25   A.   The one or two conversations that I had was not -- was



MR. BUFFINGTON                                                    125

1       not specifically focused on Uniroyal.  It was around

2       development of Bonzi with him -- with us and

3       opportunities, and the conversation of the testing I

4       believe was casual.  We did not go into it, and I don't

5       remember the details of it.

6            MR. CORCORAN:  Can that be read back, please.

7            (WHEREUPON, the answer was read back, as

8            requested.)

9   Q.   When you say it was around the development of Bonzi with

10       us and opportunities, you mean opportunities for Mr.

11       Barrett to work for Syngenta in connection with the

12       development of this product?

13  A.   It was regarding Jim's work with Bonzi on ornamental

14       plants.

15  Q.   Did you ask him some questions?

16  A.   I -- I don't recall the conversation directly.  I just

17       remember the gist of the conversation of --

18  Q.   What was the gist of the conversation?

19  A.   Is that Uniroyal was testing generic paclobutrazol.

20  Q.   All right.  And that was sometime in 2003 or 2004?

21  A.   Yes.

22  Q.   Okay.  And that's the basis on which you have testified

23       that the allegations in Paragraph 16 are true?

24            MR. MEO:  Objection to form.

25  Q.   That you learned from other sources that Uniroyal was



MR. BUFFINGTON                                              126

1      testing generic paclobutrazol?

2  A.  To the best of my knowledge, based on my -- what I had

3      picked up in the marketplace, is I believe 16 to be

4      true.

5  Q.  Okay.  Are you backing off of your prior testimony that

6      that was based on a conversation you had had with

7      someone from the university, who is Mr. Barrett, which

8      you have just summarized for us or not?

9  A.  I'm not backing off.  I am saying that, based on what my

10     memory is --

11 Q.  Okay.

12 A.  -- is that it was based on some hearsay in the --

13 Q.  Fine.

14 A.  -- marketplace.

15 Q.  And you are testifying that the conversation with Mr.

16     Barrett was in 2003 or 2004; correct?

17 A.  Correct.

18 Q.  And the discussion about testing was casual, you said;

19     correct?

20 A.  Yes.

21 Q.  All right.

22 A.  He didn't say he was personally testing it.  He said,

23     "You are aware Uniroyal is testing a" --

24 Q.  Is?

25 A.  Yes.



WESTMORELAND    WW    REPORTING, INC.

MR. BUFFINGTON                                                127

1   Q.   All right.  So at some point in 2003, 2004 -- or 2004,

2        Mr. Barrett said, "Are you aware that Uniroyal is

3        testing generic paclobutrazol?"

4             He never told you that this happened beginning no

5        later than early 2002?

6   A.   I don't recall the time line.

7   Q.   Well, you just told me the time line.

8   A.   I believe, based on our conversation, that he was

9        speaking towards early 2002, yes.

10  Q.   That's not what you said a minute ago.

11            MR. MEO:   Objection to form.

12  Q.   Let's have the testimony read back, and let's see which

13       one is correct and true.

14            (WHEREUPON, the answer was read back, as

15            requested.)

16  Q.   Okay.  So he told you beginning no later than early

17       2002?

18  A.   That's my best recollection.

19  Q.   Okay.  So was this paragraph drafted based on your

20       conversation with Mr. Barrett?

21            MR. MEO:   Objection to form.

22  A.   I certainly had input.

23  Q.   Okay.

24  A.   And reviewed it.

25  Q.   Are you aware of any facts to support the allegation


WESTMORELAND  WW  REPORTING, INC.

MR. BUFFINGTON                                                     128

1      that the purpose of Uniroyal's alleged exploration of

2      whether to market its own generic paclobutrazol was in

3      order to compete with Bonzi?

4  A.  My assumption is, if they brought a generic to

5      marketplace, is they would compete with Bonzi in the

6      marketplace.

7  Q.  Wouldn't they be competing with themselves?

8  A.  No.

9  Q.  Why not?

10 A.  Because they do not own the brand name Bonzi.

11 Q.  But they had an exclusive right to market and to sell

12     it?

13 A.  We anticipated that they would cancel -- terminate the

14     agreement.

15 Q.  And was it your -- when did you anticipate that Uniroyal

16     would cancel or terminate the agreement?  In 2002?

17 A.  No.  We weren't sure of their time line, but we

18     anticipated, based on their actions, is that they would

19     -- that they were trying to register a generic.  And

20     once they got close to registration, is they would

21     terminate the contract.

22 Q.  Okay.  Did you -- did you advise Uniroyal of this when

23     Ms. Treu came to meet with you and give her

24     presentations?

25          Did you tell her, "We don't think you are sincere,



WESTMORELAND    W    REPORTING, INC.