UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNIROYAL CHEMICAL COMPANY, INC., d/b/a CROMPTON MANUFACTURING COMPANY | : : : | |
| | : | Civil Action No. |
| Plaintiff, | : | 3:02cv02253 (AHN) |
| | : | |
| v. | : | |
| | : | |
| SYNGENTA CROP PROTECTION, INC. | : | |
| | : | |
| Defendant. | : | June 27, 2005 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.    Introduction and Summary of Argument**

Pursuant to Fed.R.Civ.P. 56(c) and D.Conn.L.Civ.R 56(a)(2), the Plaintiff, Uniroyal Chemical Company, Inc., d/b/a Crompton Manufacturing Company ("Uniroyal") submits this Memorandum in Opposition to the Defendant Syngenta Crop Protection, Inc.'s ("Syngenta") Motion for Summary Judgment.

Uniroyal's Amended Complaint ("Complaint") alleges causes of action based on breach of contract, conversion, breach of the covenant of good faith and fair dealing, promissory estoppel, unjust enrichment and Connecticut's Unfair Trade Practices Act, Connecticut General Statutes § 42-110b, ("CUTPA"). The central issue in this case is the scope and extent of certain rights conveyed by Syngenta's predecessor ICI Americas ("ICI" or "ICIA") to Uniroyal pursuant to two contracts entered into between the parties on January 29, 1991.

CARMODY & TORRANCE LLP     195 Church Street
Attorneys at Law                   Post Office Box 1950
{N0733373;2}                        New Haven, CT 06509-1950
                                          Telephone: 203 777-5501

Syngenta argues that it is entitled to summary judgment as a matter of fact and law on all counts of the Complaint because these contracts were either properly terminated or expired by their own terms. Syngenta Mem. at p.1. The Defendant makes the further claim that it is entitled to summary judgment because "any residual rights Uniroyal may have been granted under those agreements have expired." Id., at pp. 1-2. However, the contracts at issue clearly and unambiguously provide that certain rights of Uniroyal under these contracts *do not and cannot* expire, and the Defendant's Motion for Summary Judgment should therefore be denied in its entirety.

In the event that the Court finds that the contracts are not clear on their face, and are open to more than one reasonable interpretation, the Plaintiff submits that extrinsic evidence must be considered in order to determine the intent of the parties. In such a case, as any ambiguity or ambiguities would necessarily give rise to genuine issues of fact regarding the scope of the rights granted to Uniroyal under the contracts, the Defendant's Motion for Summary Judgment must be denied.

Finally, because Uniroyal is not claiming rights which are beyond the scope of the rights conferred by the contracts at issue, Syngenta is not entitled to partial summary judgment, and its motion should be denied.

1.    **The parties and their contracts**

Uniroyal is a corporation based in Middlebury, Connecticut, engaged for many years in the distribution, manufacture and sale of chemical products. Complaint, Par. 7. Syngenta manufactures and sells chemicals used in the growing and care of plants. Id., Par. 8. Syngenta is the world's largest agricultural chemical company, with offices in

CARMODY & TORRANCE LLP    195 Church Street
Attorneys at Law              Post Office Box 1950
{N0733373;2}                  New Haven, CT 06509-1950
                              Telephone: 203 777-5501

2

over one hundred countries and over 18,000 employees worldwide. Deposition of Bernd Druebbisch, June 15, 2004, at pp. 21-22, Exhibit 1 to Corcoran Affidavit.[1]

In May of 1990 Uniroyal and Syngenta's predecessor ICI began to negotiate in earnest for Uniroyal's undertaking the exclusive development and distribution of paclobutrazol (trade name "Bonzi"), a product of ICI. These negotiations culminated on January 29, 1991 in the execution of two agreements: the Bonzi Chemical Supply Agreement ("Supply Agreement") and the Bonzi Development Agreement, ("Development Agreement") (collectively, "Agreements"). Supply Agreement attached as Exhibit 2 to Corcoran Aff.; Development Agreement attached as Exhibit 3 to Corcoran Aff. These Agreements are the focus of the present action.

### a.  The Supply Agreement

The Supply Agreement became effective the day it was executed, January 29, 1991 with an initial term ending December 31, 1996. With respect to the end date of that contract, Paragraph 2.1 provided, "Thereafter, this Agreement shall continue in full force and effect for successive annual terms unless terminated by either party in writing not less than 180 days before the termination date of the prior term."

The Supply Agreement provided for certain exclusive purchase and sales rights and obligations between ICI and Uniroyal, by which Uniroyal agreed to purchase annually certain designated minimum amounts. Supply Agreement, Par. 4.3. The Supply

---

[1] The affidavit of Charles F. Corcoran III, counsel for Uniroyal in this action, is attached hereto as Exhibit A.

CARMODY & TORRANCE LLP
Attorneys at Law
{N0733373;2}

195 Church Street
Post Office Box 1950
New Haven, CT 06509-1950
Telephone: 203 777-5501

3

Agreement also contained a "Target Forecast" number of gallons which exceeded the minimum requirements. Id.

In addition, ICI granted Uniroyal the exclusive right to sell Bonzi in a defined Marketing Area and the exclusive right to "develop, register, sell and market ICIA Product in the Marketing Area for use on woody ornamentals, shrubs, shade trees, ornamental fruit trees, interiorscapes and landscapes, excluding turf and commercial rights of way." Supply Agreement, Par. 1.2. During the life of the Agreements no other entity was given such rights. Hence, pursuant to the Supply and Development Agreements, Bonzi became exclusively Uniroyal's for purposes of development, marketing and sales for use on ornamentals. Supply Agreement, Par. 1.1; Development Agreement, Par. 2.

The Supply Agreement also provided that in the event that Uniroyal failed to purchase the yearly minimum requirement, ICI could, at its option, either terminate the Supply Agreement or convert it into a non-exclusive agreement and terminate the Development Agreement. Supply Agreement, Par. 6.1.

In addition to the minimum and target purchase requirements, Paragraph 1.1 of the Supply Agreement obligated Uniroyal to spend $36,000 during 1991 and $72,000 per year during the    five-year initial term of the Supply Agreement, for a total of $396,000.00, to "commercially promote the sale of Bonzi." Supply Agreement, Par. 1.1.

In a vacuum, these numbers do not look extraordinary; but when compared against the lackluster gross sales of this product by Uniroyal's predecessor licensee

during the year immediately preceding the formation of the Agreements between Uniroyal and ICI, and then compared against the additional dollars which Uniroyal promised in the Development Agreement to expend in *developing* the product, as discussed below, they are extraordinary indeed: Uniroyal committed to spending in the advertising and promotion of Bonzi alone a sum far in excess of Bonzi's total prior annual gross sales. *See,* Exhibit 5 to Corcoran Aff. Uniroyal's extraordinary financial commitment to ICI contextualizes the Development Agreement's cession to Uniroyal of *perpetual* rights for new uses Uniroyal developed, as discussed below.

In addition to that financial commitment, and in exchange for those rights in perpetuity, Uniroyal made another, even more extraordinary concession: in the face of Bonzi's reputation as a potentially dangerous and destructive chemical, *(See,* remarks of Dr. James Barrett, Exhibit 10 to Corcoran Aff.; and Affidavit of Dr. James Barrett attached hereto as Exhibit C), Uniroyal agreed to a dramatic limitation of the liability of ICI against future claims.

There are only two Supply Agreement sections set out entirely in capital letters, and both sections severely limit ICI's liability in the event of future liability claims for Bonzi. After first warranting that it has legal title to paclobutrazol, that the product meets the chemical specifications set forth in the Agreement, and that the product will be produced in compliance with law, in Paragraph 8.1 of the Supply Agreement, ICI drastically limits its promises to Uniroyal, as the text of the Agreement moves from the lower case to run-on capital letters :

CARMODY & TORRANCE LLP    195 Church Street
Attorneys at Law          Post Office Box 1950
{N0733373;2}              New Haven, CT 06509-1950
                          Telephone: 203 777-5501

5

**ICIA MAKES NO OTHER REPRESENTATATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AS TO MERCHANTABIILITY, FITNESS FOR PARTICULAR PURPOSE, OR ANY OTHER MATTER WITH RESPECT TO THE ICIA PRODUCT.**

And Paragraph 8.4, on the same topic—ICI's liability—states, again, in running capitals,

**EXCEPT IN THE EVENT OF ICIA'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AND EXCEPT AS OTHERWISE PROVIDED IN SECTION X [PATENT INDEMNITY], UNIROYAL'S EXCLUSIVE REMEDY SHALL BE FOR DAMAGES AND ICIA'S LIABILITY FOR ANY AND ALL LOSSES OR DAMAGES RESULTING FROM ANY CAUSE WHATSOEVER, INCLUDING ALLEGED NEGLIGENCE (OTHER THAN GROSS NEGLIGENCE), SHALL IN NO EVENT EXCEED THE PURCHASE PRICE OF THE ICIA PRODUCT IN RESPECT TO WHICH THE CLAIM IS MADE.**

In exchange for this firewall against future liability claims promised by Uniroyal in Paragraphs 8.1 and 8.4 of the Supply Agreement, ICI gave Uniroyal perpetual rights to the new uses that it developed, as seen below in the text of the Development Agreement.

Through its efforts during the term of the Supply Agreement, Uniroyal dramatically increased the annual sales of Bonzi. *See,* deposition testimony of Keelan Pulliam, September 14, 2004 at p. 119, Exhibit 4 to Corcoran Aff; Chart of Bonzi historical sales, Exhibit 5 to Corcoran Aff. The Supply Agreement continued through the end of 2002. To capitalize on Uniroyal's success, Syngenta decided to take Bonzi in house, which it

had previously declined to do. Hence, on June 26, 2002 Syngenta informed Uniroyal that it was terminating the Supply Agreement effective December 31, 2002.[2]

### b. *The Development Agreement*

On the same day the Supply Agreement was executed, the parties also entered into the Development Agreement. The term of the Development Agreement was from January 1, 1991 until December 31, 1996. It granted to Uniroyal the "exclusive right to develop, register, market and sell new uses of Bonzi on woody ornamentals, shrubs, shade trees, ornamental fruit trees, interiorscapes and landscapes in the U.S. and its territories, excluding turf and commercial rights of way." Development Agreement, Par. 2.

Notably, the Development Agreement required Uniroyal to spend $40,000 in 1991 and $80,000 per year for each successive year of the Development Agreement term, a total of $440,000, to develop new uses of Bonzi. Development Agreement, Par. 3. Between the two Agreements then, in exchange for the concessions made by ICI, Uniroyal promised to spend $836,000 to develop and market Bonzi. Supply Agreement, Par. 1.1; Development Agreement, Par 3.

In exchange for these substantial financial commitments by Uniroyal and the drastic limitation of its liability, ICI granted to Uniroyal special rights in Paragraph 4 of the Development Agreement, which ICI's successor, Syngenta, now seeks to disavow:

---

[2] Although Syngenta's June 26, 2002 letter stated that the Supply Agreement would be terminated effective December 31, 2001, the parties understood the termination to take effect on December 31, 2002, in accordance with the 180-day notice provision in the Supply Agreement.

CARMODY & TORRANCE LLP    195 Church Street
Attorneys at Law                Post Office Box 1950
{N0733373;2}                    New Haven, CT 06509-1950
                                Telephone: 203 777-5501

> For each new use and formulation developed by Uniroyal for use in the Development Field, ICIA will grant to Uniroyal marketing and sales rights as defined in Section 1.2 of the Bonzi Chemical Supply Agreement. Said marketing and sales rights shall be granted for 5 years from the date of registration of any new use or formulation. ***Uniroyal shall retain all marketing and sales rights to any new use or formulation which it develops under this Agreement. This provision shall survive the termination of this Agreement provided termination is not the result of any breach by Uniroyal of this Agreement or the Supply Agreement.*** (Emphasis added).

Section 1.2 of the Supply Agreement grants further rights, as follows:

> Except for Product purchased by others from ICIA prior to January 1, 1991, Uniroyal shall have the exclusive right to sell ICIA Product for presently registered uses as determined by the current U.S. EPA approved label attached hereto as Exhibit B, in the U.S. and its territories (hereinafter "Marketing Area") on an exclusive basis and Uniroyal shall have the exclusive right to develop, register, sell and market ICIA product in the Marketing Area for use on woody ornamentals, shrubs, shade trees, ornamental fruit trees, interiorscapes and landscapes, excluding turf and commercial rights of way (hereinafter "Permitted Use"). Uniroyal shall also have the exclusive right to develop, register, sell and market new formulations of ICIA Product, such as spikes and granules, in The Marketing Area for the Permitted Use.

The language of Paragraph 4 of the Development Agreement is clear: it cedes to Uniroyal the rights to *all* new uses it develops in the development field, which articulates a broad catalogue encompassing the full spectrum of ornamental uses which were, in fact, ultimately developed by Uniroyal.

Because the only reasonable interpretation of the language of the Development Agreement is Uniroyal's, Syngenta's Motion for Summary Judgment should be denied in its entirety. However, if the Court finds that the language of Paragraph 4 is open to more than one reasonable interpretation, extrinsic evidence must be considered and the Defendant's motion must still be denied.

## II.    ARGUMENT

### A.    Legal Standard for Summary Judgment

Fed. R. Civ. P. 56(c) provides that summary judgments "shall be rendered forthwith, if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." An issue is "genuine" only if there is sufficient evidence upon which a reasonable jury could base a finding for the non-moving party, and a fact is "material" if a dispute about it might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, (1986).

A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The summary judgment standard "mirrors the standard for a directed verdict . . . which is that the trial judge must direct a verdict if under the governing law there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, 477 U.S. at 250. "In assessing the record, all ambiguities and reasonable inferences are viewed in a light most favorable to the nonmoving party." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), citing Anderson, supra, 477 U.S. at 250-51. "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id., citing United States v. Diebold, 369 U.S. 654, 655 (1962)(per curiam).

CARMODY & TORRANCE LLP
Attorneys at Law
{N0733373;2}

195 Church Street
Post Office Box 1950
New Haven, CT 06509-1950
Telephone: 203 777-5501

9

**B.    Syngenta's interpretation neglects to give effect to *all* provisions of the Development Agreement.**

It is among the most basic tenets of contract law that "Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning." Northwestern Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d 41, 43 (Del. Supr. 1995), *citing* Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1195 (Del. Supr. 1992).[3] Moreover, "In discerning the intent of the parties, the [contract] should be read as a whole and, if possible, interpreted to reconcile all of the provisions of the document." Kaiser Aluminum Corp. v. Matheson, 681 A.2d 392, 395 (Del. Supr. 1996), *citing* Warner Communications Inc. v. Chris-Craft Indus., Inc., 583 A.2d 962, 967 (Del. Ch.), *aff'd* 567 A.2d 419 (Del. Supr. 1989). "If no ambiguity is present, the Court must give effect to the clear language of the [contract]." Kaiser, 681 A.2d at 395, *citing* Johnston v. Tally Ho, Inc., 303 A.2d 677, 679 (Del. Super. 1989).

In its Memorandum in Support of its Motion for Summary Judgment, Syngenta argues that Paragraph 4 of the Development Agreement limits to five years Uniroyal's rights to the new uses for Bonzi which it developed. Syngenta Mem. at pp. 14-15. Syngenta bases this argument on the second sentence of Paragraph 4 of the Development Agreement, which provides that "Said marketing and sales rights shall be granted for 5 years from the date of registration of any new use or formulation." However, as indicated below, this reference does *not* signal the expiration of Uniroyal's rights; such a flawed

---

[3] Both the Supply and Development Agreements provide that they shall be governed by the laws of the state of Delaware. *See,* Supply Agreement, Par. 11.3 and Development Agreement, Par. 11.

interpretation of the contract between the parties would require this Court to disregard completely two additional provisions of the Development Agreement.

First, Syngenta's self-serving construction completely ignores the clear and unambiguous language contained in the immediately succeeding sentence:

> *"Uniroyal shall retain all marketing and sales rights to any new use or formulation which it develops under this Agreement."*

Development Agreement, Par. 4.  Had the parties intended to limit Uniroyal's rights to five years after the date of new registrations, there would have been no place for the foregoing sentence to have been included in the Development Agreement.

However, it is this sentence which Syngenta would have the Court either ignore or dismiss as "merely say[ing] that Uniroyal shall retain certain rights; not that it shall retain those rights forever."  Syngenta Mem. at p. 15.  As supposed evidence that those "certain rights" are not to be retained forever, Syngenta observes that this sentence has "*no temporal reference ... whatsoever,*" Id. (emphasis supplied).  This lack of any temporal limitation, however, is clear evidence that the rights granted were *not intended* to be subject to any time limit. In other words, this sentence evidences a grant of *perpetual* rights, not temporally limited rights.[4]

Second, the final sentence in Paragraph 4 of the Development Agreement states

*"This provision shall survive the termination of this Agreement ..."*

---

[4] Indeed, Syngenta's own witnesses and employees support this reading. *See, e.g.,* deposition testimony of Syngenta's Bernd Druebbisch:

Q.  Okay.  And then it says, "Uniroyal shall retain all marketing and sales rights to any new use or formulation which it develops under this agreement." Do you see that?
A.  I see that.
Q.  Okay.  What is your understanding of that term, retain?
A.  *To keep.*

(Emphasis added). Deposition of Bernd Druebbisch, June 15, 2004, at p. 54, Exhibit 1 to Corcoran Aff.

Despite the absence of any language in these two sentences placing any time restriction on Uniroyal's retained rights, Syngenta asserts that the final sentence in Paragraph 4, providing for the survival of the rights granted in Paragraph 4 beyond termination of the Development Agreement, "does not grant or even suggest the granting of perpetual rights." Syngenta Mem. at p 16. The obvious purpose of this clause, however, is to ensure that all of the rights granted to Uniroyal in the preceding sentence "shall survive" the termination of the Agreement, exactly as is stated.

Syngenta disingenuously and unpersuasively argues its case as if the language of the contract provided that Uniroyal's rights existed for "*only*" five years or were "*limited to*" five years. *But there is no such limiting language*; rather, that sentence is bracketed by language granting Uniroyal plenary and perpetual rights to the new uses it develops.

Hence, unlike Syngenta's argument, Uniroyal's explanation of the relationship among these three sentences in fact incorporates *all* of the language of Paragraph 4 of the Development Agreement: while the second sentence says that the rights "shall be granted for a period of five years following registration" the next two sentences confirm that at the expiration of five years, or following the termination of the Development or Supply Agreements, Uniroyal *retains* the rights to the uses it developed.

Because the Court is required to construe the Development Agreement in a way that gives meaning to *each* provision in Paragraph 4, and because the Defendant's argument would require the Court to read both the third and fourth sentences of Paragraph 4 entirely out of the contract *as if they had never been written*, the Defendant's interpretation of Paragraph 4 is entirely unreasonable and in direct conflict with

established rules of contract construction. *See,* <u>Kaiser</u>, *supra,* 681 A.2d at 395; <u>Sonitrol</u>

<u>Holding Co. v. Marceau Investissements</u>, 607 A.2d 1177, 1184 (Del. Supr. 1992)("The

cardinal rule of contract construction is that, where possible, a court should give effect to

*all* contract provisions." *citing,* <u>E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.</u>, 498

A.2d 1108, 1114 (Del. Supr. 1985)).

    The Defendant's argument also fails when Paragraph 4 of the Development

Agreement is read in conjunction with the Supply Agreement, executed on the same day,

and  referenced throughout the Development Agreement: as discussed above, the initial

term of the Supply Agreement expired on December 31, 1996 and, although it could be

extended for additional annual terms, Syngenta could also have terminated it at the end of

1996. Supply Agreement, Par. 2.1.  As set forth above, the combined terms of the

Agreements obligated Uniroyal to spend many hundreds of thousands of dollars to

develop and commercially promote Bonzi, *whether the Supply Agreement continued past*

*its original term or not.*

    Therefore, in order to protect the investment it had promised to make in Bonzi,

Uniroyal needed to be able to secure for at least five years its source of supply of Bonzi

in the event that Syngenta chose to terminate the Supply Agreement at the end of its

initial term.  If Uniroyal did not have at least the promise of this minimal protection, and

if Syngenta could simply terminate the Supply Agreement without consequence at the

end of 1996, Uniroyal would lose hundreds of thousands of promotional and research and

development dollars.

CARMODY & TORRANCE LLP     195 Church Street
Attorneys at Law     Post Office Box 1950
{N0733373;2}     New Haven, CT 06509-1950
Telephone: 203 777-5501

In summary, as Syngenta presents its case, the Court would have to focus myopically on one sentence in the Development Agreement and determine that, as a matter of law, that sentence means what Syngenta says that it means, notwithstanding the fact that such an interpretation would require the Court to completely ignore and discard entire portions of the Agreements preceding and succeeding this language, which refute Syngenta's claims.

Because the Court is required to construe the parties' Agreements to give effect to all the provisions therein, and because Syngenta's interpretation requires the Court to both completely disregard the final two sentences of Paragraph 4 of the Development Agreement, and to then *add* language that is nowhere contained in the Agreement, Syngenta is not entitled to judgment in its favor as a matter of law, and the Motion for Summary Judgment should be denied.

**C.    If the Court determines that Paragraph 4 of the Development Agreement is ambiguous, extrinsic evidence of the parties' intent must be considered and the Motion for Summary Judgment must be denied.**

A disagreement between the parties as to the meaning and interpretation of a contract does not automatically render the contract ambiguous. Northwestern Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d 41, 43 (Del Supr. 1995). Rather, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Id., *quoting* Rhone-Poulenc, *supra*, 616 A.2d at 1195. The Delaware Supreme Court has held, in this circumstance, that "the true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."

CARMODY & TORRANCE LLP
Attorneys at Law
{N0733373;2}

195 Church Street
Post Office Box 1950
New Haven, CT 06509-1950
Telephone: 203 777-5501

14

<u>Kaiser Aluminum Corp. v. Matheson</u>, 681 A.2d 392, 395 (Del. Supr. 1996), *citing*

<u>Rhone-Poulenc</u>, *supra,* 616 A.2d at 1196.

Although Uniroyal contends that the contract language is clear on its face, and that the only reasonable interpretation of the contract language as a whole is that offered by Uniroyal, in the event that the Court finds that the second and third sentences of Paragraph 4 of the Development Agreement create an ambiguity, extrinsic evidence should be considered to determine the intent of the parties, and as a matter of law summary judgment cannot enter in favor of Syngenta.[5]

Under such circumstances, extrinsic evidence must be considered to determine the parties' intent, and it is error for the court to refuse to admit or consider such evidence. <u>Eagle Industries v. DeVilbiss Health Care</u>, 702 A.2d 1228, 1233 (Del. Supr. 1997). The Court of Chancery in <u>Eagle Industries</u> determined that the contract at issue was unambiguous, failed to consider the extrinsic evidence presented, and granted summary judgment in favor of the plaintiff. The Delaware Supreme Court reversed: "It is a court's duty to preserve to the extent feasible the expectations that form the basis of a contractual relationship. When, as in the instant case, the meaning and application of contract terms are uncertain, a court fulfills this duty by considering extrinsic evidence." <u>Eagle Industries</u>, 702 A.2d at 1233-34. *See also,* <u>Interactive Corp. v. Vivendi Universal</u>, 2004

---

[5] The Delaware Supreme Court has also recognized certain situations where a court can properly consider extrinsic evidence, even absent a finding that the contract at issue is ambiguous. *See,* <u>Eagle Industries v. DeVilbiss Health Care</u>, 702 A.2d 1228, at note 7 (Del. Supr. 1997)("There may be occasions where it is appropriate for the trial court to consider some undisputed background facts to place the contractual provision in its historical setting without violating this principal …. [although] the trial court must be careful in entertaining background facts to avoid encroaching on the basic principles set forth herein.")

WL 1572932 *9 (Del.Ch.)(unpublished opinion)[6]("If the contract appears ambiguous, or 'fairly susceptible of different interpretations,' the court will consider extrinsic evidence, including evidence of intent, in order to uphold the 'reasonable shared expectations of the parties at the time of contracting.'" *quoting* Comrie v. Enterasys Networks, Inc., 837 A.2d 1, 13 (Del. Ch. 2003)).

Moreover, "when a contract is ambiguous, it raises '*factual issues* requiring consideration of extrinsic evidence to determine the intended meaning of the provision in light of the expectations of the contracting parties.'" In re Stone & Webster, Inc., 2005 WL 1036556 *6 (D.Del. 2005)(slip copy), *citing* Eagle Industries, *supra,* 702 A.2d at 1230. (Emphasis added.) In the event that a contract or provision thereof is found to be ambiguous, in that it is fairly open to more than one interpretation, summary judgment is inappropriate. *See, e.g.* Cendant Corp. v. Commonwealth Gen., 2002 WL 31112430, *6 (Del.Super.) (unpublished opinion)("Where more than one plausible construction of a contract exists or the contract is ambiguous because two or more provisions conflict, an issue of material fact arises and summary judgment must be denied."); Von Opel v. Youbet.com, Inc., 2000 WL 776898 *1 (Del. Ch.)(holding that "no party is entitled to summary judgment where the record is unclear about the parties' intent in preparing and signing an ambiguous release susceptible to two distinct and inconsistent meanings.") Bae Systems N. America Inc. v. Lockheed Martin Corp., 2004 WL 1739522, *5 (Del.Ch.)(unpublished opinion) (denying motion for partial judgment on the pleadings

---

[6] Copies of all unpublished opinions are attached hereto as Exhibit B.

CARMODY & TORRANCE LLP
Attorneys at Law
{N0733373;2}
195 Church Street
Post Office Box 1950
New Haven, CT 06509-1950
Telephone: 203 777-5501
16

where "the parties have set forth 'more than one plausible construction of'" the contract language.).

Uniroyal contends that the language of Paragraph 4 of the Development Agreement can reasonably and logically be read only in the manner hereinabove set forth by Uniroyal. However, in the event that the Court finds the language of the parties' contract to be ambiguous, then "the court is empowered to look to extrinsic evidence to determine the parties' reasonable intent at the time of the contract. ... The extrinsic evidence the court may consider includes 'overt statements and acts of the parties, the business [of the contract], prior dealings between the parties, business custom and usage in the industry." The Liquor Exchange, Inc. v. Tsaganos, 2004 WL 2694912 *2 (Del. Ch.)(unpublished opinion), *citing* Comrie v. Enterasys Networks, Inc., 837 A.2d 1, 13 (Del. Ch. 2003).

The types of extrinsic evidence necessary for the Court to make such factual determinations include evidence of Uniroyal's employees' oral and written statements regarding the parties' intent with respect to the rights retained by Uniroyal pursuant to the Development Agreement. *See, e.g.* deposition testimony by Laureen Treu, Vice President of Uniroyal's Specialty Agricultural Products Group:

> Q: How do you reconcile your statement about the third sentence of Paragraph 4 with the second sentence in Paragraph 4 which grants marketing and sales rights for five years from the date of registration?
>
> A: ... The sentence that refers to the five years... was an effort to, as I stated earlier, ensure we had a source of supply. *We were in a position to sell product for five years. The following says that any use that we developed, even if we no longer have a supply, we are the ones that can only sell on those uses, and market those uses. We may not have product to sell, but you can't do it either.*

CARMODY & TORRANCE LLP
Attorneys at Law
{N0733373;2}

195 Church Street
Post Office Box 1950
New Haven, CT 06509-1950
Telephone: 203 777-5501

17

Deposition of Laureen Treu, January 12, 2004 at pp. 97-98, Exhibit 6 to Corcoran Aff.

(Emphasis added).

Furthermore, Uniroyal's in house counsel Richard Weiss warned Syngenta after

receipt of Syngenta's termination letter:

> "…absent a breach by Uniroyal, it was to retain the benefits of its development efforts after the end of the Development Agreement. We believe that this interpretation is also fully supported by the provisions of the Bonzi Chemical Supply Agreement… that provided, in Section 6.1, the following remedy to ICI Americas Inc… in the event that Uniroyal failed to purchase and take delivery of the minimum quantities specified in the supply agreement:
>
> > 'In the event of such failure by Uniroyal for any reason (excluding any circumstances or contingency affecting Uniroyal under Section 9 hereof [force majeure]), all marketing rights to any Uniroyal developed new product uses and/or formulations shall revert exclusively to ICIA at no cost to ICIA…"
>
> Since a failure by Uniroyal to purchase the specified minimum quantities would, under such Section 6.1 [of the Supply Agreement], have allowed ICIA to terminate both the Supply Agreement and the Development Agreement, *this additional provision would have been unnecessary if such a termination of the Development Agreement could have cost Uniroyal its marketing rights. Similarly, the provisions of Paragraph 4 as to the survival of Uniroyal's exclusive marketing rights would have been unnecessary if Uniroyal had been looking solely to the marketing rights under the Supply Agreement to protect Uniroyal's interests after the term of the Development Agreement.*

Richard Weiss August 23, 2002 letter, Exhibit 7 to Corcoran Aff. (Emphasis added).

To understand properly the context in which Uniroyal and ICI were negotiating in

the Spring of 1990, it is important to understand that although Bonzi had been advertised

to potential distributors in the late 1980's as capable of controlling the growth of

ornamental plants, in 1990 it suffered from image problems in the marketplace and many

growers were reluctant to use it. *See,* remarks of Dr. James Barrett, Exhibit 10 to

Corcoran Aff.; Affidavit of Dr. James Barrett, attached hereto as Exhibit C. Bonzi's poor

CARMODY & TORRANCE LLP
Attorneys at Law
{N0733373;2}
195 Church Street
Post Office Box 1950
New Haven, CT 06509-1950
Telephone: 203 777-5501
18

reputation arose during the period of ICI's distributorship agreement with Uniroyal's immediate predecessor, Sandoz Corporation. Sandoz's tenure was marked by grower complaints, lawsuits for crop destruction and lackluster sales. Exhibit 10 to Corcoran Aff.

Soon after Uniroyal had signed on to develop and distribute this product, key employees attended a talk by a Florida academic who was familiar with the early history of paclobutrazol, Dr. James Barrett. Dr. Barrett was, and remains, a professor at the University of Florida at Gainesville. From the late 1970's he has done extensive work with plant growth regulating chemicals:

> ...I was involved pretty early... [with] the Sandoz folks when they got the rights to... Bonzi from ICI. ...I was involved in helping develop... that first label..., and [I was] also [involved] when they first started having problems. *That's a bad thing to say when you start talking about a chemical that you have, about the first thing that we saw were problems.* I was involved in doing some travelling across the country, evaluating why growers were having problems. ...*it is difficult to use.*

> *Now, the image problem.* ...when Bonzi first came out, it was labeled only for poinsettias.... The first problems we had [were] with poinsettias. Mistakes were made trying to handle Bonzi... *There was absolutely no information on the label about how to use Bonzi on bedding plants... all of [a] sudden there were all kinds of problems,* bedding plants were over-stunted, they weren't growing after they were replanted. *Landscapers were complaining saying they wouldn't take another Bonzi-treated impatiens from you. So they threw up their hands and didn't think they could use this stuff anymore....*

Remarks of Dr. James Barrett, Exhibit 10 to Corcoran Aff; Affidavit of Dr. James Barrett, attached hereto as Exhibit C. Emphasis added. Therefore, rather than take this volatile product in house, ICI agreed to incentivize Uniroyal to take on Bonzi by offering a highly attractive contractual arrangement which, if successful, would generate substantial profits for ICI; making very certain in the negotiation process to insulate itself from future potential liability associated with Bonzi.

CARMODY & TORRANCE LLP
Attorneys at Law
{N0733373;2}

195 Church Street
Post Office Box 1950
New Haven, CT 06509-1950
Telephone: 203 777-5501

19

Therefore, in the event that the Court concludes there is ambiguity in the Agreements at issue here, extrinsic evidence of the parties' intent must be considered, and the Defendant's Motion for Summary Judgment should, accordingly, be denied.

**D.**     <u>Because Uniroyal is not claiming rights to uses it developed that were beyond the scope of "Permitted Uses" under the Agreements, Syngenta is not entitled to partial summary judgment.</u>

Syngenta next argues that, in the event that the Court denies its motion with regard to the duration of the rights retained by Uniroyal pursuant to the Agreements, Syngenta is nevertheless entitled to partial summary judgment "limiting the scope of Uniroyal's claim to those 'new uses' which are specifically authorized by the Supply Agreement and the Development Agreement." Syngenta Mem. at pp. 17-18.

Specifically, Syngenta claims that "Uniroyal claims it retained marketing and sales rights to plants and product use sites that are nowhere discussed in [the Supply and Development] agreements." <u>Id.</u> at 18. This argument is premised on Syngenta's misreading of Paragraph 36 of the Complaint, which alleges that:

> The development agreement granted to plaintiff the exclusive right to 'develop, register market and sell Bonzi for new uses, in addition to the then current EPA registered uses: greenhouse flowers; said new uses were to include use on woody ornamentals, shrubs, shade trees, and interior and exterior landscapes in the U.S. and its territories, excluding turf and commercial rights of way.

Syngenta apparently claims that this paragraph in the Complaint indicates an improper attempt by Uniroyal to claim rights to uses (specifically, "greenhouse flowers") not contained anywhere in the parties' Agreements. Not only is this an incorrect reading of Paragraph 36 of the Complaint, it misconstrues the scope of the current rights retained by Uniroyal.

CARMODY & TORRANCE LLP
Attorneys at Law
{N0733373;2}

195 Church Street
Post Office Box 1950
New Haven, CT 06509-1950
Telephone: 203 777-5501

20

Although Uniroyal makes no claim in this litigation for rights to any uses it developed during the Development Agreement beyond those granted by that Agreement, Uniroyal contends that each and every use it did develop was within the parameters of the rights granted to it by the Agreements. *See,* Plaintiff's Supplemental Responses to Defendant's First Set of Interrogatories and Second Request for Production of Documents, attached to Local Rule 56(a)(2) Statement as Exhibit A. Indeed, Syngenta's own witnesses have agreed that the uses developed for ornamentals by Uniroyal fall squarely within the categories set forth in the definition of "Permitted Uses", which categories include "interiorscapes" and "landscapes". *See,* deposition testimony by Bernd Druebbisch:

> Q. What is an interiorscape, sir?
>
> A. My understanding is these are plants grown inside of larger buildings.
>
> Q. And can we agree that ornamentals are grown in interiorscapes, sir; yes or no?
>
> A. Ornamentals, yes.
>
> Q. Okay. And can we agree that ornamentals are used in exterior landscapes?
>
> A. Exterior, yes.
>
> Q. And can we agree that bedding plants are used in exterior landscapes?
>
> A. I think you would be able to grow them there, yes.

Deposition of Bernd Druebbisch, June 15, 2004, at pp. 52-53, Exhibit 1 to Corcoran Aff.

And again, deposition testimony by Syngenta's George Meyding:

> Q. And food crops are typically not grown in landscapes, correct?
>
> A. Not to my knowledge.

> Q.    Ornamentals are, correct?  Did you hear my question?
>
> A.    I'm sorry.
>
> Q.    Ornamentals are grown in interiorscapes, correct?
>
> A.    Yes.
>
> Q.    Okay.  And ornamentals are grown in landscapes, correct?
>
> A.    Yes.

Deposition of George Meyding, January 27, 2004, at p. 121, Exhibit 8 to Corcoran Aff.[7]

Because all of the uses developed by Uniroyal during the term of the Development Agreement fall within the scope of the rights granted to Uniroyal under the Development Agreement, Syngenta's Motion for Partial Summary Judgment must be denied.

Moreover, to the extent that Syngenta argues that Uniroyal is asserting rights to developed uses not within the scope of the Agreements, thus requiring the Court to make a determination as to whether certain uses developed by Uniroyal fall within the scope of the Agreements, multiple issues of material fact are created that would preclude granting Syngenta summary judgment.

---

[7] Former Uniroyal employee Thomas Harger also confirmed this at his deposition:

> Q.    Are there any instructions in the label for using the products, using the Bonzi product, in an interiorscape?
>
> A.    I don't think specifically to interiorscapes, but that -- that statement under general information says that *it can be used on ornamental plants grown in any of these areas* (emphasis added). Deposition of Thomas Harger, December 21, 2004, at p. 79, Exhibit 9 to Corcoran Aff.

E.    **Syngenta is not entitled to summary judgment on the remaining Counts of the Complaint.**

Finally, Syngenta argues at pp. 22-28 of its Memorandum that it is entitled to judgment as a matter of law on all remaining "non contractual" causes of action in the Complaint. Syngenta argues that

> each of Uniroyal's remaining causes of action – conversion, breach of the covenant of good faith and fair dealing, promissory estoppel, unjust enrichment and violation of CUTPA – also is based on the premise that Uniroyal continues to possess rights to market and sell 'new uses' of Bonzi that is developed during the term of the Development Agreement. As established above, that premise is false. Accordingly, Syngenta also is entitled to summary judgment on each of Uniroyal's remaining causes of action.

Syngenta Mem. at p. 22.

However, as discussed above, because the language of the Development Agreement clearly states that "Uniroyal shall retain all marketing and sales rights to any new use or formulation which it develops under this Agreement" and that "this provision shall survive the termination of this Agreement", Syngenta's claims fail as a matter of law. Plaintiff therefore submits that the Defendant is not entitled to summary judgment on any count of the Complaint and that its motion must therefore be denied in its entirety.

III.    **CONCLUSION**

There is one, and only one, reasonable and logical interpretation of the Agreements at issue: Uniroyal was granted rights in perpetuity to the new uses it developed during the term of the Development Agreement. Any other interpretation necessarily ignores certain language of the Agreements, and also adds other terms to those Agreements, where none now exist. Such exercises in sophistry violate basic and long established rules of contract interpretation. Nor is Syngenta is entitled to partial

summary judgment, as Uniroyal makes no claim here for rights to new uses outside the scope of the provisions of the Development Agreement.

Syngenta's motion should therefore be denied in its entirety.

Respectfully submitted,

THE PLAINTIFF
UNIROYAL CHEMICAL COMPANY,
INC. d/b/a CROMPTON
MANUFACTURING COMPANY

Charles F. Corcoran, III (ct04299)
Carmody & Torrance LLP
195 Church Street, P.O. Box 1950
New Haven, CT  06509-1950
Tel:  (203) 777-5501
Fax:  (203) 784-3199
E-mail: ccorcoran@carmodylaw.com
Its Attorneys

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, postage prepaid, on the above date, to:

William A. Ruskin
(Fed. Bar No. ct20898)
R. Michael Meo, Jr.
(Fed. Bar No. ct16318)
Shipman & Goodwin LLP
300 Atlantic Street
Stamford, CT  06901
Telephone: (203) 324-8100
Facsimile: (203) 324-8199
E-mail: wruskin@goodwin.com
E-mail: rmeo@goodwin.com

Paul D. Sanson (Fed. Bar No. ct05477)
Karen T. Staib (Fed. Bar No. ct21119)
Amy E. Souchuns (Fed.Bar No ct21223)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT  06103-1919
Telephone: (860) 251-5000
Facsimile: (860) 251-5600
E-mail: psanson@goodwin.com
E-mail: kstaib@goodwin.com
E-mail: asouchuns@goodwin.com

Charles F. Corcoran, III

CARMODY & TORRANCE LLP
Attorneys at Law
{N0733373;2}          195 Church  Street
Post Office Box 1950
New Haven, CT 06509-1950
Telephone: 203 777-5501          24