# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNIROYAL CHEMICAL COMPANY, INC., d/b/a CROMPTON MANUFACTURING COMPANY | : : : | |
| Plaintiff, | : | Civil Action No. 3:02cv02253 (AHN) |
| v. | : : | |
| SYNGENTA CROP PROTECTION, INC. | : : | |
| Defendant. | : | June 27, 2005 |

### AFFIDAVIT OF CHARLES F. CORCORAN III

CHARLES F. CORCORAN III, being duly sworn, deposes and states:

1.     I am over the age of eighteen and I understand the obligations of an oath.

2.     I am a partner in the law firm of Carmody & Torrance LLP, and counsel for the plaintiff, Uniroyal Chemical Company, Inc. d/b/a/ Crompton Manufacturing Company ("Uniroyal") in the above-captioned matter and am fully familiar with the facts and circumstances of this action and proceedings hereto, as more fully set forth herein.

3.     This affidavit is made in support of Uniroyal's Memorandum in Opposition to Syngenta's Motion for Summary Judgment dated May 5, 2005.

4.     This affidavit is made pursuant to Fed. R. Civ. P. 56(c) and 56(e).

5.     A true copy of relevant portions of the deposition testimony of Bernd Druebbisch, taken on June 15, 2004, is attached hereto as Exhibit 1.

6.     A true copy of the Bonzi Chemical Supply Agreement is attached hereto as Exhibit 2.

7.    A true copy of the Bonzi Development Agreement is attached hereto as Exhibit 3.

8.    A true copy of relevant portions of the deposition testimony of Keelan Pulliam, taken on September 14, 2004, is attached hereto as Exhibit 4.

9.    A true copy of the graph of historical Bonzi sales for the years 1991-2001, prepared by Laureen Treu, and introduced as Exhibit 4 at the deposition of Keelan Pulliam, is attached hereto as Exhibit 5.

10.    A true copy of relevant portions of the deposition testimony of Laureen Treu, taken on January 12, 2004, is attached hereto as Exhibit 6.

11.    A true copy of the August 23, 2002 letter of Richard Weiss to Syngenta is attached hereto as Exhibit 7.

12.    A true copy of relevant portions of the deposition testimony of George Meyding, taken on January 27, 2004, is attached hereto as Exhibit 8.

13.    A true copy of relevant portions of the deposition testimony of Dr. Thomas Harger, taken on December 21, 2004, is attached hereto as Exhibit 9.

14.    A true copy of a transcript of a recording of statements by Dr. James Barrett in 1991, prepared and maintained by Uniroyal and provided to Syngenta in discovery, is attached hereto as Exhibit 10.

_____
Charles F. Corcoran, III

Sworn and subscribed to before me, this 27th day of June, 2005.

_____
Notary Public
My commission expires _____

CARMODY & TORRANCE LLP
Attorneys at Law
{N0733423}

195 Church Street
Post Office Box 1950
New Haven, CT 06509-1950
Telephone: 203 777-5501

SHEILA A. FELIX
NOTARY PUBLIC
MY COMMISSION EXPIRES JUNE 30, 2010

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNIROYAL CHEMICAL COMPANY,  )
INC., d/b/a CROMPTON        )
MANUFACTURING COMPANY,      )
                            )
              Plaintiff,    )     Civil Action No.
                            )     3:02cv02253 (AHN)
        vs.                 )
                            )
SYNGENTA CROP PROTECTION,   )
INC.,                       )
                            )
              Defendant.    )
_____)

VIDEO DEPOSITION

OF

BERND DRUEBBISCH

Tuesday, June 15, 2004
At Greensboro, North Carolina
Reporter:  Mildred P. Jones, CVR



WESTMORELAND REPORTING, INC.

704-892-8172                                    704-333-3831
Post Office Box 489                    Post Office Box 32243
Cornelius, North Carolina  28031   WestmorelandReporting.com   Charlotte, North Carolina  28232

MR. DRUEBBISCH                                              21

1        an office?

2   A.   Maybe in some countries in Africa.

3   Q.   Nothing in the Antarctica?

4   A.   I guess so.

5   Q.   Okay.  Is Syngenta the biggest crop protection and seed

6        company in the world?

7   A.   Is Syngenta the biggest?

8   Q.   Yes.

9             MR. MEO:  Objection to form.

10  Q.   Yes, that's my question.

11  A.   Could you please repeat the question?  I didn't get the

12       --

13  Q.   Is Syngenta the biggest crop protection and seed company

14       in the entire world?

15            MR. MEO:  Objection to form.  I think that's

16            pretty vague.  What do you mean by biggest?

17            MR. CORCORAN:  Well, let's ask the witness if

18            he understands the term biggest.

19  Q.   Do you know what I mean?

20  A.   The biggest, yeah.

21  Q.   Okay.  Is it?

22            MR. MEO:  Same objection.

23  A.   Combined, I believe so, yeah.

24  Q.   Okay.  The most employees; the highest gross revenues,

25       to your knowledge?



MR. DRUEBBISCH                                                    22

1   A.   Gross revenues, yeah.   Employees, I don't know.

2   Q.   All right.   How many employees does Syngenta have?   Do

3        you have any idea, how many tens of thousands?

4   A.   There is about 18,000.

5   Q.   18,000 employees.   Okay.   All over the world?

6   A.   Yes.

7   Q.   All right.   Can you tell us what your job

8        responsibilities have been in your most recent position?

9   A.   Sure.   When I joined Syngenta here in the United States

10       as a business development manager -- business

11       development manager, my responsibilities were third-

12       party relationships regarding licensing in and out of

13       products.

14  Q.   How many people report to you, sir?

15  A.   None.

16  Q.   Have you reviewed the supply and development agreements

17       in connection with this matter -- this case?

18  A.   I have read them.   That's correct.

19  Q.   All right.   And how recently have you read them?

20  A.   As I said earlier, as recently as --

21  Q.   This morning?

22  A.   -- the last couple of days.

23  Q.   This morning?

24  A.   No.

25  Q.   Okay.   Were you personally involved in the negotiation



WESTMORELAND W REPORTING, INC.

MR. DRUEBBISCH                                                    52

1   Q.   All right.   And do you recognize the handwriting?

2   A.   I do.

3   Q.   Whose handwriting is that?

4   A.   It is my handwriting.

5   Q.   Okay.   Did this agreement grant to Uniroyal an exclusive

6        right to develop, register, market, and sell Bonzi for

7        new uses, in addition to the then current EPA-registered

8        uses?

9             MR. MEO:   Same objections to this line of

10            questioning.

11  A.   Could you please repeat that question?

12  Q.   Did the development agreement grant to Uniroyal the

13       exclusive right to develop, register, market, and sell

14       new uses of Bonzi?

15  A.   For certain uses here, such as woody ornamentals,

16       shrubs, shade trees, ornamental fruit trees,

17       interiorscapes and landscapes in the United States and

18       in its territories, excluding turf and commercial rights

19       of way.

20  Q.   Okay.   And where do you see that, sir?

21  A.   That is the second part of the sentence, in the second

22       paragraph; the first sentence of the second paragraph.

23  Q.   What is an interiorscape, sir?

24  A.   My understanding is these are plants grown inside of

25       larger buildings.



WESTMORELAND  W  REPORTING, INC.

MR. DRUEBBISCH                                                    53

1  Q.  And can we agree that ornamentals are grown in

2      interiorscapes, sir; yes or no?

3  A.  Ornamentals, yes.

4  Q.  Okay.  And can we agree that bedding plants are also

5      grown in interiorscapes?

6  A.  I don't know --

7  Q.  Can you answer --

8  A.  -- whether they grow inside.  I don't know, bedding

9      plants.

10 Q.  You cannot agree that bedding plants are used in

11     interiorscapes?

12 A.  No, I -- I don't know.

13 Q.  Okay.  And can we agree that ornamentals are used in

14     exterior landscapes?

15 A.  Exterior, yes.

16 Q.  And can we agree that bedding plants are used in

17     exterior landscapes?

18 A.  I think you would be able to grow them there, yes.

19 Q.  Okay.  Let's go down to Paragraph 4.

20 A.  Sure.

21 Q.  Does the development agreement grant to Uniroyal the

22     exclusive right to develop, register, market, and sell

23     Bonzi for new uses, in addition to --

24 A.  Is that a question or --

25 Q.  I'm sorry.



MR. DRUEBBISCH

54

1   A.   -- are you reading off the document?

2   Q.   I'm sorry.  I'm sorry.

3            "For each new use in formulation developed by

4        Uniroyal for use in the Development Field, ICIA will

5        grant to Uniroyal marketing and sales rights as defined

6        in Section 1.2 of the Bonzi Chemical Supply Agreement."

7            Do you see that?

8   A.   I see that, yes.

9   Q.   And then it says, "Said marketing and sales rights shall

10       be granted for 5 years from the date of registration of

11       any new use or formulation."

12           Do you see that?

13  A.   I see that.

14  Q.   Okay.  And then it says, "Uniroyal shall retain all

15       marketing and sales rights to any new use or formulation

16       which it develops under this agreement."

17           Do you see that?

18  A.   I see that.

19  Q.   Okay.  What is your understanding of that term, retain?

20  A.   To keep.

21  Q.   The next sentence, "This provision shall survive the

22       termination of this Agreement provided termination is

23       not the result of any breach by Uniroyal of this

24       Agreement or the Supply Agreement."

25           Do you see that?



STATE OF NORTH CAROLINA                    C E R T I F I C A T E

COUNTY OF ALLEGHANY

    I, Mildred P. Jones, CVR, Certified Verbatim

Reporter and Notary Public, do hereby certify that BERND

DRUEBBISCH was duly sworn by me prior to the taking of the

Video Deposition; that said Video Deposition was taken and

transcribed under my supervision; and that the foregoing 217

pages are a true and accurate transcription of the testimony

of the said deponent.

    I further certify that review and signing of the

transcript by the witness was reserved.

    I further certify that the persons were present as

stated.

    I further certify that I am not related to, of

counsel for or in the employment of any of the parties to

this action.

    IN WITNESS WHEREOF, I have hereunto subscribed my

name, this the 6th day of July 2004.



Mildred P. Jones, CVR
Certified Verbatim Reporter and
Notary Public

My Commission Expires

August 14, 2008





WESTMORELAND REPORTING, INC.

# **EXHIBIT 2**

BONZI
CHEMICAL SUPPLY AGREEMENT

THIS AGREEMENT, made this 29th day of January, 1991, by and between ICI AMERICAS INC., a Delaware corporation with its principal place of business at New Murphy Road and Concord Pike, Wilmington, Delaware 19897 (hereinafter "ICIA") and Uniroyal Chemical Company, Inc., a New Jersey corporation with its principal place of business at Middlebury, CT  06749 (hereinafter "Uniroyal").

WITNESSETH:

WHEREAS ICIA has developed a plant growth regulator with a common or generic name of Paclobutrazol, identified by the trademark "Bonzi", meeting the specifications set forth in Exhibit A to this Agreement (hereinafter "ICIA Product"); and

WHEREAS Uniroyal desires to purchase on an exclusive basis the ICIA Product, and ICIA desires to sell to Uniroyal ICIA Product for use by Uniroyal in its sales of ICIA Product, all on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual covenants set forth herein and other good and valuable consideration, ICIA and Uniroyal, intending to be legally bound, hereby agree as follows:

1. Purchase and Sales of ICIA Product

   1.1  ICIA agrees to sell and deliver exclusively to Uniroyal and Uniroyal agrees to purchase and receive ICiA Product exclusively from ICIA in sufficient quantities to satisfy 100% of Uniroyal's requirements of the ICIA Product according to the sales Target Forecast more specifically set forth in Section 4 hereof.  Uniroyal further agrees to make average annual expenditures of $72,000 for five years, beginning in 1992, to commercially promote the sale of Bonzi.  Uniroyal agrees to spend $36,000 during 1991 to promote the sale of Bonzi.  Uniroyal, in its sole discretion, shall determine how this money shall be spent.

   1.2  Except for Product purchased by others from ICIA prior to January 1, 1991, Uniroyal shall have the exclusive right to sell ICIA Product for presently registered uses as determined by the current U.S. EPA approved label attached hereto as Exhibit B, in the U.S. and its territories (hereinafter "Marketing Area") on an exclusive basis and Uniroyal shall have the exclusive right to develop, register, sell and market ICIA product in the Marketing Area for use on woody ornamentals, shrubs, shade trees, ornamental fruit trees, interiorscapes and landscapes, excluding turf and commercial rights of way (hereinafter "Permitted Use").  Uniroyal shall also have the exclusive right to develop, register, sell and market new formulations of ICIA Product, such as spikes and granules, in The Marketing Area for the Permitted Use.

   1.3  Except as expressly set forth in this Supply Agreement and the Bonzi Development Agreement ("Development Agreement") of even

RECEIVED

FEB ⸱ ⸱ ⸱1

S 00988

AC ⸱⸱⸱ ⸱⸱TS

date herewith, both parties agree and acknowledge that no express or implied license, right or interest is granted to Uniroyal by reason of the sale of ICIA Product hereunder or otherwise.

1.4  ICIA permits Uniroyal to repackage ICIA Product which is purchased under the terms of this Agreement.

## 2.  Term; Termination

2.1  Unless earlier terminated as provided hereunder, the term of this Agreement shall be for an initial term commencing on January 1, 1991 and ending December 31, 1996.  Thereafter, this Agreement shall continue in full force and effect for successive annual terms unless terminated by either party in writing not less than 180 days before the termination date of the prior term.

2.2  This Supply Agreement may be terminated by either party at any time by reason of a material breach by the other under the terms of this Supply Agreement or under the terms of the Development Agreement between Uniroyal and ICIA, dated of even date herewith relating to Uniroyal's commitment to develop new uses for Bonzi, and upon ninety (90) days prior written notice to the other setting forth the basis therefor and providing the other with the opportunity to cure such breach.  Failure of the breaching party to cure such breach in the said ninety (90) day period shall permit the nondefaulting party to terminate this Supply Agreement and the Development Agreement upon thirty (30) days prior written notice thereafter.

## 3.  Price

3.1  The initial purchase price of ICIA Product sold hereunder shall be $108.00 per gallon.  Beginning June 1992, ICIA shall have the right once each June during the term of this agreement, to increase the purchase price of ICIA Product to offset cost escalation and inflation. The amount of any such increase shall be the greater of either 4% of the existing purchase price or 50% of inflation as reported by the Producer Price Index for Chemicals and Allied Products for the preceding June 1 - May 31 period.  The price increase will be delivered to Uniroyal by written notice and shall apply to purchase orders dated at least fifteen (15) days after the date notice of the price increase is given.

## 4.  Product Purchase Terms

4.1  Payments are due net 45 days after date of invoice (the "Net Due Date").  Payments must be received by ICIA on or before the Net Due Date and at the location specified on the invoice.  In the event Uniroyal fails to pay in full the balance due in accordance with the invoice on or before the Net Due Date, ICIA at its option may suspend further deliveries under this Supply Agreement after ten (10) days prior written notice of Uniroyal's failure to pay or may charge Uniroyal an interest fee on the outstanding balance, such fee not to exceed 12% per annum, until all overdue indebtedness has been paid.

**S 00989**

4.2 ICIA Product shall be delivered in 55 gallon drums to a destination chosen by Uniroyal, within sixty (60) days of receipt of a quarterly purchase order release. Shipments will be made f.o.b. ICIA's Richmond, California plant.

4.3 Uniroyal will purchase and receive from ICIA during each year of this Agreement one hundred percent (100%) of Uniroyal's requirements of ICIA Product for the Permitted Use for sales in its Marketing Area during each year. These requirements shall not be less than 75% of the Sales Target Forecast outlined below ("Minimum Quantity"). In the event that these Minimum Quantity amounts are not met, ICIA's remedies shall be set forth in Section 6.1 of this Agreement.

Uniroyal Sales Target Forecast (Bonzi 0.0367 Lbs./Gal.)

| Calendar Year | Gallons | Minimum Quantity of Gallons |
|---|---|---|
| 1991 | 2000 | 0 |
| 1992 | 3000 | 2250 |
| 1993 | 3500 | 2625 |
| 1994 | 4250 | 3188 |
| 1995 | 5000 | 3750 |
| 1996 and each one year extension thereafter | 6000 | 4500 |

4.4 For any new uses and formulations developed by Uniroyal, ICIA Product volumes and pricing shall mutually be agreed by the parties.

4.5 On or before August 31 of each calendar year, Uniroyal shall provide to ICIA an annual forecast, by quarter, of its requirements for ICIA Product for the following year. At the end of each forecast year Uniroyal shall provide an annual purchase order for the following sales year and issue quarterly purchase order releases against the purchase order during the sales year.

5. Trademarks

5.1 ICIA warrants that it owns all rights to the trademark BONZI. ICIA hereby grants to Uniroyal an exclusive, royalty-free right to use the Bonzi trademark in the Marketing Area during the term of this agreement.

5.2 Uniroyal recognizes that the trademark BONZI is the property of ICIA and shall take all steps as are reasonable to assure that the property in this trademark shall remain with ICIA. Uniroyal will sell Product only under ICIA's trademark BONZI. Uniroyal will use reasonable efforts to ensure that the labels and any other promotion and marketing materials will be in compliance with the requirements of appropriate regulatory agency. In no event shall Uniroyal sell any Product bearing the BONZI trademark with any label that has not previously been approved by EPA.

S 00990

6. ICIA's Remedies

6.1 In the event Uniroyal fails to purchase and take delivery of the Minimum Quantities of ICIA Product specified in Section 4 hereof, ICIA may, at its sole election and on thirty (30) days prior written notice to Uniroyal, without liability and without prejudice to any other remedy, either terminate this Agreement or convert this Agreement to a non-exclusive supply agreement and terminate the Development Agreement.  In the event of such failure by Uniroyal for any reason (excluding any circumstances or contingency affecting Uniroyal under Section 9 hereof), all marketing rights to any Uniroyal developed new product uses and/or formulations shall revert exclusively to ICIA at no cost to ICIA, and Uniroyal shall have no obligation to pay future promotional or development expenditures required under this Agreement and the Development Agreement.

7. Registrations

7.1 On or before February 1, 1991 ICIA shall take all necessary action to obtain the grant to Uniroyal of a supplemental registration with the EPA under ICIA's registration for the ICIA Product during the term of this agreement.  Notwithstanding anything herein to the contrary, nothing herein, or in any section hereof, shall grant to Uniroyal any right, including without limitation the rights of data composition or exclusive use rights, with respect to any data submitted to EPA by ICIA in support of any registration, re-registration, application for registration or otherwise of the ICIA product.  ICIA shall maintain and support such supplemental registration for the ICIA Product for at least as long as this Agreement is in effect and for such additional time and may be required by EPA.

7.2 In addition to ICIA's rights under any other provision of this agreement, ICIA shall have the right to terminate this agreement by giving at least 30 days prior written notice if the EPA issues a data call in, special review, re-registration standard, or other data requirement for the ICIA Product in response to which ICIA, in its sole discretion, decides not to supply data.

7.3 Uniroyal shall obtain and maintain at its expense all necessary state and local registrations and approvals required of Uniroyal for the sale and use of the ICIA product.  Uniroyal shall have the right to prosecute and maintain such registrations in ICIA's name if required by state or local law with prior notice to ICIA.  ICIA shall cooperate with Uniroyal in obtaining such registrations and approvals and shall provide Uniroyal and the appropriate agencies with all necessary information and data to the extent it is able to do so as long as Uniroyal is in full compliance with the terms and conditions of this agreement.

S 00991

8. Warranties; Limitation of Liability; Indemnification

8.1 ICIA warrants that it has legal title to the ICIA Product sold hereunder, and that ICIA Product sold hereunder shall meet the specifications set forth in Exhibit A and shall be produced in

-4-

compliance with all applicable federal, state and local laws, ordinances, rules, regulations, and executive orders. ICIA MAKES NO OTHER REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE, OR ANY OTHER MATTER WITH RESPECT TO THE ICIA PRODUCT.

8.2  Subject to Sections 8.3 and 8.4, ICIA agrees to indemnify and hold Uniroyal harmless from and against any and all loss, liability, damage, expenses, costs and fees (including reasonable attorneys fees), based upon or arising out of ICIA's breach of its warranties hereunder, breach of this Supply Agreement and/or ICIA's negligence or willful misconduct.

8.3  Within one hundred twenty (120) days after receipt of each shipment of the ICIA Product, Uniroyal shall examine such ICIA Product for any damage, defect or shortage. All claims for any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) shall be deemed waived unless made in writing and received by ICIA within one hundred twenty (120) days after Uniroyal's receipt of the ICIA Product, in respect to which such claim is made, or, if such claim is for non-delivery of such ICIA Product, within one hundred twenty (120) days after the date upon which such ICIA Product was to have been delivered; provided that as to any such cause not reasonably discoverable ("latent defect") within such one hundred twenty (120) day period (including that discoverable only in processing, further manufacture, other use or resale) any claim shall be made in writing and received by ICIA within one hundred twenty (120) days after Uniroyal learns of the latent defect giving rise to such claim. Failure of ICIA to receive written notice of any such claim within the applicable time period shall be deemed an absolute and unconditional waiver by Uniroyal of such claim, known or unknown, irrespective of whether the facts giving rise to such claim shall have then been discovered or of whether processing, further manufacture, other use of resale of the ICIA Product shall have then taken place.

8.4  EXCEPT IN THE EVENT OF ICIA'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AND EXCEPT AS OTHERWISE PROVIDED IN SECTION X, UNIROYAL'S EXCLUSIVE REMEDY SHALL BE FOR DAMAGES AND ICIA'S LIABILITY FOR ANY AND ALL LOSSES OR DAMAGES RESULTING FROM ANY CAUSE WHATSOEVER, INCLUDING ALLEGED NEGLIGENCE (OTHER THAN GROSS NEGLIGENCE), SHALL IN NO EVENT EXCEED THE PURCHASE PRICE OF THE ICIA PRODUCT IN RESPECT TO WHICH THE CLAIM IS MADE.

9.  Excuse of Performance

9.1  Neither party shall be subject to any liability for delay in performance or nonperformance as a result of fire, flood, natural catastrophe, strike, labor trouble, accident, riot, act of governmental authority or compliance with government request, act of God, or other contingencies and circumstances beyond its reasonable control interfering with the production, supply, transportation, or

S 00992

consumption of ICIA Product or with the supply of any raw materials (including energy sources) used in connection therewith or, in the event either party ceases or suspends the operation of any facility where it is producing any quantity of ICIA Product deliverable hereunder, and such termination or suspension is made by such party because said facility, the operation thereof and/or the product therefrom violates or fails to comply with any applicable governmental law, regulation, ordinance, standard, order or decree relating to pollution, ecology, occupational safety and health or environmental matters. Quantities so affected may be eliminated from the Supply Agreement without liability, but this Supply Agreement shall otherwise remain unaffected. In no event shall Uniroyal or ICIA be obligated to purchase any materials in the marketplace to satisfy its obligations hereunder. Neither party shall be obligated to settle any labor trouble or strike for purposes of this Agreement.

## 10. Patent Indemnity

10.1 ICIA agrees to indemnify and hold Uniroyal harmless from any liability or expense (including reasonable attorneys' fees) resulting from any claim or lawsuit alleging that ICIA Product infringes any claim of a patent provided that said liability or expense results from Uniroyal's use or sale of the ICIA Product and provided that Uniroyal has given ICIA prompt written notice of any suit for infringement brought against Uniroyal and has offered ICIA the opportunity to defend such suit. Article 8 does not apply to this Section 10.1.

## 11. Miscellaneous

11.1 This Supply Agreement and the Development Agreement contain all the terms and conditions of sale and purchase of ICIA Product to Uniroyal and embody and integrate the entire understanding of the parties with respect thereto. No modification, extension or release from any provision hereof shall be effected by mutual agreement, acknowledgement, acceptance of purchase order, invoice or shipping instruction forms, or otherwise, unless the same shall be in writing, signed by the party to be bound and specifically described as an amendment or extension of this Supply Agreement.

11.2 No waiver by either Uniroyal or ICIA with respect to any breach or default or of any right or remedy, and no course of dealing shall be deemed to constitute a continuing waiver of any other breach or default or of any other right or remedy, unless such waiver be expressed in writing signed by the party to be bound.

11.3 This Agreement and performance hereunder shall be construed and governed by the laws of the State of Delaware.

S 00993

-6-

11.4   Neither this Supply Agreement nor any interest therein shall be transferred or assigned by either party except upon the prior written consent of the other party which shall not be unreasonably withheld.

11.5   Notices hereunder shall be sent in writing by registered or certified mail to the party at the address set forth in the preamble to this Supply Agreement or at such other address as may be specified in writing by such party.

IN WITNESS WHEREOF, Uniroyal and ICIA have caused their duly authorized representatives to execute this Supply Agreement all as of the day and year first above written.

ICI AMERICAS INC.                    UNIROYAL CHEMICAL COMPANY, INC.

By: _Charles R Nash_                 By: _____

Title: _Business Mgr._               Title: _Director of Purchasing_

090790MK03

S 00994

7

# **<u>EXHIBIT 3</u>**

BONZI DEVELOPMENT AGREEMENT

This agreement, effective as of the 29th day of January 1991, by and between ICI Americas Inc., a Delaware corporation with its principal place of business at New Murphy Road and Concord Pike, Wilmington, Delaware, 19897 hereinafter ("ICIA") and Uniroyal Chemical Co. Inc., a New Jersey corporation with its principal place of business at Middlebury, Connecticut, 06749 hereinafter ("Uniroyal").

WITNESSETH:

WHEREAS ICIA has the right to make, use and sell in the United States and its territories a plant growth regulator known by its generic name paclobutrazol and sold under the Bonzi trademark (hereinafter "the ICIA Product") and desires to promote the development of new uses and formulations of ICIA Products; and whereas, the parties have entered into a confidentiality agreement, dated May 23, 1990, regarding Uniroyal's development of new ICIA Product uses and sales of ICIA Product for presently registered uses as more fully set forth in the Bonzi Chemical Supply Agreement of even date herewith.

NOW THEREFORE, in consideration of foregoing premises and mutual promises hereinafter contained, the parties hereto agree as follows:

1. This agreement shall take effect on January 1, 1991 and shall remain in effect thru December 31, 1996, unless otherwise terminated as provided in the Bonzi Chemical Supply Agreement. Termination of the Development Agreement shall not necessarily cause termination of the Bonzi Chemical Supply Agreement, which shall be terminable pursuant to its own terms.

2. ICIA grants to Uniroyal the exclusive right to develop, register, market and sell new uses of Bonzi on woody ornamentals, shrubs, shade trees, ornamental fruit trees, interiorscapes and landscapes in the U.S. and its territories excluding turf and commercial rights of way. ICIA further grants to Uniroyal exclusive rights to develop and register new ICIA Product formulations such as spikes and granules in the U.S. and its territories for use on woody ornamentals, shrubs, shade trees, ornamental fruit trees, interiorscapes and landscapes in the U.S. and its territories excluding turf and commercial rights of way (hereinafter the "Development Field").

3. In consideration of the right to develop the new uses and formulations as identified in paragraph 2 hereof, Uniroyal agrees to make average annual expenditures of $80,000 for five years, beginning in 1992, for development of new Bonzi uses. Uniroyal agrees to spend $40,000 in 1991 to develop new uses of Bonzi. Uniroyal in its sole discretion shall determine how this money shall be spent.

4. For each new use and formulation developed by Uniroyal for use in the Development Field, ICIA will grant to Uniroyal marketing and sales rights as defined in Section 1.2 of the Bonzi Chemical Supply Agreement. Said marketing and sales rights shall be granted for 5 years from the date of registration of any new use or formulation. Uniroyal shall retain all marketing amd sales rights to any new use or formulation which it develops under this Agreement. This provision shall survive the termination of this Agreement provided termination is not the result of any breach by Uniroyal of this Agreement or the Supply Agreement.

CC 01402

5. ICIA agrees to authorize the Environmental Protection Agency to reference ICIA registrations, without right of compensation, in support of Uniroyal Bonzi registration(s) and to support state registrations. (To include federal and state).

6. Uniroyal agrees to provide to ICIA an annual report by the anniversary date of this agreement on progress made in developing new Bonzi uses and formulations and on promotional and developmental expenditures and on market position vs. competition.

7. Commercialization of any new Bonzi uses and formulations shall be governed by the terms of the Bonzi Chemical Supply Agreement.

8. Uniroyal agrees to obtain all permits and licenses necessary for development of new Bonzi uses and formulations. Neither party may-assign its rights or delegate its performance hereunder without the prior written consent of the other party.

9. This agreement shall contain all the terms and conditions between the parties hereto regarding the development of new Bonzi uses and formulations. No modification, extension or release from any provision hereof shall be effected by mutual agreement, acknowledgement, acceptance or otherwise, unless the same be in writing, signed by both parties hereto, and specifically described as an amendment or extension of this agreement.

10. In the performance of this agreement, each party is an independent business and nothing herein shall be construed to the contrary. Nothing in this agreement shall make either party the party, agent or representative of the other party.

11. The validity,.Construction, and performance of this agreement shall be governed by the internal laws of the State of Delaware.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed by their duly authorized representative effective as of the date first written above.

ACCEPTED AND AGREED:

ICI AMERICAS INC.          UNIROYAL CHEMICAL COMPANY, INC.

By: _Charles R Nash_       By: _[signature]_

Title: _Business Mgr_      Title: _[illegible]_

Bonzi - ICI and Uniroyal

CC 01403

- 2 -

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

UNIROYAL CHEMICAL COMPANY, INC.,   )
d/b/a CROMPTON MANUFACTURING       )
COMPANY,                          )
                             )
        Plaintiff,       )     Civil Action No.
                             )     3:02cv02253 (AHN)
      vs.                  )
                             )
SYNGENTA CROP PROTECTION, INC.,     )
                             )
        Defendant.       )
_____)

VIDEO DEPOSITION

OF

KEELAN PULLIAM

Tuesday, September 14, 2004
At Greensboro, North Carolina
Reporter:  Mildred P. Jones, CVR



WESTMORELAND REPORTING, INC.

704-892-8172
Post Office Box 489
Cornelius, North Carolina  28031     WestmorelandReporting.com

704-333-3831
Post Office Box 32243
Charlotte, North Carolina  28232

MR. PULLIAM                                                    103

1  A.  That was their prediction.

2  Q.  All right.  Now let's look at the sales history, which

3      is Page 116.

4         Okay.  Do you see the chart which Ms. Treu has

5      done?

6  A.  I do.

7  Q.  Okay.  And is it fair to say that the sales in 1991

8      appear to have been less than 500,000 (sic) gallons?

9  A.  I would have no reason to dispute any of the numbers on

10     the chart.

11 Q.  Okay.  And is it also fair to say that the arch of this

12     graph goes steadily upwards until 2001?

13 A.  It does.

14 Q.  And that by 2001, Uniroyal was selling more than 15,000

15     gallons of Bonzi annually?

16 A.  That's true.

17 Q.  Okay.  When Syngenta began considering terminating the

18     supply agreement, did anyone at Syngenta ever express,

19     in your presence, a concern that Syngenta could not

20     simply terminate the supply agreement with Uniroyal

21     without creating some potential contract difficulties

22     for Syngenta?

23        MR. MEO:  Objection to form.  And, again, are

24        you excluding counsel from that question?

25        MR. CORCORAN:  I think he said he never talked



WESTMORELAND  W  REPORTING, INC.

MR. PULLIAM                                                    119

1   Q.   Okay.  And the sales history showed a dramatic increase

2        in sales of Bonzi following Uniroyal's involvement;

3        correct?

4   A.   It showed a sales increase; that's right.

5   Q.   Would you say that from five -- less than 500,000 (sic)

6        gallons to fifteen -- over 15,000 gallons during a

7        period of ten years is less than -- 500 gallons.  All

8        right.  Now let's get dramatic.

9             Would you say that going from 500 gallons to 15,000

10       gallons during a course of ten years is a dramatic

11       increase?

12            MR. MEO:  Objection to form.

13  A.   I would have to say it's certainly a dramatic increase.

14  Q.   Thank you.

15  A.   But having said that, there is other products that have

16       gone from hundreds of thousands of gallons in the same

17       time frame.

18  Q.   Do you have any knowledge of whether the product

19       suffered from an image problem prior to 1991 which

20       Uniroyal worked to counteract?

21            MR. MEO:  Objection to form.

22  A.   What was the dates again, if I could ask?  Prior -- the

23       way you stated the question?

24  Q.   Prior to 1991.

25  A.   I don't have knowledge.



WESTMORELAND    W    REPORTING, INC.

MR. PULLIAM
165

STATE OF NORTH CAROLINA                    C E R T I F I C A T E

COUNTY OF ALLEGHANY

      I, Mildred P. Jones, CVR, Certified Verbatim Reporter and Notary Public, do hereby certify that KEELAN PULLIAM was duly sworn by me prior to the taking of the Deposition; that said Deposition was taken and transcribed under my supervision; and that the foregoing 164 pages are a true and accurate transcription of the testimony of the said deponent.

      I further certify that review and signing of the transcript by the witness was reserved.

      I further certify that the persons were present as stated.

      I further certify that I am not related to, of counsel for or in the employment of any of the parties to this action.

      IN WITNESS WHEREOF, I have hereunto subscribed my name, this the 18th day of October 2004.



_____
Mildred P. Jones, CVR
Certified Verbatim Reporter and
Notary Public

COPY

My Commission Expires

August 14, 2008



WESTMORELAND REPORTING, INC.

# **<u>EXHIBIT 5</u>**

S 00116



# BONZI® - SALES HISTORY (000 GALS.)

# EXHIBIT 6

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
2                            VOLUME I
3
4
     - - - - - - - - - - - - - - - - -x
5    UNIROYAL CHEMICAL COMPANY, INC.:
     d/b/a CROMPTON MANUFACTURING    :
6    COMPANY,                        :
                      Plaintiff,     :
7    vs.                             :   CIVIL ACTION NO.
                                     :   3:02CV02253
8                                    :
     SYNGENTA CROP PROTECTION, INC. :
9                    Defendant.      :
     - - - - - - - - - - - - - - - - -x
10
11
12
13         Deposition of LAUREEN C. TREU, taken
14    pursuant to the Federal Rules of Civil Procedure,
15    before Melissa J. Kelly, RPR, CRR, Licensed
16    Shorthand Reporter #00307, and Notary Public within
17    and for the State of Connecticut, held at the
18    offices of Shipman & Goodwin LLP, 300 Atlantic
19    Street, Stamford, Connecticut, on January 12, 2004,
20    at 10:25 a.m.
21
22
23
               DEL VECCHIO REPORTING SERVICES, LLC
24            PROFESSIONAL SHORTHAND REPORTERS
                      117 RANDI DRIVE
25               MADISON, CT  06443
     HARTFORD              203 245-9583          STAMFORD

1      Q.    And would that go beyond the five-year

2    period from registration referenced in Sentence 2?

3      A.    Yes.

4      Q.    Well, how do you reconcile the second

5    sentence which grants marketing and sales rights

6    for five years with the third sentence?

7                MR. CORCORAN:  Objection.  You're

8          reading this all out of context and you're

9          studiously ignoring other sentences in

10          Paragraph 4.  You're misleading the witness.

11          You may answer.

12                THE WITNESS:  Would you rephrase your

13          question, please.

14    BY MR. RUSKIN:

15      Q.    How do you reconcile your statement about

16    the third sentence of Paragraph 4 with the second

17    sentence in Paragraph 4 which grants marketing and

18    sales rights for five years from the date of

19    registration?

20      A.    The -- I'm getting confused on to which

21    sentence is the third sentence.  The sentence that

22    refers to the five years, that, in my opinion, was

23    an effort to, as I stated earlier, ensure we had a

24    source of supply.  We were in a position to sell

25    product for five years.  The following sentence

 1    says that any use that we developed, even if we no

 2    longer have a supply, we are the ones that can only

 3    sell on those uses, sell and market those uses.  We

 4    may not have product to sell, but you can't do it

 5    either.

 6        Q.    And do you have -- have you seen any

 7    writing at Uniroyal, other than by your in-house

 8    attorney, that discusses that interpretation of

 9    Paragraph 4, other than the Exhibit 23, the letter

10    from Mr. Ingulli to Bob Woods dated August 13,

11    2002?

12              MR. CORCORAN:  So something in addition

13         to that.

14              THE WITNESS:  Yes.

15    BY MR. RUSKIN:

16        Q.    What, in addition to that?

17        A.    I'd have to refresh myself with the

18    documents, but I believe there is a letter from Bob

19    Woods to Mr. Ingulli in response to this which

20    refers to it.

21        Q.    And what does Mr. Woods say?

22        A.    I don't recall.

23        Q.    Well, I want to show you Uniroyal/Treu

24    Exhibit 24 which is Bob Woods' letter to Ingulli

25    dated August 22, 2002.

```
 1                    CERTIFICATE
 2             I hereby certify that I am a Notary
 3    Public, in and for the State of Connecticut, duly
 4    commissioned and qualified to administer oaths.
 5             I further certify that the deponent
 6    named in the foregoing deposition was by me duly
 7    sworn, and thereupon testified as appears in the
 8    foregoing deposition; that said deposition was
 9    taken by me stenographically in the presence of
10    counsel and reduced to typewriting under my
11    direction, and the foregoing is a true and accurate
12    transcript of the testimony.
13             I further certify that I am neither of
14    counsel nor attorney to either of the parties to
15    said suit, nor am I an employee of either party to
16    said suit, nor of either counsel in said suit, nor
17    am I interested in the outcome of said cause.
18             Witness my hand and seal as Notary
19    Public this ____ of _____, 2004.
20
21                    _____
22                    Melissa J. Kelly, RPR, CRR
23                    Licensed Shorthand Reporter #00307
24
25    My Commission expires:  September 30, 2008
```

# **<u>EXHIBIT 7</u>**

08/28/2002 14:46 FAX                                                    ☒002



                                                      Richard D. Weiss
                                                   Assistant General Counsel


                                                 August 23, 2002


Mr. Robert A. Woods, Chairman and
    Regional Head
Syngenta Crop Protection, Inc.
P.O. Box 18300
Greensboro, North Carolina 27419-8300

Dear Mr. Woods:

    I have received a copy of your August 22, 2002 letter to Mr. Alfred Ingulli
relating to Syngenta's Bonzi product and referring to the business relationship that has
heretofore been in effect between Syngenta and Crompton's Crop Protection Division.
Mr. Ingulli has asked me to respond to the portion of your letter in which you state your
disagreement with Crompton as to the interpretation of Paragraph 4 of the Bonzi
Development Agreement (the "Development Agreement") dated as of January 29, 1991
and which, as you note in your letter, expired on December 31, 1996.

    As you know, Paragraph 4 of the Development Agreement states, in relevant part:

    "Uniroyal shall retain all marketing and sales rights to any new use or formulation
    which it develops under this Agreement.  This provision shall survive the
    termination of this Agreement provided termination is not the result of breach by
    Uniroyal of this Agreement or the Supply Agreement."

We believe that the clear intent and import of this provision is that, absent a breach by
Uniroyal, it was to retain the benefits of its development efforts after the end of the
Development Agreement.  We believe that this interpretation is also fully supported by
the provisions of the Bonzi Chemical Supply Agreement (the "Supply Agreement")
between the parties that provided, in Section 6.1, the following remedy to ICI Americas
Inc. (Syngenta's predecessor-in-interest under the Supply Agreement and under the
Development Agreement) in the event that Uniroyal failed to purchase and take delivery
of the minimum quantities specified in the Supply Agreement:

    "In the event of such failure by Uniroyal for any reason (excluding any
    circumstances or contingency affecting Uniroyal under Section 9 hereof [force
    majeure]), all marketing rights to any Uniroyal developed new product uses
    and/or formulations shall revert exclusively to ICIA at no cost to ICIA . . . ."

Since a failure by Uniroyal to purchase the specified minimum quantities would, under
such Section 6.1, have allowed ICIA to terminate both the Supply Agreement and the
Development Agreement, this additional provision would have been unnecessary if such

                                                      S 00479

08/28/2002 14:46 FAX                                                                    ☑003

a termination of the Development Agreement could have cost Uniroyal its marketing rights. Similarly, the provisions of Paragraph 4 as to the survival of Uniroyal's exclusive rights would have been unnecessary if Uniroyal had been looking solely to the marketing rights under the Supply Agreement to protect Uniroyal's interests after the term of the Development Agreement.

You are certainly not required to agree with Crompton Corporation's interpretation of Paragraph 4 of the Development Agreement, and we agree that Syngenta is free to sell Bonzi, as of January 1, 2003, for those uses that were on the Bonzi label at the time the parties entered into the Development Agreement. But we are confident that judicial interpretation will support our reading of Paragraph 4 and that the court will find that "all marketing and sales rights" to any new Bonzi uses and formulations developed by Uniroyal during the term of the Development Agreement <u>are retained exclusively by us</u>. Crompton is prepared to take any necessary actions to protect these retained rights.

Very truly yours,

Richard D. Weiss

S 00480

# **<u>EXHIBIT 8</u>**

Uniroyal Chemical Company, Inc. vs. Syngenta Crop Protection, Inc.
George Meyding

3:02CV02325
1/27/200

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------------X
UNIROYAL CHEMICAL COMPANY, INC.     :
d/b/a CROMPTON MANUFACTURING        :
COMPANY                             :
                                    :
                                    :   Civil Action No.
        Plaintiff,                  :   3:02CV023253 (AHN)
                                    :
                                    :
        v.                          :
                                    :
                                    :
SYNGENTA CROP PROTECTION, INC.      :
                                    :
                                    :
        Defendant.                  :
------------------------------------X
```

COPY

### DEPOSITION OF GEORGE MEYDING
(Taken by the Defendant)
Charlotte, North Carolina
January 27, 2004

REPORTED BY:                    GISELE CALAME
                                Court Reporter
                                Notary Public



Reported By: Gisele Calame, Court Reporter

Huseby, Inc. An Affiliate of Spherion, Address: 301 South McDowell Street, Suite 1000, Charlotte, NC 28204 (704) 333-9889

800-333-2082
Fax (704) 372-4503

Uniroyal Chemical Company, Inc. vs. Syngenta Crop Protection, Inc.
George Meyding

3:02CV023253
1/27/2004

121

1    Q.    Food crops are not grown in interiorscapes,
2  are they?

3    A.    That depends on how clever you are.

4    Q.    Typically?

5    A.    I'm sure the Japanese figured out a way of
6  doing that.

7    Q.    Typically, correct?

8    A.    Typically.

9    Q.    And food crops are typically not grown in
10  landscapes, correct?

11    A.    Not to my knowledge.

12    Q.    Ornamentals are, correct?  Did you hear my
13  question?

14    A.    I'm sorry.

15    Q.    Ornamentals are grown in interiorscapes,
16  correct?

17    A.    Yes.

18    Q.    Okay.  And ornamentals are grown in
19  landscapes, correct?

20    A.    Yes.

21    Q.    And interiorscapes means inside, correct?

22    A.    As opposed to?

23    Q.    Outside.

24    A.    Landscapes.

25    Q.    Which is outside?

Reported By: Gisele Calame, Court Reporter
Huseby, Inc. An Affiliate of Spherion, Address: 301 South McDowell Street, Suite 1000, Charlotte, NC 28204 (704) 333-9889

800-333-2082
Fax (704) 372-4503

## CERTIFICATE OF REPORTER

I, Gisele Calame, Professional Court Reporter and Notary Public for the State of North Carolina At Large, do hereby certify that the foregoing transcript is a true, accurate, and complete record.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 2nd day of January, 2004 at Charlotte, Mecklenburg County, North Carolina.


Gisele Calame
Professional Court Reporter
My Commission expires
December 29, 2008

# EXHIBIT 9



```
 1            IN THE UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2

 3

     UNIROYAL CHEMICAL COMPANY, INC.,
 4                 Plaintiff,

 5   vs.                          CASE NO. 3:02CV02253

 6   SYNGENTA CROP PROTECTION, INC.,
                   Defendant.
 7

 8        ORAL DEPOSITION OF DR. THOMAS HARGER, PH.D.

 9

     APPEARANCES:
10

11        MS. ANNE D. PETERSON, Attorney at Law
               Carmody & Torrance
12             195 Church Street
               New Haven, Connecticut 06509
13
                  *** For the Plaintiff ***
14
          MR. WILLIAM A. RUSKIN, Attorney at Law
15             Shipman & Goodwin
               300 Atlantic Street
16             Stamford, Connecticut 06901

17                *** For the Defendant ***

     ALSO PRESENT:
18        Mr. Donovan, Dr. Lapp

19

20

          TAKEN BEFORE Garold W. Pritsch, Certified Court
21   Reporter, LS Certificate No. 329, Bushman Court
     Reporting, 620 West Third Street, Suite 201, Little
22   Rock, Arkansas 72201 on December 21st, 2004 at Courtyard
     Marriott, 521 President Clinton Avenue, Little Rock,
23   Arkansas commencing at 10:08 a.m.

24

25
```

1    grow ornamental plants and that's why the word

2    shadehouse and interiorscapes or all enclosed areas were

3    used to better define where the product could be legally

4    used.

5    Q.    Are there any instructions in the label for using

6    the products, using the Bonzi product, in an

7    interiorscape?

8    A.    I don't think specifically to interiorscapes, but

9    that -- that statement under general information says

10   that it can be used on ornamental plants grown in any of

11   these areas.  And then the directions for specific

12   plants and crops could be used in any of those locations

13   where it was needed.  Most of the labels are defined --

14   most of the recommendations are for use in the

15   production of ornamentals, and those ornamentals could

16   be in shadehouses.

17        The interiorscapes would be pretty much a

18   specialized area where it would not be production, but

19   where growth needs to be controlled to keep the plants

20   manageable.

21   Q.    Am I correct that virtually all of the ornamental

22   plants that are grown in containers are grown in

23   greenhouses and shadehouses?

24   A.    No, many are grown outside in containers with no

25   covering.

1          REPORTER'S CERTIFICATION OF CERTIFIED COPY

2

3          I, GAROLD W. PRITSCH, LS No. 329, Certified Court

4    Reporter in the State of Arkansas, certify that the

5    foregoing pages 1 through 149 constitute a true and

6    correct copy of the original deposition of DR. THOMAS

7    HARGER, PH.D. taken on December 21st, 2004.

8          I declare under penalty of perjury under the laws

9    of the State of Arkansas that the foregoing is true and

10   correct.

11         Dated this 9th day of January, 2005.

12

13   _____

14   Garold W. Pritsch, CCR, LS No. 329, Notary
     Public in and for Garland County, Arkansas

15   My Commission expires February 27, 2010.

16                               OFFICIAL SEAL
                                 GAROLD W. PRITSCH
17               NOTARY PUBLIC - GARLAND CO., AR
                 COMMISSION EXPIRES 2-27-2010
                 CERTIFIED COURT REPORTER
18               ARKANSAS SUPREME COURT
                 CERTIFICATE NO. 329

19

20

21

22

23

24

25

GAROLD W. PRITSCH
BUSHMAN COURT REPORTING
(501) 372-5115