# **EXHIBIT B**

Not Reported in A.2d                                                    **Page 20**
2004 WL 1572932 (Del.Ch.)
(Cite as: 2004 WL 1572932 (Del.Ch.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
**INTERACTIVE CORP. (f/k/a USA Interactive) and USANI Sub LLC, Plaintiffs,**
**v.**
**VIVENDI UNIVERSAL, S.A., USI Entertainment Inc., and Vivendi Universal Entertainment LLLP, Defendants.**
**No. Civ.A. 20260.**

Submitted May 12, 2004.
Decided June 30, 2004.
Revised July 6, 2004.

Kenneth J. Nachbar, Jon E. Abramczyk, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Theodore N. Mirvis, Paul K. Rowe, William Savitt, Wachtell, Lipton, Rosen & Katz, New York, New York, for the Plaintiffs.

Jesse A. Finkelstein, Candice M. Toll, Richards, Layton & Finger, Wilmington, Delaware; Irwin H. Warren, Paul Dutka, Geoffrey D. Berman, Weil, Gotshal & Manges LLP, New York, New York; Paul C. Saunders, Daniel Slifkin, Cravath, Swaine & Moore LLP, New York, New York, for the Defendants.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

*1 In furtherance of an effort to create a global media and entertainment business, defendant Vivendi Universal, S.A. sought to acquire the entertainment assets of plaintiff USA Interactive. [FN1] After three months of negotiation, Vivendi and USA entered into a transaction (the "Transaction") which created a joint venture between them, with USA contributing its entertainment assets and Vivendi contributing the entertainment assets of Universal Studios, Inc. ("Universal"). [FN2]

FN1. USA Interactive is currently known as Interactive Corp. (hereinafter referred to as "USA").

FN2. Vivendi owned Universal's assets. Vivendi itself was created out of a 2000 merger of Vivendi, S.A. Seagrams (which owned Universal Studios), and the French cable provider/movie studio Canal Plus, S.A.

In order to effect the Transaction, a limited liability limited partnership was created to which the entertainment assets would be contributed. The agreement creating this partnership provides for USA to receive certain preferred interests. The current litigation requires the court to determine whether that agreement as memorialized requires the partnership to make certain tax distributions to USA as the holder of those preferred interests. If so, the court must then determine whether the obligation to do so is the result of a mistake.

On a motion for judgment on the pleadings, the court holds that the plain meaning of the partnership agreement is to require the partnership to make those tax distributions. Further, the court finds that the defendants have not adequately pleaded the elements of either mutual or unilateral mistake.

II. [FN3]

FN3. All facts herein are taken from the well-pleaded facts contained in the answer, those facts contained in the complaint and admitted in the answer, and the contents of documents specifically referred to by the answer.

A. *The Parties*

USA is a publicly traded Delaware corporation that "via the internet, television, and the telephone engages in the worldwide business of interactivity through electronic retailing, travel services, ticketing services, personal services, local information services and teleservices." [FN4] Plaintiff USANI Sub LLC ("USANI") is a Delaware limited liability company and wholly owned subsidiary of USA. USA and USANI (together referred to as "USA" or the "plaintiffs") are limited partners of defendant Vivendi Universal Entertainment LLLP ("VUE").

FN4. Compl. ¶ 7.

Defendant Vivendi is a *societe anonyme* incorporated under the laws of France whose shares trade on the Paris Bourse and whose American Depository Receipts trade on the New York Stock Exchange. Vivendi operates businesses in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
(Cite as: 2004 WL 1572932, *1 (Del.Ch.))

telecommunications, music, television, and film. Defendant USI Entertainment, Inc. (referred to jointly with Vivendi simply as "Vivendi," and jointly with Vivendi and VUE as the "defendants"), a Delaware corporation, is a subsidiary of Vivendi and the general partner of VUE. VUE is the Delaware limited liability limited partnership created to effect the Transaction.

B. *General Negotiations Leading To The Transaction Agreement*

In late 2001, Vivendi and USA began holding informal discussions regarding a potential strategic transaction between the two companies, focusing on the entertainment assets of USA and Universal. As discussions continued, Vivendi hired Cravath, Swaine & Moore LLP as legal advisor and Goldman, Sachs & Co. as financial advisor; USA hired Wachtell, Lipton, Rosen & Katz and Allen & Co. in the same capacities. In the first week of December 2001, USA's board of directors appointed a special committee of independent directors (the "Special Committee") to work toward and evaluate such a transaction. The Special Committee retained Morris, Nichols, Arsht & Tunell as legal counsel and Bear Stearns as financial advisor.

*2 Throughout December, negotiations continued and drafts of transaction documents were exchanged. On December 16, 2001, following approval by the USA board and the Special Committee, the parties entered into the Amended and Restated Transaction Agreement (the "Transaction Agreement"). [FN5] Under the terms of the Transaction Agreement, USA contributed to VUE various entertainment-related assets valued at approximately $11.7 billion. In return, USA received certain interests in VUE (described below), approximately $1.62 billion in cash, and the retirement of securities of a USA subsidiary held by Vivendi that were exchangeable for approximately 321 million shares of USA common stock with a public market value of $7 billion.

> FN5. The Transaction Agreement is among USA, Vivendi, Universal, USANI, and Liberty Media Corp., and is dated as of December 16, 2001. The transactions contemplated by the Transaction Agreement closed on May 7, 2002. The answer refers to the Transaction Agreement for its contents.

C. *The Partnership Agreement*

An Amended and Restated Limited Liability Limited Partnership Agreement (the "Partnership Agreement") [FN6] setting up VUE was attached as Annex A to the Transaction Agreement. In exchange for the contributions made by it under the Transaction Agreement, [FN7] USA [FN8] received both common and preferred interests in VUE.

> FN6. The Partnership Agreement is dated as of May 7, 2002 and is entered into by USI Entertainment, Inc.; USANI Holding XX, Inc.; Universal Pictures International Holdings BV; Universal Pictures International Holdings 2 BV; NYCSPIRIT Corp. II; USA; USANI; New-U Studios Holdings, Inc.; and Barry Diller. The Partnership Agreement is attached as Exhibit A to the complaint and the answer refers to the Partnership Agreement for its contents.
> The Partnership Agreement contains an integration clause. Partnership Agreement § 14.04. The Partnership Agreement is governed by, and is to be construed in accordance with, Delaware law, *id.* § 14.08, and the signatories have consented to the jurisdiction of the Delaware courts, *id.* § 14.09.
> The court notes that jurisdiction in this case arises under 6 *Del. C.* § 17-111, which states "[a]ny action to interpret, apply or enforce the provisions of a partnership agreement ... may be brought in the Court of Chancery."

> FN7. Section 3.01(b) of the Partnership Agreement provides that "[i]n return for such initial Capital Contributions, Common Interests and/or Preferred Interests shall be issued to the Partners as provided in Articles V and VI hereof."

> FN8. For simplicity, references to USA include certain USA affiliates (*e.g.,* New-U Studios).

1. *Common Interests*

The "Common Interests" are the equity interests by which VUE is controlled. Section 6.01 [FN9] sets forth the participation percentage of each partner's Common Interest. According to this provision, USA holds a 5.44% Common Interest in VUE. This interest is, subject to certain limitations, callable by Universal after five years and puttable to Universal after eight years. [FN10] The put and call, if exercised, are to be exercised through either Vivendi

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 22
(Cite as: 2004 WL 1572932, *2 (Del.Ch.))

stock or cash, at Universal's election. [FN11]

> FN9. When this memorandum opinion refers simply to Section numbers, it is referring to sections of the Partnership Agreement.
>
> FN10. Partnership Agreement § 10.03. The limitation provided for in Section 10.03 states:
> [F]or so long as USAi or its Affiliates shall be the holder of any Preferred Interests, at the election of USANi Sub, any Call or Put under this section 10.03(a) shall only be applicable to a portion of the Common Interests of USANi Sub and its Affiliates such that upon the consummation of the applicable purchase and sale USAi and its Affiliates would retain a Participation Percentage of 1%, and in such event the determination of Appraised Value shall only apply to the portion of the Common Interests of USAi and its Affiliates subject to such Call or Put.
>
> FN11. *Id.* § 10.03(e).

Of the remaining Common Interests, Vivendi holds 93.06%, and Barry Diller, the USA principal, holds 1.5%. By virtue of its majority equity stake in VUE, Vivendi essentially exercises control over it, subject only to certain consent and veto rights of USA.

*2. Preferred Interests*

USA also received two forms of preferred interests (the "Preferred Interests") in VUE initially totaling $2.5 billion at face value. USA (or more specifically USANI) is the only holder of these Preferred Interests.

The Class A Preferred Interests (the "A Interests") had an initial face value of $750 million. [FN12] The face value of the A Interests accretes at a rate of 5% per annum. [FN13] Importantly, this face-value accretion is mandatory; it occurs regardless of partnership income. [FN14] On May 7, 2022 (twenty years from the closing date), these A Interests mature and will be redeemed by VUE through a cash distribution equal to the face value of those interests. [FN15] At such time, the A Interests will cease to exist. [FN16] Further, if VUE should liquidate, the A Interests have a preferred position, receiving proceeds of the liquidation after creditors of VUE, but before the holders of Common Interests. [FN17]

> FN12. *Id.* § 5.01(a).
>
> FN13. *Id.* § 5.03.
>
> FN14. *See id.* § 5.03(a) ("The Face Value of the Class A Preferred Interests *shall* accrete at a rate ...") (emphasis added).
>
> FN15. *Id.* § 8.06. Face value will include accretion through and including the date of redemption.
>
> FN16. *Id.*
>
> FN17. *Id.* § 13.02(b)(ii).

The Class B Preferred Interests (the "B Interests") USA receives under the Partnership Agreement have distinct characteristics from those of the A Interests. The initial face value of the B Interests was $1.75 billion, [FN18] which accretes at a 1.4% rate per annum. [FN19] As is true of the A Interests' face-value accretion, this 1.4% face-value accretion occurs without regard to partnership income. [FN20] While the B Interests have the same liquidation preference as the A Interests, [FN21] they also have an additional ongoing distribution preference. This preference requires VUE to make cumulative preferential distributions to the holders of the B Interests at a 3.6% rate per annum of the face value of the B Interests. [FN22] These distributions are to be made quarterly and in cash. [FN23] Like the mandatory face-value accretion of the A and B Interests, the cash distributions the B Interest holders receive are on their face entitlements--they are not tied to partnership income. [FN24] Unlike the A Interests, the B Interests have no maturity date--they are perpetual. However, the B Interests are callable by and puttable to Universal after 20 years, at the lesser of their then-face value or the then-value of approximately 56.6 million USA common shares. [FN25]

> FN18. *Id.* § 5.01(b).
>
> FN19. *Id.* § 5.03.
>
> FN20. *Id.* § 5.03(b) ("[T]he Face Value of the Class B Preferred Interests *shall* accrete at a rate of 1.4% per annum, ...") (emphasis added).
>
> FN21. *Id.* § 13.02(b)(ii).
>
> FN22. *Id.* § 8.01.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 23
(Cite as: 2004 WL 1572932, *2 (Del.Ch.))

FN23. *Id.*

FN24. *See id.* § 8.01(a) ("The Partnership *shall* make cumulative preferential distributions ...") (emphasis added).

FN25. *Id.* § 8.07.

### 3. *Allocation Of Partnership Income*

**\*3** Section 7.02 of the Partnership Agreement sets forth the order for allocating VUE income among the holders of all interests of VUE and is central to the current dispute. It provides:

> SECTION 7.02. *Allocation of Net Income and Net Loss.* (a) *General.* (i) Except as otherwise provided in this Section 7.02, Net Income shall be allocated to the extent therof:
> (A) *first,* if any Net Loss has been allocated to the holders of Preferred Interests under Section 7.02(a)(ii)(B), to the holders of Preferred Interests *pro rata* in proportion to the amount of Net Loss so allocated until the aggregate Net Income allocated under this paragraph (A) shall equal the aggregate amount of such Net Loss;
> (B) *second,* to the holders of Preferred Interests *pro rata* until the aggregate amount allocated under this paragraph (B) equals a return of 5% per annum on the Face Value of their Preferred Interests;
> (C) *third,* if any Net Loss has been allocated to the holders of Common Interests under Section 7.02(a)(ii)(A) or (C), to the holders of Common Interests *pro rata* in proportion to the amount of Net Loss so allocated until the aggregate Net Income allocated under this paragraph (C) shall equal the aggregate amount of such Net Loss; and
> (D) *fourth,* to the Partners in accordance with their Participation Percentages.

The key paragraph in this Section is paragraph (B). It allocates VUE income to the holders of the Preferred Interests in an amount that equals a return of 5% per annum on the face value of those interests. As will be discussed below, what is crucial is that the capital accounts of each partner of VUE are increased by allocations of income under this Section.

### 4. *Tax Distributions*

This case centers on the tax distribution provisions of the Partnership Agreement and thus a brief discussion of the nature of tax distributions and of the negotiation history of this particular tax distribution

provision is warranted.

At the outset, a "partnership distribution" is the "payment of cash or property to a partner out of earnings or as an advance against future earnings, or a payment of the partners' capital in partial or complete liquidation of the partner's interest." [FN26] Because partnerships are generally considered flow-through entities--the income of the partnership "flows through" to the individual partners (here based on the allocation provisions of Section 7.02) and is not taxed at the partnership level--allocations of income to a partner not accompanied by a distribution can result in a tax liability to be paid by a partner without a concomitant receipt of cash from the partnership. To remedy this, some partnerships provide for certain "tax" distributions to ensure that the partners have enough liquidity to make tax payments on their allocated share of the partnership income.

FN26. BLACK'S LAW DICTIONARY 488 (7th ed.1999).

The tax distribution provision ultimately set forth in Section 8.02 was the subject of much negotiation. The first draft of the tax distribution provision, prepared by Cravath and dated December 6, 2001, provided for discretionary tax distributions and limited such distributions to those permitted by the terms of any loan agreement or indenture to which VUE is a party: [FN27]

FN27. The answer refers the court to the drafts for their contents. Ans. ¶¶ 25, 26.

> **\*4** SECTION 8.02. *Tax Distributions.* To the extent permitted by the terms of any loan agreement or indenture to which the Partnership is a party, the Partnership may, at the discretion of the General Partner, as soon as practicable after the close of each taxable year, make cash distributions to each Partner in an amount equal to the product of (i) the amount of taxable income allocated to such Partner for such taxable year pursuant to section 7.02 ... and (ii) the highest aggregate marginal statutory Federal, state, local and foreign income tax rate....

Following receipt of this draft, USA's vice chairman, Victor Kaufman, and Vivendi's then-CFO, Guillaume Hannezo, had a conversation. During this conversation, Hannezo rejected Kaufman's demand for a mandatory tax distribution provision with respect to the Preferred Interests. This conversation is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
(Cite as: 2004 WL 1572932, *4 (Del.Ch.))

the only negotiation history alleged in the pleadings that occurred between the principals to the transaction. The remaining negotiation history contained in the pleadings is simply draft provisions exchanged between Cravath and Wachtell, with Cravath holding the pen throughout negotiations.

Attorneys at Wachtell prepared a mark-up of the December 6 draft, dated December 8,2001. This mark-up would have made the tax distributions mandatory and eliminated the compliance limitations (changes notated by strikethrough or in brackets):

> SECTION 8.02. *Tax Distributions.* [T]he Partnership [shall] as soon as practicable after the close of each taxable year, make cash distributions to each Partner in an amount equal to the product of (i) the amount of taxable income allocated to such Partner for such taxable year pursuant to section 7.02 ... and (ii) the highest aggregate marginal statutory Federal, state, local and foreign income tax rate....

Cravath's second draft of the Partnership Agreement, dated December 11, 2001, acceded to making the distributions mandatory, but rejected Wachtell's elimination of the compliance limitations:

> SECTION 8.02. *Tax Distributions.* [To the extent permitted by the terms of any loan agreement or indenture to which the Partnership is a party,] the Partnership [ shall], as soon as practicable after the close of each taxable year, make cash distributions to each Partner in an amount equal to the product of (i) the amount of taxable income allocated to such Partner for such taxable year pursuant to section 7.02 ... and (ii) the highest aggregate marginal statutory Federal, state, local and foreign income tax rate ...

Wachtell's markup of the December 11, 2001 draft again eliminated the compliance limitations. The third Cravath draft, dated December 13, 2001, accepted and incorporated this change:

> SECTION 8.02. *Tax Distributions. The* Partnership [shall], as soon as practicable after the close of each taxable year, make cash distributions to each Partner in an amount equal to the product of (i) the amount of taxable income allocated to such Partner for such taxable year pursuant to section 7.02 ... and (ii) the highest aggregate marginal statutory Federal, state, local and foreign income tax rate....

*5 The executed Partnership Agreement reflects the December 13, 2001 draft and incorporates all of Wachtell's proposed changes to this section:

> SECTION 8.02. *Tax Distributions.* The Partnership shall, as soon as practicable after the

close of each taxable year, make cash distributions to each Partner in an amount equal to the product of (a) the amount of taxable income allocated to such Partner for such taxable year pursuant to Section 7.02 ... and (b) the highest aggregate marginal statutory Federal, state, local and foreign income tax rate....

Thus Section 8.02, working in conjunction with Section 7.02, provides for mandatory annual tax distributions equal to allocations of taxable income as provided for under Section 7.02 multiplied by a statutory tax rate. There are no compliance limitations.

*5. Effect Of Distributions And Allocations Of Income On Capital Accounts*

Each partner has a separate capital account for each form of VUE interest (Common, A, or B) it holds. [FN28] Central to the functioning of the Partnership Agreement is how distributions and allocations of income made under that agreement affect these capital accounts. The key section 7.01, which provides:

> FN28. Partnership Agreement § 7.01. When referring generally to these accounts, the term is used in its plural form. When referring to a specific interest or specific affect, the singular "capital account" is used.

SECTION 7.01. *Capital Accounts.* (a) The Partnership shall establish a separate capital account (a *"Capital Account"* ) in respect of each Common Interest and Preferred Interest held by each Partner on the books of the Partnership. The Capital Account of a Partner shall be increased by (i) the amount of money contributed by that Partner to the Partnership, (ii) the fair market value of property contributed by that Partner to the Partnership (net of liabilities related to such contributed property that the Partnership is considered to assume or take subject to under Section 752 of the Code) and (iii) allocations to that Partner pursuant to Section 7.02 of profit, income and gain (or items thereof). The Capital Account of a Partner shall be decreased by (i) the amount of money distributed to that Partner by the Partnership, (ii) the fair market value of property distributed to that Partner by the Partnership (net of liabilities related to such distributed property that such Partner is considered to assume or take subject to under Section 752 of the Code) and (iii) allocations to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                       Page 25
(Cite as: 2004 WL 1572932, *5 (Del.Ch.))

that Partner pursuant to Section 7.02 of loss, expense and deduction (or items thereof).

Capital contributions attributable to each partner at the outset were set out in Schedule B to the Partnership Agreement. [FN29] Other than cash and property contributed to VUE (and the "bump up" provision described in detail below), a partner's capital accounts increase solely based on allocations of income pursuant to Section 7 .02(a). [FN30] Capital accounts are decreased by allocations of loss under that Section, and by the amount of cash or the fair market value of property distributed to a partner (including tax distributions under Section 8.02 and annual cash distributions under Section 8.01).

> FN29. *See Id.* § 3.01(b) ("Schedule B indicates the amount of Capital Contributions attributable to Common Interests and Preferred Interests, respectively, for each Partner.").

> FN30. Sections 7.02(b)-(f) also allocate income if necessary to comply with certain tax regulations not at issue in this memorandum opinion.

**\*6** Under this structure, the annual allocation of income (up to 5% of the face value of each of the Preferred Interests) pursuant to Section 7.02(a)(i)(B) increases USA's capital accounts. For the A Interests, Section 7.02(a)(i)(B) would allocate income (to the extent there is income) to USA's capital account to directly reflect the 5% face-value accretion mandated by Section 5.03. For the B Interests, Section 7.02(a)(i)(B) would (again, to the extent there is income) increase USA's capital account by 5% of the face value of the B Interests. Because capital accounts are decreased by the amount of money distributed by VUE to a partner, the mandatory 3.6% cash distribution tied to the B Interests would decrease USA's capital account by that amount. The resultant difference between the initial 5% allocation (and concomitant increase in capital account) contemplated by Section 7.02(a)(i)(B) and the 3.6% cash distribution (and concomitant decrease in capital account) contemplated by Section 8.01 is a 1.4% increase in capital account equal to Section 5.03(b)'s contemplated face-value accretion of the B Interests. Thus, to the extent enough income is available to affect the allocations called for under Section 7.02(a)(i)(B), that Section, along with Sections 8.01 and 5.03, working together and in a vacuum ensure that yearly capital accounts increases reflect exactly the mandatory yearly face-value accretion of both

classes of the Preferred Interests.

However, these Sections do not operate in a vacuum; other provisions in the Partnership Agreement also affect the capital accounts. Specifically, since capital accounts are decreased by *any* distribution made by VUE to a partner, if tax distributions pursuant to Section 8.02 are made, the capital account balances would decrease and be lower than the Preferred Interests' face value. Similarly, if VUE did not have enough income to allocate the full amount called for under Section 7.02(a)(i)(B), capital accounts would not reflect the face value of the Preferred Interests.

6. *Capital Accounts And Liquidation*

Although the Partnership Agreement allows liquidation in extremely narrow circumstances, it has detailed provisions as to preferences in liquidation. Section 13.02(b) provides:
> (b) The proceeds of the liquidation of the Partnership shall be distributed in the following order and priority:
> (i) *first,* to the creditors (including any Partners or their respective Affiliates that are creditors) of the Partnership in satisfaction of all of the Partnership's liabilities (whether by payment or by making reasonable provision for payment thereof, including the setting up of any reserves which are, in the judgment of the liquidator, reasonably necessary therefor);
> (ii) second, *to the Partners holding Preferred Interests* pro rata *up to the amount of the Face Value of such Preferred Interests;*
> (iii) *third,* to the Partners holding Common Interests *pro rata* based on the amount of Capital Contributions attributable thereto, up to the amount of such Capital Contributions; and
> **\*7** (iv) *fourth,* to the Partners holding Common Interests *pro rata* in accordance with their respective Participation Percentages; [FN31]

> FN31. Partnership Agreement § 13.02(b) (emphasis added).

Thus, after creditors, the Preferred Interest holders are in a preferred position, and USA (as the holder of those interests) will receive face value for its interests upon liquidation. There is a proviso (the "Liquidation Preference Proviso") to this preference schedule, however. It ties payments in liquidation directly to the balances of the capital accounts:
> *provided, however,* that in the event that distributions pursuant to clauses (ii) through (iv)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

above would not otherwise be identical to distribution in accordance with the positive balances in the Partners' Capital Accounts, such distributions shall instead be made in accordance with such positive balances;.... [FN32]

FN32. *Id.*

Thus, to the extent there is a lack of income to make sufficient allocations under Section 7.02(a)(i)(B) to allow capital account balances to keep pace with the face-value accretions of the Preferred Interests, or to the extent tax distributions are made, the amount paid out upon liquidation of VUE will likely be less than the face value of the Preferred Interests. For this reason, the face value of the Preferred Interests is tied directly to the balances of the capital accounts unless the difference is made up by the "bump up" provision described below.

### 7. *The Capital Account Bump Up*

Notwithstanding the Liquidation Preference Proviso, there is a provision (the "Bump Up Provision") in the Partnership Agreement which tends to negate to a certain extent the effect of the proviso. Section 7.02(g) provides:

> (g) *Allocations in Liquidation and upon Maturity of Class A Preferred Interests.* Upon a dissolution of the Partnership in accordance with Article XIII, the Net Income or Net Loss (or items of profit, income, gain, loss, deduction and expense) of the Partnership shall be allocated to the Partners so that the balance in each Partner's Capital Account as of the date of dissolution shall equal the amount distributable to such Partner pursuant to Section 13.02(b)(ii) through (iv) (determined without regard to the provisos thereto);....

This provision acts as a supplement to the basic Section 7.02(a) income allocation provision. According to it, if the capital accounts do *not* equal the face value of the Preferred Interests upon liquidation, net income of VUE will be allocated to the respective capital accounts until the balances of the capital accounts equal the face value of the Preferred Interests. Net income, however, is a defined term and is limited. [FN33] Net income during the period preceding liquidation (or, when dealing with the A Interests, during the period proceeding maturity) may not be enough to make up for shortfalls between capital account balances and face value of the Preferred Interests that build up over the life of the partnership. In this event, USA would not receive

the face value of the Preferred Interests.

FN33. Specifically, Net Income is defined as:
[F]or any period, the taxable income ... of the Partnership for such period for Federal income tax purposes, taking into account any separately stated tax items and increased by the amount of any tax-exempt income of the Partnership during such period and decreased by the amount of any Section 705(a)(2)(B) expenditures (within the meaning of Treasury Regulation Section 1.704-1(b)(2)(iv)(i)) of the Partnership; *provided, however,* that Net Income ... of the Partnership shall be computed without regard to the amount of any items of gross income, gain, loss or deduction that are specially allocated pursuant to Section 7.02(c), (d) or (e). With respect to any property contributed to the Partnership at a time when its adjusted tax basis differs from its fair market value, and with respect to all Partnership property after any adjustment to the Capital Accounts pursuant to Section 7.01(c), the Net Income ... of the Partnership (and the constituent items of income, gain, loss and deduction) shall be computed in accordance with the principles of Treasury Regulation Section 1.704-1(b)(2)(iv)(g).
*Id.* § 1.01.

### D. *Vivendi Takes The Position That VUE Is Not Required To Make Tax Distributions With Respect To The Preferred Interests And Subsequent Litigation*

**\*8** In the fall of 2002, Vivendi informed USA that it did not believe that VUE was obligated to pay tax distributions with respect to the Preferred Interests, but rather only with respect to the Common Interests. This position was reasserted in a written memorandum prepared by attorneys at Cravath dated November 13, 2002, and a letter dated December 13, 2002 and prepared by Mr. Jean-Bernard Levy of Vivendi.

In a January 30, 2003, letter, VUE was instructed by USI Entertainment, Inc. (a subsidiary of Vivendi) not to make distributions pursuant to Section 8.02. Further, in its form 6-K filed with the SEC on March 28, 2003, VUE states that "it does not intend to make such [tax] distributions [on the Preferred Interests] for such taxable year" because it "believes that USAi's position is without merit." [FN34]

FN34. These documents were referred to for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
(Cite as: 2004 WL 1572932, *8 (Del.Ch.))

their contents in the answer.

USA filed a complaint in this court on April 14, 2003, seeking specific performance of the Partnership Agreement, as well as a declaratory judgment regarding the interpretation of Sections 7.02 and 8.02. Vivendi filed an answer on June 30, 2003, containing eight affirmative defenses and three counterclaims. The affirmative defenses are that USA has failed to state a claim; amounts due under Section 8.02 were already satisfied by previous distributions to USA by VUE; waiver; estoppel; unclean hands; mutual mistake; unilateral mistake; and the reservation of the right to raise further affirmative defenses as might arise through discovery. Vivendi's counterclaims seek a declaratory judgment that the plain meaning of the Partnership Agreement does not require VUE to make tax distributions based on the Preferred Interests, and for reformation based on the theories of mutual or unilateral mistake. USA replied to these counterclaims on July 21, 2003, and, on January 30, 2004, moved for judgment on the pleadings. Following briefing and oral argument, this is the court's opinion on that motion.

### III.

Court of Chancery Rule 12(c) provides for motions for judgment on the pleadings: "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." The standard utilized to determine such a motion is generally the same as the standard utilized to determine motions filed pursuant to Court of Chancery Rule 12(b)(6). Judgment on the pleadings should be granted only when, accepting as true all of the nonmoving party's well-pleaded factual allegations, "there is no material fact in dispute and the moving party is entitled to judgment as a matter of law." [FN35] Any inferences that may be drawn from the pleadings are drawn in favor of the nonmoving party. [FN36]

> FN35. *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.,* 1992 WL 181718, at *1 (Del.Ch. July 28, 1992), *rev'd on other grounds,* 624 A.2d 1119 (Del.1993).

> FN36. *Id.* The court notes that to the extent Vivendi seeks reformation of the Partnership Agreement based on a theory of either unilateral or mutual mistake, the standard at trial would be the "clear and convincing evidence" standard. *See Brandywine Dev. Group, L.L.C. v. Alpha*

*Trust,* 2003 WL 241727, at *6 (Del.Ch. Jan.30, 2003) (stating that the clear and convincing evidence standard is the appropriate standard when deciding whether to reform a contract based on the doctrine of mutual mistake). This standard of *proof* is not implicated here. Decisions on motions for judgment on the pleadings assume as true the well-pleaded allegations of the nonmoving party.

The court, however, is not required to accept conclusory allegations as true. [FN37] Moreover, "[a] trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in [the nonmoving party's] favor unless they are reasonable inferences." [FN38]

> FN37. *Orman v. Cullman,* 794 A.2d 5, 15 (Del.Ch.2002).

> FN38. *Grobow v. Perot,* 539 A.2d 180, 187 n. 6 (Del.1988), *quoted in Werner v. Miller Tech. Mgmt., L.P.,* 831 A.2d 318, 327 (Del.Ch.2003).

While courts generally do not look beyond the pleadings in deciding motions for judgment on the pleadings, "[i]n particular instances and for carefully limited purposes," considering documents referred to in the pleadings of the nonmoving party "may be an appropriate practice." [FN39] This is particularly true when "the document is integral to [the nonmoving party's] claim and incorporated in" that party's pleadings. [FN40]

> FN39. *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 69 (Del.1995).

> FN40. *Id.*

### IV.
#### A. *Interpretation Of The Partnership Agreement*

*9 The principles of contract interpretation in Delaware are well settled. In deciding a contract interpretation dispute, the court will first "examine the entire agreement to determine whether the parties' intent can be discerned from the express words used or, alternatively, whether its terms are ambiguous." [FN41] If the contract is clear on its face, the court will rely solely on the clear, literal meaning of those words. [FN42] The court will not consider extrinsic evidence when a contract is unambiguous and will not attempt to discern the intent of the parties. [FN43] If

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                            **Page 28**
**(Cite as: 2004 WL 1572932, \*9 (Del.Ch.))**

the contract appears ambiguous, or "fairly susceptible of different interpretations," the court will consider extrinsic evidence, including evidence of intent, in order to uphold the "reasonable shared expectations of the parties at the time of contracting." [FN44]

> FN41. *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del.Ch.2003).

> FN42. *See Demetree v. Commonwealth Trust Co.*, 1996 WL 494910, at \* 4 (Del.Ch. Aug.27, 1996), *aff'd*, 647 A.2d 382 (Del.1994) (unpublished table decision) ("Under the plain meaning rule of contract construction, if a contract is clear on its face, the Court should rely solely on the clear, literal meaning of the words.").

> FN43. *See Star Cellular Telephone Co., Inc. v. Baton Rouge CGSA, Inc.*, 1993 WL 294847, at \*4 (Del.Ch. Aug.2, 1993) (noting that if the court determines a contract has a plain meaning, "then no other evidence need be considered").

> FN44. *Comrie*, 837 A.2d at 13.

Here, the meaning of Section 8.02, standing alone, is clear as day. Annual cash distributions are to be made in an amount equal to the product of "the amount of taxable income allocated to such Partner for such taxable year *pursuant to Section 7.02* ... and ... the highest aggregate marginal statutory" tax rate. [FN45]

> FN45. Partnership Agreement § 8.02 (emphasis added).

Section 7.02 not only provides for Preferred Interest holders to be allocated income, it gives them a preference in regard to income allocation ahead of the Common Interest holders. [FN46] Both Section 8.02 and Section 7.02 are mandatory provisions. Nowhere in the text of either provision is there any carve out of Preferred Interests or a discussion of the Common Interests separate from the Preferred Interests. Had the parties intended to limit tax distributions to be made solely on allocations of income based on holdings of the Common Interests, or to make distributions under Section 8.02 discretionary, they could have easily done so. They did not. The meaning of the language they adopted is plain on its face.

> FN46. *Id.* § 7.02. Specifically, Section 7.02 provides for allocation *"second,* to the holders of Preferred Interests *pro rata* until the aggregate amount allocated under this

paragraph (B) equals a return of 5% per annum on the Face Value of their Preferred Interests."

Vivendi, notwithstanding the crystal clear meaning of Section 8.02, argues that such a meaning would render that Section in conflict with other Sections of the Partnership Agreement. Noting the mandate that courts should construe contracts so as to give effect to all of their provisions, [FN47] Vivendi points to several sections of the Partnership Agreement that it says, when read in connection with Section 8.02, make Section 8.02 ambiguous. These arguments are addressed in turn.

> FN47. *See Council of Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 7 (Del.2002) ("A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole.").

*1. Section 5.01 Does Not Conflict With The Plain Meaning Of Section 8.02*

Vivendi argues that, since Section 5.01 "specifically identifies, by Section numbers, the distributions on the Preferred Interests," but does not "mention [ ] the extremely material tax gross-up distributions that [USA] claims that it is entitled to under Section 8.02," [FN48] allowing tax distributions to the holders of Preferred Interests based on the provisions of Section 8.02 would be contradictory.

> FN48. Defs.' Mem. of Law in Opp'n to Pls.' Mot. for J. on the Pleadings ("Defs.' Br.") at 33-34.

This argument fails. First, Section 5.01 itself only purports to list *"preference[s]* with respect to distributions ... and liquidation" [FN49] that are conferred on the Preferred Interests; it does not purport to list *all* distributions associated with the Preferred Interests. Second, Section 6.01, which provides the basic characteristics of the Common Interests, does not discuss the tax distribution. If Vivendi's theory were true, the tax distributions would be included in Section 6.01 as well as Section 5 .01.

> FN49. Partnership Agreement § 5.01(a), (b) (emphasis added).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 29
(Cite as: 2004 WL 1572932, *10 (Del.Ch.))

*10 There is simply no conflict between the plain language of Section 8.02 and that of Section 5.01.

2. *Internal Revenue Code-Based Arguments*

As discussed above, partnerships are flow-through entities. The partnership does not pay tax on partnership income at the partnership level; rather, partnership income, once calculated, is allocated among individual partners, who are "liable for income tax only in their separate or individual capacities." [FN50]

FN50. I.R.C. § 701.

In determining the amount of partnership income to report on their individual income tax returns, each partner of a partnership must "take into account separately his *distributive share* of the partnership's" gains and losses. [FN51] Section 704 of the Internal Revenue Code (the "IRC") provides how to determine a partner's distributive share of partnership income. At first, it leaves such determination to the partnership agreement. [FN52] Notwithstanding that allowance, if "the allocation to a partner under the agreement of income, gain, loss, deduction, or credit (or item therof) does not have substantial economic effect," the partner's distributive share will not be determined in accordance with the partnership agreement, but rather in accordance with her interest in the partnership. [FN53]

FN51. *Id.* § 702 (emphasis added).

FN52. *Id.* § 704(a) ("A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this chapter, be determined by a partnership agreement.").

FN53. *Id.* § 704(b).

Moreover, certain payments made to individual partners, for purposes of calculating gross income and business expenses that qualify as a deduction on partnership income, are specifically defined *not* to be allocations of partnership income under the IRC. These payments, called "guaranteed payments," are defined as payments "to a partner for services or the use of capital," to the extent they are "determined without regard to the income of the partnership." [FN54] When calculating gross income and business expenses that qualify as deductions on partnership income, these payments are to be considered as

payments made "to one who is not a member of the partnership." [FN55] A determination of status as a "guaranteed payment" affects the calculation of gross income at the partnership level (by, for example, allowing for a deduction of a business expense).

FN54. *Id.* § 707(c).

FN55. *Id.*

Vivendi makes two arguments relating to this general code-defined tax structure. Generally, the first argument is that, although Section 7.02 textually purports to allocate partnership income, it is really only representative of "guaranteed payments" made by the partnership to certain of its partners (the B Interest holders)--payments which are specifically defined not to be allocations of partnership income under the IRC for purposes of determining gross (and subsequently taxable) partnership income. The second argument is that, to the extent it does allocate partnership income, allocations made under Section 7.02 do not have "substantial economic effect," and so that Section does not follow the mandates of IRC section 704(b).

a. *Section 7.02 Allocates Taxable Income*

Section 8.02 of the Partnership Agreement allows distributions equal to the product of "the amount of *taxable income* allocated ... pursuant to Section 7.02" and a specified tax rate. Vivendi argues that Section 7.02(a)(i)(B) merely represents annual payments made to the holders of the B Interests [FN56] in the form of cash distributions to the holders of the B Interests (pursuant to Section 8.01) and face-value accretions of the B Interests (pursuant to Section 5.03). Section 7.02, Vivendi argues, is not *really* allocating partnership income, but only recounting that B Interest holders have received the payments. Thus, the argument goes, to the extent these payments are guaranteed payments, Section 7.02 is not allocating "taxable income," and Section 8.02 becomes ambiguous.

FN56. Vivendi does not make such an allegation with regard to the A Interests.

*11 Vivendi argues that the court should ignore Section 7.02(a)(i)(B)'s clear text--which expressly provides that B Interest holders are allocated partnership income and equally as clearly does not reference the annual face-value accretion of B Interests and cash distributions to B Interest holders

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.