provided for elsewhere in the Partnership Agreement--because to not do so would be to transform what are economically guaranteed payments into allocated shares of partnership income. [FN57] Vivendi asserts that recognizing the 5% income allocation *in addition* to the 3.6% cash distribution to the holders of the B Interests and the 1.4% face-value accretion of the B Interests would result in a 10% return to the B Interest holders. This assertion is based on an incomplete reading of the Partnership Agreement. As discussed more fully below, the cash distributions and face-value accretions are not worth their nominal amounts if not accompanied by an allocation of partnership income under Section 7.02; indeed, it is the allocation of income under Section 7.02 that gives true value to the distributions and face-value accretions provided for elsewhere in the Partnership Agreement.

> FN57. *See* Defs.' Br. at 36-37 ("Although [USA] may argue that the language of the Partnership Agreement says that [USA] would be allocated income under Section 7.02 in amount of a 5% return, that phrasing cannot trump the tax law and transform what are economically guaranteed payments into allocated shares of partnership income.").

Even accepting Vivendi's argument, the payments that Section 7.02(a)(i)(B) would be recounting are not guaranteed payments. According to IRC section 707(c), the key trait of guaranteed payments is that they are determined *without regard to the income of the partnership*. [FN58] This trait is not a trait of either the cash distributions to holders of the B Interests or the face-value accretion of the B Interests.

> FN58. *See also* Treas. Reg. § 1.707-4 ("The term guaranteed payment for capital means any payment to a partner by a partnership that is determined without regard to partnership income and is for the use of that partner's capital.").

Although the cash distributions under Section 8.01 are required to be made to holders of B Interests regardless of VUE's income, Section 7.01(a) requires that capital accounts be decreased by "the amount of money distributed to" a partner by VUE. Thus, the cash distributions result in a decrease in the capital account. Given that, as discussed in parts II.C.6-7 of this opinion, the *true* value of the Preferred Interests in liquidation is tied directly to capital accounts, and not to the nominal face value of those interests, the 3.6% distributions reduce, dollar-for-dollar, the amount that the holders of the B Interests will receive in liquidation unless the distribution is offset by a corresponding allocation of income under Section 7.02(a)(i)(B). Because the allocation of income under Section 7.02(a)(i)(B) would serve to replenish the capital account following a mandatory cash distribution, the true value of that cash distribution is dependent on the partnership's net income. That is to say, if a cash distribution decreases the liquidation value of the B Interests, its true worth is not the 3.6% of the face value of the B Interests the Partnership Agreement nominally accords it if that distribution is not accompanied by a concomitant allocation of partnership income.

Similarly, the 1.4%-face-value accretion of B Interest value is required regardless of VUE's income. But, as discussed above, the actual liquidation value of the Preferred Interests, regardless of how much face value is said to "accrete," is tied directly to the capital accounts. To the extent VUE does not have enough income in any given year to allocate the full 5% of face value according to Section 7.02(a)(i)(B), the face-value accretion contemplated by Section 5.03 is accretion in name only. Face-value accretion, then is tied directly to VUE's income and the allocations provided for in Section 7.02(a)(i)(B). [FN59]

> FN59. Vivendi argues that the Bump Up Provision would serve to nullify the effects of the Liquidation Preference Proviso. But, as discussed above, the Bump Up Provision is tied directly to Net Income, as that term is defined and temporally limited in the Partnership Agreement, and to the extent VUE cannot allocate enough Net Income to replenish the capital accounts to an amount equal to face value of the B Interests, the B Interest holders will not receive B Interest face value.

*12 Moreover, a term defined in Treasury Regulation 1.707-4, promulgated under IRC section 707, more aptly describes transactions under Sections 8.01 and 5.03 of the Partnership Agreement. A "preferred return," is "a preferential distribution of partnership cash flow to a partner with respect to capital contributed to the partnership by the partner that will be matched, to the extent available, by an allocation of income or gain." [FN60] Rather than being made without regard to the income of the partnership, payments under Sections 8.01 and 5.03 are distributions matched by the allocations of income, to the extent available, under Section 7.02;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

allocations which give the distributions their true value.

> FN60. Treas. Reg. 1.707-4(a)(2).

What both sides label a "leading treatise" on tax, William S. McKee's Federal Taxation of Partnership and Partners, discusses the differences between guaranteed payments and preferred returns:

> If a partner's right to receive amounts from his partnership is fixed and certain, or "guaranteed" in some sense, it may be difficult to determine whether the amounts are § 707(c) guaranteed payments or § 731 distributions [*i.e.,* preferred returns]. The touchstone for this determination should be the effect on the recipient's capital account.... If the amounts received do not result in a charge to the recipient's capital account or otherwise reduce his rights to other partnership distributions, then the amount should be treated as § 707(c) guaranteed payments. Conversely, if the recipient's capital account is charged, or his rights to future distributions are reduced, the amounts should generally be treated as § 731 distributions. [FN61]

> FN61. 1 William S. McKee et al., FEDERAL TAXATION OF PARTNERSHIPS AND PARTNERS ¶ 13.03[1][b], at 13-42.

It is clear that the cash distribution and face-value accretion of the B Interests *do* result in a form of charge to the holder's capital account in that they work (whether by increasing nominal face value of the B Interests or by decreasing the balance of the capital accounts) to decrease the capital account's value in relation to the face value of the B Interests (which represents the value both parties anticipated in determining consideration for Vivendi's assets). Thus they are preferred returns, not guaranteed payments under the IRC. [FN62] Similarly, Section 7.02 allocates taxable income to the individual partners and Section 8.02, which references such an allocation, is not ambiguous.

> FN62. Vivendi has already treated the cash distribution as allocated income for purposes of its federal income taxes. Without reaching a theory of estoppel, and notwithstanding Vivendi's statement that "VUE will make all corrections to that return which are legally required and is reviewing the need to amend the return," Defs.' Br. at 36 n.23, the court simply notes this as an offshoot of the clear meaning of Sections 7.02 and 8.02.

**b. *Section 8.02 Does Not Conflict With Section 7.01(e)* [FN63]**

> FN63. Again, Vivendi's argument extends only to the B Interests.

Section 7.01(e) requires the Partnership Agreement to be "interpreted and applied in a manner consistent with" the "Treasury Regulations promulgated under Section 704(b)" of the IRC.

These promulgated regulations extrapolate on the IRC's requirement that an allocation of income under a partnership agreement's allocation provisions have "substantial economic effect" in order for those provisions to be upheld. As Vivendi describes, "[i]n order to comply with [IRC] § 704(b), Section 7.02's 5% nominal income allocation on the [B Interests] must affect, dollar for dollar, the amount that [USA] will receive under the Partnership Agreement from [VUE], for its [B Interests]." [FN64] Or, as the Treasury Regulations provide:

> FN64. Defs.' Br. at 38.

*13 (ii) Economic effect--(a) Fundamental principles. In order for an allocation to have economic effect, it must be consistent with the underlying economic arrangement of the partners. This means that in the event there is an economic benefit or economic burden that corresponds to an allocation, the partner to whom the allocation is made must receive such economic benefit or bear such economic burden . [FN65]

> FN65. Treas. Reg. § 1.704-1(b)(2)(ii).

The McKee treatise sums this test as:
> An allocation has economic effect only if the economic benefit or burden of the allocation has a dollar-for-dollar impact on the net aggregate amounts of money that the partners will ultimately receive over the life of the partnership. [FN66]

> FN66. McKee, at ¶ 10.02[2][a][i], at 10-14.

As set forth throughout this opinion, the Section 7.02 income allocation provision is one part of an intricately designed structure of payments, distributions, accretions and allocations, all working

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in harmony. The cash distributions to the B Interest holders and the face-value accretion on the B Interests each year clearly have a substantial economic effect in liquidation. The income allocation provision's substantial economic effect is clear--it counterbalances the effect of the cash distribution and face-value accretion provisions. The Bump Up Provision does not nullify the importance of this substantial economic effect because it may not replenish the capital accounts to the extent they do not match the face value of the B Interests due to distributions or a lack of income allocable in previous years. To quote Vivendi, "Section 7.02's 5% nominal income allocation on the [B Interests]" *do* "affect, dollar for dollar, the amount that [USA] will receive under the Partnership Agreement from [VUE], for its [B Interests]." [FN67]

> FN67. Defs.' Br. at 38.

Vivendi argues that notwithstanding that capital accounts may not equal the face value of the B Interests upon liquidation, "[t]he possibility that the Partnership may be liquidated is ... a remote contingency that cannot change the illusory nature of the nominal income allocation to the holder of the [B Interests]." [FN68] It further argues that the put/call options tied to the B Interests are "substantially certain to be exercised," [FN69] and so the court should not look to the function of the capital accounts in liquidation. A "virtual certainty" does not mean that a court should ignore a possibility in interpreting a contract. This is especially true when the clear language of the contract provision at issue is completely unambiguous, and the court is merely ensuring that such a reading can be made consistently with other provisions of the contract. Moreover, Treasury Regulation 1.704-1(b)(2)(ii)(b) provides that IRC § 704(b) is not violated:

> FN68. *Id.* at 42.
>
> FN69. *Id.* at 41.

> if all or part of the partnership interest of one or more partners is purchased (other than in connection with the liquidation of the partnership) by the partnership or by one or more partners ... pursuant to an agreement negotiated at arm's length by persons who at the time such agreement is entered into have materially adverse interests and if a principal purpose of such purchase and sale is not to avoid the principles of [IRC § 704(b) ].

*14 The put/call options described above are contained in the Partnership Agreement. That Agreement was negotiated at arm's length by parties who had materially adverse interests. Vivendi has not pleaded that the principal purpose of the put/call options is to avoid the substantial economic effect principle. Thus, the existence of the put/call options contained in the Partnership Agreement do not serve to prevent Section 7.02's income allocations from otherwise meeting the requirements of IRC § 704(b).

For these reasons, Section 7.02 does not conflict with Section 7.01(e).

3. *Tax Distributions Under Section 8.02 Will Not Conflict With Section 8.06 In Calendar Year 2023* [FN70]

> FN70. Vivendi's argument addressed in this section, converse to the previous two arguments, deals solely with the A Interests.

Vivendi also argues that because the final tax distributions based upon income allocable to the A Interests under Section 7.02(a)(i)(B) would be made after the A Interests cease to exist, reading Section 8.02 to allow tax distributions on the A Interests would put it in conflict with Section 8.06. Section 8.06 provides for maturity of the A Interests 20 years from the closing date of the Transaction, in 2022. At that time, Section 8.06 states, the A Interests "shall cease to be outstanding and all rights of the holders thereof shall cease." However, Section 8.02 allows for the tax distribution based on income allocable to the A Interests before they are redeemed in 2022, to be made at the close of that taxable year (in 2023). Vivendi argues this illustrates a conflict between Sections 8.02 and 8.06.

This argument simply does not hold water. The economic facts that determine the amount of the final 2023 tax distribution--the income allocable to the A Interest holders for VUE fiscal year 2022--will be fixed at redemption. That the rights associated with holding the A Interests cease before the final tax distribution is made is irrelevant. As such, the probability of a final tax distribution made after the A Interests are redeemed does not put Section 7.02(a)(i)(B) in conflict with Section 8.06.

4. *Section 8.02 Provides For Tax Distributions, Not A Tax Indemnity*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Vivendi's final argument in this regard is that "[b]ecause the cash coupon on [the B Interest], payable under Section 8.01(a), already covers [USA's] tax liability for its Preferred Interests, any additional distribution essentially gives USA a tax indemnity--but the parties never bargained for, or intended one." [FN71] Vivendi asserts that the cash distribution on the B Interests is intended to cover all of the tax liability incurred by holders of Preferred Interests as a result of the allocation provision in Section 7.02.

FN71. Defs.' Br. at 43.

Nowhere in the Partnership Agreement is this expressed. Rather, the cash distribution is entirely related to the B Interests; there is no indication it is tied in any way to the Common or A Interests. Moreover, this argument would require that tax distributions for the Preferred Interests be set out under a heading simply labeled "Distributions," not in the provision dealing expressly with, and in fact labeled, "Tax Distributions." Finally, although the 3.6% cash distribution may be sufficient to pay tax liabilities based on the current maximum statutory rate, there is no guarantee that this rate will not increase in the future so that tax liabilities based on the allocated income would exceed the cash distributions on the B Interests.

*15 Vivendi has provided no evidence that Section 8.02 represents a tax indemnity. Its argument, therefore, fails.

Given that the language of Section 8.02 is unambiguous, not susceptible of another reading, and its clear reading does not conflict with any other provision of the Partnership Agreement, the court determines that it provides for tax distributions to be made on both the Common and Preferred Interests.

B. *Mistake*

1. *Nature Of Mistake Claims*

Having determined that Section 8.02 requires VUE to make tax distributions to USA based on income allocations provided for under Section 7.02(a)(i)(B), the court turns to Vivendi's affirmative defenses and its counterclaims seeking reformation of the terms of the Partnership Agreement. These are premised on the two theories of mistake--mutual and unilateral.

Before turning to the claim itself, it is important to understand the implications of finding that the elements of mistake have been adequately pleaded. As recounted above, in order for a dispute centered on the interpretation of a contract to move beyond the pleading stage, a court must find that a contract's terms are ambiguous or susceptible of different meanings. If the court finds the terms are not ambiguous, the court will enforce those terms as written, and the case will not move to the expensive, time-consuming stages of discovery and trial. Through this framework, contracting parties are assured that their well-documented agreements will be upheld without significant time and funds expended.

Mistake is a claim that disregards this framework. One claiming mistake assumes that the contract is clear on its face. The claimant must argue that, notwithstanding this clarity, the court should enforce another meaning of the contract. The argument is that the contract's "clear meaning" is not *really* the meaning the parties intended.

The implications of allowing such a claim are readily apparent, and have been highlighted in many Delaware opinions. [FN72] To allow one party to a contract to argue that an unambiguous writing does not reflect the parties' real agreement deprives the other contracting party of the protections of the framework described above. Though mistake is a necessary legal tool to reform contracts that do not reflect the parties' intent because of problems such as scriveners' errors, it must be applied narrowly so as to ensure to contracting parties that in only limited circumstances will the court look beyond the four corners of a negotiated contract. [FN73] This is especially true here, where the Partnership Agreement is an integrated document. [FN74]

FN72. *See e.g., Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.,* 794 A.2d 1141, 1153 (Del.2002) (noting that the purpose of requiring clear and convincing evidence to prove mistake is to "uphold a contract as the parties' written expression of their intent"); *Joyce v. RCN Corp.,* 2003 WL 21517864, at *3 (Del.Ch. July 1, 2003) (stating that the heightened pleading standard required when pleading mistake serves to "preserve the integrity of written agreements by making it difficult to re-open completed transaction"); *see also* Restatement (Second) of Contracts § 155 cmt. c. (1981) ("Care is all the more necessary when the asserted mistake relates to a writing, because the law of contracts, as is indicated by the parol evidence rule and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Statute of Frauds, attaches great weight to the written expression of an agreement."), cited in *Cerberus Int'l, Ltd.*, 794 A.2d at 1153 n .44.

FN73. *Cf. James River-Pennington, Inc. v. CRSS Capital, Inc.*, 1995 WL 106554, at *7 (Del.Ch. Mar.6, 1995) ("Reformation is appropriate only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence.").

FN74. Section 14.04 of the Partnership Agreement states:
Section 14.04. *Integration.* This Agreement and the Transaction Documents constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supercede all prior agreements and understandings of the parties in connection herewith, and no covenant, representation or condition not expressed in this Agreement or in any Transaction Document shall affect, or be effective to interpret, change or restrict, the express provisions of this Agreement. Notwithstanding the foregoing, the parties hereto agree to be bound by the terms and provisions of the Letter Agreement (the "Letter Agreement") dated as of the Closing Date, by and among the Universal Partners and the USAi Limited Partners relating to the clarification of certain matters in this Agreement, and the terms and provisions of the Letter Agreement are hereby expressly incorporated herein by reference.

2. *Requirements For Pleading Mistake*

This caution in entertaining mistake claims is reflected in three ways. First, our court rules require the circumstances constituting mistake to be pleaded with particularity. [FN75] Second, the standard of proof required to succeed on a mistake claim is the intermediate "clear and convincing evidence" standard. [FN76] Finally, and most relevant to the current litigation, a substantive element of a claim of mistake--whether mutual or unilateral--is that the parties came to a specific prior understanding that differed materially from the written agreement. The Supreme Court, in *Cerberus International, Ltd. v. Apollo Management, L.P.*, highlighted this requirement:

FN75. Ct. Ch. R. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

FN76. The Supreme Court, in *Cerberus International, Ltd. v. Apollo Management, L.P.*, held that trial courts must account for this standard in deciding upon motions for summary judgment. *Cerberus Int'l, Ltd.*, 794 A.2d at 1149 ("[T]he trial court must determine whether the plaintiffs on the summary judgment record proffered evidence from which any rational trier of fact could infer that plaintiffs have proven the elements of a prima facie case [of mistake] by clear and convincing evidence."). This case, unlike *Cerberus*, is decided at the pleading stage. Thus, the court does not apply any standard of proof; rather it simply decides whether the nonmoving party, here Vivendi, "would ... be entitled to relief under any of the facts (or reasonable inferences therefrom) alleged in the complaint." *Joyce*, 2003 WL 21517864, at *2.

*16 There are two doctrines that allow reformation. The first is the doctrine of mutual mistake. In such a case, the plaintiff must show that both parties were mistaken as to a material portion of the written agreement. The second is the doctrine of unilateral mistake. The party asserting this doctrine must show that it was mistaken and that the other party knew of the mistake but remained silent. *Regardless of which doctrine is used, the plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement.* [FN77]

FN77. *Cerberus Int'l Ltd.*, 794 A.2d at 1151-52 (emphasis added).

This description is important because it sets forth that no matter what theory of mistake is used the party claiming mistake must allege a specific prior agreement. Moreover, it demonstrates that although Court of Chancery Rule 9(b)'s particularity requirement may heighten what is required to plead mistake, the substance of a mistake claim--by itself--requires the pleading of a "specific" prior agreement. [FN78] While an alleged prior agreement may be informal, [FN79] oral, [FN80] and not constitutive of a complete contract, [FN81] some form of specific prior agreement must be alleged. Furthermore, conclusory factual allegations do not suffice for a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claim of mistake to survive a motion for judgment on the pleadings. [FN82] In this case, Vivendi's affirmative defenses and counterclaims contain only conclusory allegations of a prior agreement at odds with the written contract.

> FN78. Thus, while the *Joyce* opinion rejected the argument that the complaint "must refer to the time, place, and content of the *mistake*," 2003 WL 21517864, at *5 (emphasis added), that opinion went on to state, that while "it is not necessary to plead how or why the mistake occurred," it is "essential to articulate the alleged mutual mistake," *id.*, which would necessarily require pleading a specific prior agreement.

> FN79. *See Hob Tea Room v. Miller*, 89 A.2d 851, 856 (Del.1952) (noting that "the clear language of a formal instrument, duly executed ... will be set aside ... where the evidence leaves no serious doubt but that a specific agreement was informally made ...").

> FN80. *James River-Pennington, Inc.*, 1995 WL 106554, at *9 (allowing mistake claim based on alleged prior oral agreement).

> FN81. *Cerberus Int'l Ltd.*, 794 A.2d at 1152 ("Th[e prior] understanding need only be complete as to the issue involved. It need not constitute a complete contract in and of itself.").

> FN82. *Joyce*, 2003 WL 21517864, at *2 (noting, in a decision on a motion to dismiss pursuant to Rule 12(b)(6), "[w]here the factual allegations are conclusory in nature, they will not be accepted as true for purposes of the motion").

Vivendi argues that the purpose of Rule 9(b) --to "giv[e] notice of the claimed ground or mistake to the defendant," *Joyce*, 2003 WL 21517864, at *3--is served by its counterclaims. The court disagrees with this assessment. Nevertheless, the court's decision is based not on the heightened pleading requirements of Rule 9(b) but on the lack of the pleading of a *specific* prior agreement. Thus, Vivendi's argument that USA waived its right to raise 9(b) concerns (which the court also highly suspects) is irrelevant.

3. *Vivendi's Allegations*

Nowhere in Vivendi's counterclaims is there any pleading of even an oral, informal, or incomplete agreement. The only allegations of an agreement between the parties in Vivendi's answer when discussing mutual mistake are, as follows:

. [T]he parties' agreement at the date of execution of the Partnership Agreement, as evidenced by the history of negotiations between them, was that Section 8.02 of the Partnership Agreement, as a standard boilerplate tax distribution provision, was designed to ensure only that the holders of common interests in VUE would have adequate liquidity to pay their respective share of the taxes allocated under the Partnership Agreement as they fell due. Section 8.02 of the Partnership Agreement was not intended to provide distributions to the preferred shareholders in addition to the specifically negotiated cash distributions set forth in Sections 8.01(a) and 8.06; [FN83]

> FN83. Answer, p. 11. This allegation is repeated at *id.* p. 14, ¶ 2.

. In the event that the objective terms of the Partnership Agreement do require VUE to make tax distributions to Counterclaim-Defendants pursuant to Section 8.02 in the manner that they contend, then the Partnership Agreement does not accurately reflect the parties' prior agreement regarding that term. [FN84]

> FN84. *Id.* p. 16, ¶ 10. Vivendi also alludes to the existence of a deal "previously agreed to by the parties at the time of [the Partnership Agreement's] execution" when discussing the nature of the dispute between the parties. *Id.* p.3, ¶ 3; *id.* p.4, ¶ 10.

When pleading unilateral mistake, Vivendi does not once, even in conclusory fashion, reference a specific prior agreement. The conclusory allegations Vivendi does plead are not sufficient to defeat a motion for judgment on the pleadings.

*17 Nevertheless, Vivendi argues it has adequately pleaded a specific prior agreement. First, it refers to the point in negotiating history discussed in Part II.C.4 hereof, during which Hannezo informed Kaufman that Vivendi would not accede to providing mandatory tax distributions based on allocations of income to the Preferred Interests. Alleging a prior *disagreement*, however, is not a substitute for alleging a prior *agreement*. The sequence of events described is that of a *dis* agreement, followed by an intricately documented negotiation in which several draft

agreements were exchanged, that led ultimately to the tax distribution provision memorialized at Section 8.02. [FN85] Thus, Vivendi's oft-repeated allegations that "[i]n the course of negotiations prior to the execution of the Partnership Agreement, Vivendi rejected plaintiffs' demand for a so-called tax 'gross-up' provision with respect to plaintiffs' proposed preferred interests in VUE," [FN86] or that "[d]uring the negotiation of the transaction, Vivendi unequivocally communicated its refusal to accede to that demand," [FN87] are of no consequence in determining whether a specific prior *agreement,* and therefore a claim for mistake, has been pleaded. Simply put, there is no allegation by Vivendi of a prior agreement of any kind on the tax distributions, much less that there was an agreement that tax distributions would be made based on allocations of income to the holders of the Common Interests, but not on allocations of income to the holders of the Preferred Interests. [FN88]

FN85. The complaint specifically states that this conversation took place after the circulation of the December 6 draft. Compl. ¶ 25. While generally denying the allegations of paragraph 25 of the complaint, the answer goes on to reference the conversation a number of times. In a May 26, 2004, letter submitted to the court subsequent to the submission of briefs and conclusion of oral argument, Vivendi states: Giving defendants all required inferences, [the] conversation may prove to have occurred *after* Section 8.02's drafting was concluded, with Mr. Kaufman asking for distributions that he knew defendants had not agreed to; Mr. Hannezo rejecting that request; and the parties then proceeding to contract, thus showing the parties' prior agreement that was imperfectly reflected in the Partnership Agreement.
At oral argument, however, counsel for Vivendi placed this conversation as taking place immediately after the December 6 draft was circulated. *See* Tr. at 46 ("If Cravath gave this draft of December 6th and Mr. Kaufman gets the draft and, as Vivendi pleads, calls Mr. Hannezo up and says ..."). Further, counsel for Vivendi specifically referenced paragraph 25 of the complaint, stating, "[t]he pleading, by [USA] as well, in 25, is that Victor Kaufman then contacts Vivendi's then-CFO, Guillaume Hannezo." *Id.* at 45-46. Indeed, Vivendi asserts in its brief that the final tax distribution provision was the result of a drafting error. *See* Defs.' Br. at 21 n.15 ("Accordingly, Vivendi is not required to plead the details of exactly how that completely unintentional drafting error might have occurred." Finally, Vivendi's counsel repeatedly referred to the conversation taking place when "both sides have the first Cravath draft." *See generally* Tr. at 70-80.
Moreover, this court is only required at the pleadings stage to take all *reasonable* inferences from the well-pleaded facts of the nonmoving parties. To infer that the Kaufman/Hannezo conversation took place *after* all drafts were exchanged would be to infer that, following draft negotiations in which USA objectively and clearly received exactly what it demanded, USA would call Vivendi to demand that very concession. This inference is inherently *unreasonable.*

FN86. Defs.' Br. at 12.

FN87. *Id.*

FN88. *See Jefferson Chem. Co. v. Mobay Chem. Co.,* 253 A.2d 512, 516 (Del.Ch.1969) ("The difficulty here is that Jefferson has not alleged any 'facts' in support of its allegation seeking reformation. It states merely that the 'intent of the parties' when they made the contract was something different than what Mobay now contends that it is."). *But see* Petition for Reformation at ¶¶ 10, 11, *Joyce,* 2003 WL 21517864 (No. 19621-NC) (pleading that a disputed issue *had been resolved* as the petitioner claimed and alleging the specific terms that would have appeared in a contract but for a mistake); Compl. at ¶¶ 26-30, 37, *Universal Compression, Inc. v. Tidewater, Inc.,* 2000 WL 1597895 (Del.Ch. Oct.19, 2000) (No. 17774-NC) (same). The court takes judicial notice of these public filings.

4. *Other "Facts" Pleaded By Vivendi Do Not Support The Assertion That There Was A Specific Prior Agreement*

Vivendi argues that the court may utilize parol evidence to piece together a pleading of a prior specific agreement. While the nature of mistake claims allows parol evidence to be used as *proof* of a mistake at the summary judgment or trial stage, it is unclear whether such evidence, when properly before the court at the pleadings stage, may be used to *discern an allegation* of a specific prior agreement in the absence of an explicit allegation. If such evidence were permitted at this stage to discern a pleading, it would necessitate the court finding whether or not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

there is enough *proof of an allegation* to survive a motion to dismiss on the pleadings. This is not the type of inquiry a motion on the pleadings typically invites. Regardless, the parol evidence introduced by Vivendi--the Proxy Statement filed by USA disclosing the consideration it would receive as part of the VUE transaction (the "Proxy Statement") [FN89] and the teleconference announcing the transaction [FN90]--both of which are properly before the court at this stage--do not point to a specific prior agreement.

> FN89. A court may consider proxy statements at the pleadings stage to consider what information is disclosed in the proxy statement when such statements are incorporated by reference into the pleadings. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d at 69-70.
>
> FN90. The text of this teleconference is provided in Vivendi's counterclaims, and a transcript of the teleconference is provided to the court in the Affidavit of Jon E. Abramczyk ("Abramczyk Aff."), Ex. I.

a. *Proxy Statement*

Vivendi first argues that USA must have known (and therefore agreed) that it is not entitled to tax distributions based on Preferred Interest holdings because if it were entitled to such distribution "the value of [the Preferred Interests] far exceeds the value disclosed by [USA] in its SEC filings and Proxy Statement, which as a mater of law was required to fully and accurately disclose all material information." [FN91] In furtherance of this argument, Vivendi points to the facts that (1) the Proxy Statement does not mention that the Preferred Interests are entitled to a tax-exempt yield; (2) the value of that yield would exceed $600 million (which would make it material); (3) the Proxy Statement contains pro forma financials showing that taxes are owed on the Preferred Interests without showing any offsetting tax distributions; (4) the Proxy Statement values the A Interests using a pre-tax discount rate instead of an after-tax discount rate (which, Vivendi argues, USA would have used if it believed it was entitled to the distributions); (5) the Proxy Statement states that Bear Stearns valued the A Interests using a 9% to 9.85% discount rate instead of a lower range of discount rates (which, again, Vivendi argues should have been used if USA were entitled to the tax distributions); (6) the Proxy Statement states that Allen & Co. valued the Preferred Interests using pre-tax discount rates of 7% to 8% instead of valuing those interests on an after-tax basis; and (7) the Proxy Statement includes statements in the pro forma financials that underestimate the value of the A Interests because that value was derived using a pre-tax discount rate.

> FN91. Defs.' Br. at 11.

*18 The Proxy Statement, however, plainly states that "VUE will make mandatory tax distributions to cover taxes allocable to USA and its subsidiaries, Universal or Diller with respect to VUE's taxable income." [FN92]

> FN92. Proxy Statement at 63 (submitted to the court in Transmittal Declaration of Candice M. Toll, Esq.). Vivendi argues that this "language refers to nothing other than the tax distributions to the Common Interests holders." Defs.' Br. at 11-12 n.8. Specifically, it states that because the provision refers not only to USA, but also Universal and Diller (who do not hold Preferred Interests), it only contemplates tax distributions to Common Interest holders. That argument is unsupported by any language in the Proxy Statement.

USA initially valued the A Interests on an after-tax basis ($750 million). [FN93] In a responsive letter to the SEC during the review-and-comment process, USA revised its valuation to reflect the value of those interests on a pre-tax basis ($540 million). In a letter to the SEC, USA wrote:

> FN93. This valuation was represented in a letter from USA to the SEC. Correspondence between the SEC and USA was pleaded in the Complaint. Vivendi, while neither admitting nor denying the contents of the letters, referred the court to them for their contents. The letters are thus incorporated by reference into the pleadings and are properly considered at this stage. USA's initial valuation is submitted in Abramczyk Aff. Ex. G, p. 11.

The Company's initial [$750 million] valuation took into consideration certain tax distributions of the partnership. In the revised valuation, the Company used the valuation methodology and resulting range of values estimated by Allen & Co., because it was advised that valuation of such instruments are more typically performed on a pre-tax basis rather than the Company's valuation

methodology for valuing this security. [FN94]

> FN94. Abramczyk Aff. Ex. H.

Thus this correspondence, *which was shared with Vivendi and Cravath,* [FN95] explains that the Proxy Statement reflects Allen & Co.'s analysis, which utilizes a pre-tax methodology, simply because that is how it is "more typically performed." Given the totality of USA's correspondence with the SEC, it is clear that the decision to use a pre-tax, as opposed to an after-tax, analysis does not reflect a prior agreement that tax distributions would not be made to account for allocations of income to holders of the Preferred Interests; it merely reflects a decision that the information in the Proxy Statement should reflect industry standard. [FN96] Moreover, the Proxy Statement itself reinforces that the parties contemplated tax distributions based on allocations of income to holders of the A Interests:

> FN95. Answer p. 8, ¶ 31.

> FN96. Accordingly, Vivendi's argument in regard to the Bear Stearns valuation of the A Interests does not show a prior agreement.

Allen & Co. valued the [Preferred Interests] in VUE using a range of pre-tax discount rates of 7% to 8% ... (on an after-tax basis the preferred interests received by USA would be valued significantly in excess of the values Allen & Co. used in this analysis). [FN97]

> FN97. Proxy Statement at 41.

Notwithstanding Vivendi's argument that this language "simply helps the reader understand the implications of the numbers on the page," [FN98] the clear meaning of this passage is that USA contemplated receiving tax distributions based on its holdings of the Preferred Interests.

> FN98. Defs.' Br., at 11-12 n.8.

Finally, the pro forma financial statements in the Proxy Statement show taxes due, but do not reflect countervailing tax distributions as income. This is consistent with the workings of the partnership, in which income is allocated only in accordance with Section 7.02. Tellingly, the pro formas not only do not show tax distributions as income in respect of the Preferred Interests, but also do not show tax distributions as income in respect of the Common Interests--interests which USA claims are entitled to receive the tax distributions.

b. *Conference Call*

Vivendi has pleaded that:
> [A]t a December 17, 2001, analysts' conference, USA Interactive's Vice-Chairman Victor Kaufman stated that "USA will receive enough cash dividends relating to the preferred stocks that we're receiving to more than cover all of the deferred taxes on the transaction, which become due 15 or 20 years out with respect to the cash and securities." He further confirmed that "the cash dividends that we're receiving start at over $60 million a year and actually get up to over $100 million a year towards the end, so that the aggregate sum well exceeds the tax that we're going to pay on all of the instruments." [FN99]

> FN99. Answer, pp. 14-15, ¶ 3.

*19 Vivendi argues that this statement, without an accompanying reference to the annual tax distributions on the Preferred Interests, is evidence of a prior agreement that those tax distributions would not be made. This statement, however, explicitly refers to *deferred* taxes--not to taxation on the year-to-year partnership income allocated under Section 7.02.

In sum, neither the conference call nor the contents of the Proxy Statement support an allegation of a prior specific agreement between USA and Vivendi to form the basis of a mistake claim. Because the pleadings of Vivendi are entirely devoid of such an allegation, Vivendi's mistake claims--mutual and unilateral--fail as a matter of law. [FN100]

> FN100. In addition to stating a prior specific agreement between the parties, to state a claim for mutual mistake a party must allege execution of a writing that was intended, but failed, to incorporate the terms of that prior agreement; and that the parties had a mutual but mistaken belief that the writing reflected their true agreement. *Cerberus Int'l Ltd.,* 794 A.2d at 1152. The elements of unilateral mistake are the same as mutual mistake save that unilateral mistake requires a mistaken belief by only *one* party, coupled with the other party's knowing silence. *Id.* at 1151. Because Vivendi has failed to prove the bedrock element for either form of mistake--a prior

specific agreement--the court does not reach the other elements of mistake.

## V.

The pleadings show a contract that is unambiguous on its face and the product of long negotiation between sophisticated parties supported by some of the world's most well-regarded investment banks and law firms. USA is not seeking a "double dip" as Vivendi alleges, but merely what it contracted for. For the foregoing reasons, the plaintiffs' motion for judgment on the pleadings is granted. The parties shall confer and submit a conforming order within ten days of the issuance of this memorandum opinion.

2004 WL 1572932 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.