Slip Copy
2005 WL 1036556 (D.Del.)
(Cite as: 2005 WL 1036556 (D.Del.))

Page 9

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
In re: STONE & WEBSTER, INC. et al., Debtors.
SAUDI AMERICAN BANK, Plaintiff,
v.
SHAW GROUP, INC., Swinc Acquisition Three, Inc., and SWE & C Liquidating
Trustee, Defendants.
No. 00-2142 (PJW), ADV. 01-7766(PJW), Civ. 04-834-SLR.

May 3, 2005.

Francis A. Monaco, and Kevin J. Mangan, of Walsh Monzack & Monaco, P.A., Wilmington, Delaware, John C. Hutchins, Daniel E. Rosenfeld, and Amy Beth Abbott, of Kirkpatrick & Lockhart L.L.P., Boston, Massachusetts, for Plaintiff, of counsel.

Gregory Alan Taylor, Stephen E. Jenkins, Christopher S. Sontchi, and Liza H. Meltzer, of Ashby & Geddes, Wilmington, Delaware, for Defendants Shaw Group, Inc. and Swinc Acquisition Three.

Adam G. Landis, of Landis, Rath & Cobb, L.L.P., Wilmington, Delaware, for Defendant SWE & C Liquidating Trustee.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On June 2, 2000, debtor Stone & Webster, Inc. ("debtor") [FN1] filed a voluntary petition for relief under chapter 11, title 11 of the United States Code. On October 18, 2001, plaintiff Saudi American Bank ("SAMBA") filed an adversary action against defendants Shaw Group, Inc. ("Shaw"), SWINC Acquisition Three, Inc. and SWE & C Liquidating Trustee (collectively "defendants") in the United States Bankruptcy Court for the District of Delaware ("the bankruptcy court"). (D.I.1) [FN2] Plaintiff alleged that, under an Asset Purchase Agreement ("the APA"), defendants assumed a debt owed to plaintiff by Stone & Webster Engineering Corporation ("SWEC"), a subsidiary of debtor. (*Id.*) On June 1, 2004, defendants moved to withdraw the adversary proceeding from the bankruptcy court. (D.I.75) This court granted the motion on September 13, 2004. (D.I.88) The court has jurisdiction over actions arising out of chapter 11 of the bankruptcy code pursuant to 28 U.S.C. § 1334(a). Presently before the court are plaintiff's and defendants' motions for summary judgment. (D.I.29, 47) [FN3] For the reasons set forth below, the court grants plaintiff's motion for summary judgment (D.I.47) and denies defendants' motion for summary judgment (D.I.29).

FN1. Although there are multiple named debtors, for ease of reference this order shall refer to a single "debtor."

FN2. Unless otherwise noted, the docket items (i.e., D.I.__) will be from the bankruptcy court's docket for this case.

FN3. There are several motions which are currently pending before the court. While this memorandum opinion will focus on plaintiff's and defendants' cross motions for summary judgment, it will also resolve several other pending motions. Most notably this order will address: (1) plaintiff's motion for leave to file an amended complaint (D.I.8); (2) plaintiff's motion for consolidation or dismissal (D.I.9); (3) defendants' motion for summary judgment (D.I.29); (4) plaintiff's motion for summary judgment (D.I.47); and (5) plaintiff's motion to strike the declaration of James P. Carroll (D.I.48). Because debtor Stone & Webster, Inc. has been terminated from the present matter, its motion for summary judgment (D.I.11) is denied as moot.

II. BACKGROUND

On May 31, 1980, SWEC and Abdullah Said Bugshan & Bros. ("Bugshan"), a Saudi Arabian business enterprise, formed a joint venture called Bugshan Stone & Webster ("BSW") under the laws of Saudi Arabia. (D.I. 1 at 5) BSW was owned in equal shares by SWEC and Bugshan. (*Id.*) In the mid 1990s, BSW entered a $130 million contract with Saudi Arabian American Oil Company ("Aramco") to upgrade a large oil refinery at Ras Tanura in Saudi Arabia (the "Ras Tanura Contract"). (D.I. 31 at A-173) In an attempt to induce plaintiff to grant credit to BSW, Bugshan and SWEC each agreed to issue guaranties to plaintiff for 50% of any loans plaintiff made to BSW. (D.I. 1, ex. A; D.I. 49 at A95-A96, A125) On October 11, 1994, SWEC delivered a letter guarantying payment of 50% of all

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
(Cite as: 2005 WL 1036556, *1 (D.Del.))

Page 10

obligations owed to plaintiff by BSW, up to thirty five million dollars (the "Guaranty"). (D.I.1, ex. A) In a letter dated July 10, 1997, plaintiff approved a loan for $35 million "to finance mobilization & working capital requirements of Saudi Aramco Cont[r]act [No.] 65004/00 (IK)." [FN4] (D.I. 31 at A-168) Unfortunately, BSW ran into difficulties on the Ras Tanura project and was unable to repay plaintiff the outstanding amount of the loan when the project was completed. In late 1998, pursuant to their guaranties, SWEC and Bugshan each agreed to repay one-half of the outstanding Ras Tanura Contract loan at a rate of $650,000 per month (the "Payment Letter"). (D.I. 49 at A67, A127)

> FN4. Contract No. 65004/00 (IK) was BSW's name for the contract to upgrade Aramco's Ras Tanura facility. (D.I. 31 at A-131, A-170)

By June 2000, debtor was operating its businesses and managing its properties pursuant to 11 U.S.C. §§ 1107(a) and 1108. At the time of debtor's chapter 11 filing, SWEC allegedly owed plaintiff approximately $6 million. (D.I. 49 at A69) On July 6 and 7, 2000, substantially all of debtor's assets were sold to defendant Shaw through an auction sale (the "Auction Sale"). (D.I. 49 at A131-A291)

*2 On July 7 and 12, 2000, a hearing for approval of the Auction Sale (the "Sale Hearing") was conducted. [FN5] (D.I. 50 at A497-A648) At the Sale Hearing, counsel for debtor represented that debtor had

> FN5. At the time of the Sale Hearing, the United States District Court for the District of Delaware was hearing bankruptcy cases pursuant to 28 U.S.C. § 1334(a).

sent out a notice of sale ... that said, essentially, if you don't see your name on this list, or this schedule of contracts, which is the, what I like to call the excluded contracts, then your contract is being assumed.
...
Sometimes, Your Honor, in purchase contracts, schedules are merely informative and not necessarily per se material to the deal. That is not the nature of this agreement. This agreement revolves, in terms of its economics, around three schedules, or let's say two schedules, and whether or not your contract is on one of those two schedules. And those two schedules are the schedule for rejected contracts and the schedule for completed contracts. If they are not on those schedules, in essence, your contract is an assumed contract, and the economic impact to you as a stakeholder is dependent upon whether you are on those two lists....
(D.I. 50 at A518-A529) (emphasis added)

On July 13, 2000, an order (the "Sale and Assumption Order") regarding the Auction Sale was entered. (D.I. 49 at A1-A36) In the Sale and Assumption Order, the court stated:

> [A]ll rights and remedies of any non-debtor party or Shaw under any of the Assumed Contracts (the "Rights and Remedies") are fully preserved and shall be enforceable after the Closing against Shaw or the non-debtor party unless such Rights and Remedies are or were expressly waived in a separate agreement or on the record of the Auction.

(D.I. 49 at A18-A19) The court also stated that

> [t]he terms and provisions of the [APA] and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the [debtor], [its] estates, and [its] creditors, Shaw, and its respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Interests in the Assets to be sold to Shaw pursuant to the [APA]....

(D.I. 49 at A26) Finally, the court stated that the APA could not be modified without further order unless "such modification, amendment, or supplement does not have a material adverse effect on the [debtor's] estates." (D.I. 49 at A27)

On July 14, 2000, debtor and defendant Shaw entered into the APA whereby Shaw purchased a substantial portion of debtor's assets and assumed many of its liabilities. (D.I. 50 at A861-A969) On the same date, the court entered an order approving the APA.

Section 2.02 of the APA, titled "Excluded Assets," excludes a number of assets from those being acquired by defendant Shaw. (D.I. 31 at A-240) Subsection (b) defines as "Excluded Assets" all "Completed Contracts" of debtor. Section 1.01 of the APA defines "Completed Contracts" as contracts of debtor, "including those specifically set forth on Schedule 2.02(b), under which substantially all of the contractual work effort of [debtor] has been completed, even if such Contracts have continuing warranty obligations, administrative matters or work related to warranty or other claims[.]" (*Id.* at A-229)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
(Cite as: 2005 WL 1036556, *2 (D.Del.))

Page 11

Schedule 2.02(b) does not include any reference to the Guaranty, the Payment Letter, or the underlying Ras Tanura Contract. (*Id.* at A-306)

*3 Subsection (e) of Section 2.02 of the APA defines as "Excluded Assets" all the "Special Project Claims". (*Id.* at A-241) Section 1.01 of the APA defines "Special Project Claims" as "any and all claims under the project agreements set forth on Schedule 2.02(e) to the extent not reflected on the March 31 Balance Sheet[.]" [FN6] (*Id.* at A-237) Schedule 2.02(e) lists the "Ras Tanura, Saudi Arabia, Refinery Upgrade Project" as one of the "Special Project Claims." (D.I. 50 at A979) Schedule 2.02(e) also specifically identifies a "Contract for Construction dated as of June 28, 1994 by and between Saudi Arabian Oil Company ("Saudi Aramco") and [BSW] (designated by Saudi Aramco as Contract No. 65004/00) [ ]" as a "Special Project Claim". (*Id.*) Finally, Schedule 2.02(e) identifies "[o]ne or more potential claims for payment under a series of Letters of Credit issued by [plaintiff] and involving materials supplied under a number of purchase orders issued by [BSW] ... for materials incorporated into the [Ras Tanura Refinery Upgrade Project]" as "Special Project Claims". (*Id.*)

> FN6. Although the APA defines "Special Project Claims" as any and all claims set forth on Schedule 2.02(e), the Execution Copy of the APA did not include a Schedule 2.02(e). Rather, Schedule 2.02(e) was added to the APA by debtor and defendant Shaw subsequent to this court's approval of the Execution Copy of the APA. (D.I. 51 at 42; D.I. 57 at 14 n. 3)

Section 2.03 of the APA states that "[Shaw] shall assume the Assumed Liabilities[ ]" as of the closing date. (*Id.* at A887) Section 1.01 of the APA defines "Assumed Liabilities" as "all liabilities and obligations of [debtor] set forth on Schedule 2.03 as of the Closing Date...." (*Id.* at A872) Schedule 2.03 is the "List of Assumed Liabilities". (*Id.* at A957) Paragraph three of Schedule 2.03 provides that "[l]iabilities under [debtor's] outstanding bank indebtedness, including amounts outstanding and pursuant to existing standby letters of credit[ ]" are "Assumed Liabilities." (*Id.*) Section 3.17 of the APA states that Schedule 3.17(a)(ix) is "a true, complete and correct list" of "any bond, indenture, note, loan or credit agreement ... or other Contract relating to the borrowing of money or to the direct or indirect guarant[y] or assumption of obligations of any other Person for borrowed money." (*Id.* at A897) Schedule 3.17(a)(ix) lists: (1) a guaranty by BSW to plaintiff (*id.* at A983); (2) a letter of guaranty dated September 1, 1992 from SWEC to plaintiff regarding BSW securing credit facilities (*id.* at A984); and (3) a letter of guaranty dated October 19, 1992 whereby SWEC guaranteed plaintiff the repayment of 40 million Saudi Riyals (*id.*). Defendant Shaw admits that Schedule 3.17(a)(ix) lists a guaranty by SWEC for BSW's borrowing from plaintiff. (D.I. 49 at A91) Defendant Shaw assumes that the guaranty listed on Schedule 3.17(a)(ix) incorporates the Guaranty by which SWEC guaranteed 50% of BSW's obligations to plaintiff up to $35 million. (*Id.* at A91-A92) Defendant Shaw admits that Schedule 3.17(a)(ix) lists contractual liabilities disclosed to defendant Shaw by debtor. (D.I. 49 at A91)

Section 2.04 of the APA, captioned "Excluded Liabilities," states that "[u]nder no circumstances shall [defendant Shaw] assume or be obligated to pay ... any of the Excluded Liabilities, including the following liabilities, which shall be and remain liabilities of [debtor]: ... (c) liabilities or obligations associated with any Excluded Assets; ... (e) liabilities or obligations under the Assumed Contracts that are not Assumed Liabilities and liabilities or obligations arising under the Rejected Contracts or the Completed Contracts[.]" (D.I. 31 at A-241)

*4 On July 18, 2001, the court entered an order establishing a cure claim procedure. (D.I. 49 at A293-A307) The cure claim procedure defined "cure claims" as "any and all liquidated monetary claims [FN7] arising or accruing on or before July 14, 2000 under the Assumed Contracts and actually known by the non-[debtor] party to an Assumed Contract." (*Id.* at A294) The cure claim procedure also required debtor to file a list of all Assumed Contracts and an amended list of all Excluded Contracts. (*Id.* at A305) According to the cure claim procedure, a cure claim had to be filed by August 25, 2000. (*Id.* at A299)

> FN7. "Liquidated monetary claims" relate to "money due and owing or allegedly due and owing by the [debtor] under the Assumed Contracts, but does not include any claims by the non-[debtor] party for any defective work (whether latent or otherwise) by the [debtor] or [its] subcontractors or under any warranty provisions of the Assumed Contract." (D.I. 49 at A294-A295)

On July 21, 2000, debtor filed an Assumed Contract List, an Excluded Contract List, and an Amended Excluded Contract List. (D.I. 50 at A649-A660)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Neither the Guaranty nor the Payment Letter was included on any of those lists. On August 4, 2000, debtor filed a Second Amended Excluded Contract List, and a Second Amended Assumed Contract List. (D.I. 50 at A661-A668) The Second Amended Assumed Contract List includes a contract with Aramco Services Co. and two contracts with plaintiff. (D.I. 50 at A666, A668)

On August 24, 2000, plaintiff filed a statement of cure claim against SWEC, alleging that SWEC owed outstanding financial obligations to plaintiff. (D.I. 49 at A52-A85) Plaintiff attached the Guaranty and the Payment Letter as exhibits to its cure claim. (*Id.* at A56, A67) Defendant Shaw failed to pay or contest plaintiff's cure claim.

On December 28, 2000, the court entered an order approving a letter agreement, dated December 27, 2000, which confirmed the terms of the APA. (D.I. 50 at A857-A860) Pursuant to this letter agreement and order, certain additional projects were to be treated as Completed Contracts under the APA and Schedule 2.02(b). (D.I. 50 at A670) Neither the Guaranty nor the Payment Letter were added to the list of Completed Contracts. (*Id.*) Debtor also stated that the additional completed contracts "constitute the only completed contracts or substantially completed contracts of which [debtor has] actual knowledge as not being listed on Schedule 2.02(b) to the Disclosure Schedules (collectively with Schedule 2.02(b), the 'Completed Contracts List')." (*Id.*) Neither the letter agreement nor the order sought to amend the Schedule of Rejected Contracts.

On August 1, 2001, debtor commenced a preference action against plaintiff to avoid and recover certain preferential transfers, to disallow plaintiff's claims, to estimate plaintiff's claims at $0, and to reduce plaintiff's claims to an amount reflected on the debtor's books and records (the "Preference Action"). Plaintiff filed its answer and affirmative defenses on October 18, 2001.

On August 1, 2002, plaintiff commenced the instant adversary proceeding. (D.I.1) Plaintiff's complaint alleged that, under the APA, defendant Shaw assumed the $6,728,529 debt owed to plaintiff by SWEC. In the alternative, plaintiff claimed that "[u]nless [defendant] Shaw assume[d] its obligation to pay [plaintiff] ... SWEC is obligated to pay [plaintiff]...." (D.I. 1 at 12)

*5 On January 2, 2002, defendants filed an answer to plaintiff's adversary proceeding complaint. (D.I.5) Plaintiff filed a motion for leave to file an amended complaint on January 7, 2002. [FN8] (D.I.8) That same day, plaintiff filed a motion seeking to consolidate the Preference Action and the instant litigation. [FN9] (D.I.9) On August 13, 2002, defendant Shaw filed a motion for summary judgment. [FN10] (D.I.29) On October 18, 2002, plaintiff filed its motion for summary judgment. (D.I.47)

> FN8. The court denies plaintiff's motion for leave to file an amended complaint (D.I.8), as amending the complaint will further delay this case, which lingered in the bankruptcy court for several years before it was withdrawn to this court.
>
> FN9. The court denies plaintiff's motion to consolidate. (D.I.9) Federal Rule of Civil Procedure 42(a) provides this court with authority to consolidate "actions involving a common question of law or fact ... pending before the court." Decisions to consolidate cases are at the discretion of the district court, but often courts balance considerations of efficiency, expense and fairness. *See United States v. Dentsply Int'l, Inc.,* 190 F.R .D. 140, 142-43 (D.Del.1999). Because the Preference Action and this litigation stem from different factual circumstances, consolidation is not appropriate.
> The court also denies plaintiff's motion to dismiss the preference action (D.I.9), as the preference action is not pending in this court.
>
> FN10. The court grants plaintiff's motion to strike the declaration of James P. Carroll submitted in support of defendants' motion for summary judgment. (D.I.48)

III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

IV. DISCUSSION [FN11]

> FN11. In the case at bar, plaintiff asserts that defendant Shaw assumed a debt owed to plaintiff by SWEC through operation of the Guaranty and Payment Letter. Because there is no dispute that plaintiff has standing to enforce these contracts if they were assumed by defendant Shaw pursuant to the Sale and Assumption Order and Sections 2.03 and 3.17 of the APA, there can be no dispute that plaintiff has standing to bring the issue for resolution before this court.

Construction of contract language is a question of law. *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992). The primary consideration in interpreting a contract is to "attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted." *See Comrie v. Enterasys Networks, Inc.,* 837 A.2d 1, 13 (Del. Ch.2003). In ascertaining intent, Delaware courts adhere to the "objective" theory of contracts. *See Haft v. Haft,* 671 A.2d 413, 417 (Del. Ch.1995). Under this approach, a contract's "construction should be that which would be understood by an objective reasonable third party." *R.E. Haight & Assocs. v. W.B. Venables & Sons, Inc.,* C.A. No. 94C-11-023, 1996 WL 658969, at *3 (Del.Super.Oct. 30, 1996) (quoting *Demetree v. Commonwealth Trust Co.,* No. 14354, 1996 WL 494910, at *4 (Del. Ch. Aug. 27, 1996)). Thus,

*6 [w]here parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party. An inquiry into the subjective unexpressed intent or understanding of the individual parties [to the contract] is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning.

*Demetree,* 1996 WL 494910, at *4 (citations omitted); *accord Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997) ( "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."). The court, therefore, must determine whether the contractual language in dispute, when read in the context of the entire contract, is ambiguous.

Ambiguity exists only when a contractual provision is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc,* 616 A.2d at 1196; *accord SI Mgmt. L.P. v. Wininger,* 707 A.2d 37, 42 (Del.1998). Contractual language "is not rendered ambiguous simply because the parties do not agree upon its proper construction ." *Id.; see also City Investing Co. Liquidating Trust v. Cont'l Cas. Co.,* 624 A.2d 1191, 1198 (Del.1993) (finding contract language is not ambiguous "simply because the parties in litigation differ concerning its meaning."). However, inconsistent contractual provisions may create ambiguity in a contract. *Fraternal Order of Police v. City of Fairmont,* 468 S.E.2d 712, 717 (W.Va.1996) ("Contract language usually is considered ambiguous where an agreement's terms are inconsistent on their face...."); *Weber v. Tillman,* 913 P.2d 84, 96 (Kan.1996) ("To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."); *Franklin v. White Egret Condo., Inc.,* 358 So.2d 1084 (Fla.Dist.Ct.App.1977), *aff'd,* 379 So.2d 346 (Fla.1979) (finding "two sections [of a disputed contract] are inconsistent, and inherently ambiguous."). When a contract is ambiguous, it raises "factual issues requiring consideration of extrinsic

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence to determine the intended meaning of the provision in light of the expectations of the contracting parties." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1230 (Del.1997). If "the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide." *In re Columbia Gas Sys.,* 50 F.3d 233 (3d Cir.1995).

The question of whether defendant Shaw assumed the Guaranty and Payment Letter must be considered in light of the fundamental premise that a guaranty "is a separate contract involving duties and responsibilities which are different from the basic contract to which it is collateral." [FN12] *Financeamerica Private Brands, Inc. v. Harvey E. Hall, Inc.,* 380 A.2d 1377, 1379 (Del.Super.1977); see also *Jones Motor Co. v. Teledyne, Inc.,* 690 F.Supp. 310, 313 (D.Del.1988). Therefore, the issue presented by the parties is whether the Guaranty and Payment Letter were unambiguously assumed or rejected under the APA.

> FN12. Given the very clear case law establishing that a guaranty and the underlying contract are separate contracts, the court rejects defendant Shaw's argument that the contract at issue is the Ras Tanura Contract.

*7 The court concludes that the Guaranty and Payment Letter were assumed under the APA. First, neither the Guaranty nor the Payment Letter fall within the definition of an "Excluded Asset" either as a "Completed Contract" or as a "Special Project Claim", as defined in Section 2.02 of the APA and the schedules related thereto. Second, Section 1.01 of the APA defines an "Assumed Contract" as any contract that is not specifically identified as a "Rejected Contract" or a "Completed Contract". Sections 1.01 and 2.03 and Schedule 2.03 of the APA define the scope of "Assumed Liabilities" as including "outstanding bank indebtedness". The record indicates that Schedule 3.17, listing those contracts which relate to such outstanding bank indebtedness as guaranties, includes at least an indirect reference to the Guaranty and Payment Letter. Defendant failed to pay or contest plaintiff's cure claim. Finally, and of great significance, are the representations made to this court by counsel for the debtor, that if contracts were not identified on the schedules listing rejected and completed contracts, then the contract would be deemed an assumed contract.

V. CONCLUSION

For all of these reasons, the court concludes that the Guaranty and Payment Letter are contracts that were assumed by defendant Shaw by operation of the APA and the Sale and Assumption Order. Therefore, plaintiff's motion for summary judgment shall be granted. An appropriate order shall issue.

ORDER

At Wilmington this 3rd day of May, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendants' motion for summary judgment (D.I.29) is denied.

2. Plaintiff's motion for summary judgment (D.I.47) is granted.

3. The Clerk of Court is directed to enter judgment in favor of plaintiff and against defendants.

2005 WL 1036556 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 41
2002 WL 31112430 (Del.Super.)
(Cite as: 2002 WL 31112430 (Del.Super.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
**CENDANT CORPORATION, Plaintiff,**
v.
**COMMONWEALTH GENERAL CORPORATION, Defendant.**
No. 98C-10-034 HLA.

Submitted: March 6, 2002.
Decided: Aug. 28, 2002.

Upon Defendant's Motion for Summary Judgment. Denied.

ORDER

ALFORD, J.

*1 On this 28th day of August 2002, upon consideration of the Motion for Summary Judgment filed by Defendant, the response by Plaintiff and the oral argument, it appears to the Court that:

FACTS
On December 9, 1997, Cendant's predecessor HFS Corporation ("HFS") entered into a contract to purchase from Commonwealth General Corporation ("Commonwealth") all of the stock of the Providian Property and Casualty Insurance Companies ("Providian"). Commonwealth's Offering Memo for the sale of Providian presented a general overview of Providian's potential future policy sales, premiums and expenses; disclaimed any representations or warranties on these projections; and cautioned that future results will probably vary from the projections. [FN1] The Offering Memo predicted 20,000 new insurance policies to be sold in the current fiscal year ending June 30, 1998 and 27,500 in the 1998 calendar year. The Offering Memo predicted that values in the succeeding years would increase steadily, and would reach 50,000 by fiscal year 2000. As a result of the 1997 Offering Memo, HFS became interested in purchasing Providian. Biemer and Commonwealth employees reiterated and reinforced the prosperous expectations of Providian, as set forth in the Offering Memo. In reliance on Commonwealth's Offering Memo and representations, HFS [FN2] tendered an offer to purchase Providian which Commonwealth accepted.

   FN1. Cendant Corporation ("Cendant") argues that Ed Biemer ("Biemer"), Providian's Senior Vice President of Marketing, had a $1 million incentive to sell Providian for approximately $200 million. Thus when he created the sales brochure, he stated a healthy outlook anticipating several years of prosperity and long-term growth. Further, Cendant alleges Biemer knew that 25 to 40% of the expected purchase price would be tied to expectations for future sales to new customers, as he was intricately involved in the development of a valuation model by Tillinghast Towers-Perrin, an insurance actuarial firm. Therefore, Cendant alleges fraud in the sales brochure.

   FN2. HFS is now known as Cendant Corporation.

On December 9, 1997 HFS and Commonwealth signed a Stock Purchase Agreement (SPA) to purchase from Commonwealth all of the stock of Providian. [FN3] Pursuant to section 4.16 of the SPA, Commonwealth warrants that since December 31, 1996 no event or occurrence took place which had a Material Adverse Effect on Providian. The SPA defines Material Adverse Effect as follows:

   FN3. Pursuant to the SPA, New York law governs its interpretation.

   Material Adverse Effect means an event or occurrence that has or could reasonably be expected to have a material adverse effect on permits, the business, financial condition or results of operations of the Company and the Subsidiaries taken as a whole.

Commonwealth brought this motion to have the Court declare that a failure to meet precontract projections cannot be construed as constituting a Material Adverse Change or Material Adverse Effect as defined by the SPA.

Cendant argues that the forward looking language of the Material Adverse Effect ("MAE") clause, which was specifically negotiated into the clause, is in fact a warranty which encompasses expectations for the future results of operations. In support Cendant argues that Commonwealth's initial draft of the SPA had an express disclaimer that projections, including those in the 1997 Offering Memo were not warranted. Cendant further contends that the disclaimer was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

struck from the SPA because it directly conflicted with the forward reach of the MAE definition. Commonwealth rebuts that Cendant knew and its CEO Henry Silverman ("Silverman") admitted that there was no warranty of projections. Cendant contends that Silverman merely testified that sellers normally do not like to warrant projections and posits that this MAE Clause does warrant them.

*2 On December 17, 1997, CUC International ("CUC") and HFS merged to form Cendant Corporation ("Cendant"). In March 1998, Cendant learned there was nonrecurring income at CUC for 1997 that might reach as high as $100 million. It thus had to switch $165 million from reserves to revenue to meet its 1998 budget. By April 1998, Cendant became concerned that the earnings from CUC's receivables were falsified. Nonetheless it continued to tell investors that "fundamentals are great." On April 15, 1998 Cendant publicly announced it discovered potential accounting irregularities at its membership services unit. On April 16, its stock price fell by 46% and its credit rating was placed under review. By this time Cendant internally concluded that fraud occurred. Yet on April 28, 1998, Silverman publicly stated that Cendant believed that the only potential accounting problems which existed were those previously discovered. He stated that Cendant remains strong, liquid and extremely profitable. This statement turned out to be erroneous. Due to the accounting irregularities, Cendant experienced a cash flow problem. At a meeting between Cendant and Commonwealth on May 18, 1998, the parties agreed to extend the June 1, 1998 closing date to September 30, 1998.

Commonwealth argues that Cendant had no intention to complete the sale after it discovered CUC's accounting fraud. According to Commonwealth the following course of events are significant. On July 14, 1998, Cendant announced that it would restate its earnings for 1995 and 1996 and amend its 1997 10-K to report a loss of $218.2 million restated from a profit of $55.4 million. Cendant further explained the widespread and systematic nature of the accounting fraud and told how it affected the accounting records of all major business units of CUC. The next day, Cendant's stock price fell again. On August 13, 1998, Cendant lowered its 1997 profits by $392 million or $0.28 per share. Due to its problems, Cendant changed from an acquirer of companies to a seller of them. It raised $4.8 billion from the sale of 18 business units and used the proceeds to purchase 165 million shares of Cendant stock and to pay down approximately $700 million in debt.

Cendant combats this argument by pointing out that the Securities & Exchange Commission found the accounting regularities were performed by CUC employees in CUC financial records and that HFS was a victim, not a participant. In addition, Cendant contends that as of September 30, 1998 it had over $1.6 billion in available cash.

Cendant argues that Commonwealth was trying to hide the truth about Providian's finances from Cendant. According to Cendant the following facts are significant. Cendant contends that Commonwealth did not want the buyer of Providian to conduct a post-closing audit to reflect changes in the book value between the signing and the closing because of significant risks. Cendant argues that as soon as they received the 1997 year-end results of operations Cendant raised the issue of Providian failing to meet projections. They argue that a January 25, 1998 phone call to Commonwealth proves that they did not invent this problem to get out of the deal after finding out about the accounting fraud. Based on Cendant's complaints, Commonwealth set out to aggressively manage expenses in the short run without long term viability concerns. One concern of Cendant was that Commonwealth allowed Providian's telemarketing staff to fall to 40 workers when the Expense Reduction Plan in the SPA called for it to remain at 60. Commonwealth also switched from underwriting its own policies to brokering Progressive policies. Underwriting their own policies generates approximately $1150, plus a renewal each year for that amount, whereas brokering Progressive policies only generates a one time fee of $225. If one did not qualify for a Providian policy, Progressive policies were offered. Cendant contends that a failure of marketing occurred when Commonwealth employees consistently marketed to people who did not qualify for Providian policies. After the signing of the SPA the ratio between Progressive policies and Providian policies sold was reversed although the accounting practices did not reveal this fact. Further, before Cendant complained to Commonwealth about the failure to meet projections, Commonwealth reported the sale of Progressive polices as "Other Income" which reduced acquisition costs. After signing the SPA Commonwealth began reporting this as an off-income statement deduction from expenses. Thus, Cendant contends a material change in their accounting practices occurred which the terms of the SPA forbid.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d	Page 43
(Cite as: 2002 WL 31112430, *3 (Del.Super.))

*3 Moreover, Cendant contends that the SPA provided that if the closing date was not met either party could terminate the transaction. Cendant lists numerous reasons why the closing did not take place: (1) Commonwealth did not get regulatory approval for the name change nor were Providian policyholders notified of it, (2) Commonwealth did not get Providian's permission for Cendant to use the Providian name for a short post-closing period, and (3) the April 1998 accounting irregularities required Cendant to restate its audited financial statements and without them Cendant could not get regulatory approval. Cendant avers that it tried to arrange a meeting with Commonwealth to investigate their concerns after the extension, but Commonwealth stalled until August 1998. After this meeting, Silverman told Cendant's Board of Directors that he believed a Material Adverse Change occurred in Providian's business and that business simply was not being run in accordance with the SPA. On October 2, 1998, Cendant's Board of Directors met with its acquisition team and outside advisors and determined not to go forward with Providian's acquisition.

On October 5, 1998, Cendant wrote to Commonwealth indicating it terminated the SPA because Commonwealth had breached various representations and warranties in the SPA. The same day, Cendant filed this lawsuit. Cendant's lawsuit seeks to determine that it was within its right to terminate the SPA.

Following the termination of the SPA, Commonwealth put Providian back on the market with a 1998 Offering Memo. Cendant alleges this memo demonstrates that a Material Adverse Change occurred; i.e., (i) the actual and projected sales deteriorated, (ii) the actual and projected cost of acquiring new customers burgeoned and (iii) Providian altered the way it sold insurance.

SUMMARY JUDGMENT
Summary judgment is appropriate when the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. [FN4] In considering such a motion, the Court must evaluate the facts in the light most favorable to the non-moving party. [FN5] Summary judgment will not be granted under circumstances where the record reasonably indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. [FN6]

FN4. *Moore v. Sizemore,* 405 A.2d 679 (Del.1979).

FN5. *Id.*

FN6. *Ebersole v. Lowengrub,* 180 A.2d 467 (Del.1962).

ANALYSIS
Commonwealth's main argument for partial summary judgment is that their 1997 Offering Memo had a disclaimer against reliance on projections and the integrated SPA contained no warranty for them. Commonwealth asserts that absent an express warranty, the court cannot imply a warranty of future prospects. It asserts that the Material Adverse Change Clause and the SPA should be narrowly construed as the definition of Material Adverse Effect was narrowly defined. Commonwealth contends that the SPA is silent on the issue of prospects or projections and argues that Cendant is trying to get the Court to rewrite the contract via judicial construction.

*4 Commonwealth contends that a MAC clause does not warrant prospects or projections unless specifically mentioned. Commonwealth cites *IBP, Inc. v. Tyson Foods, Inc.* [FN7] for the above proposition. In that case, the Delaware Chancery Court stated that "practical reasons lead me to conclude that a New York Court would incline toward the view that a buyer ought to have to make a strong showing to invoke a MAE exception to its obligation to close." [FN8] The Court specifically stated that "a short-term hiccup in earnings should not suffice; rather the MAE should be material when viewed from the longer-term perspective of a reasonable acquiror." [FN9]

FN7. C.A. No. 18373, Strine, V.C. (Del. Ch. June 18, 2001).

FN8. *Id.* at *43.

FN9. *Id.*

Commonwealth contends that since a court determined that *IBP* 's broader MAE clause did not warrant projections, the same result should be found here. However, the court in *IBP* did not hold that IBP did not or could not suffer a MAE by failing to reach projections, the court held that degree and duration of IBP's shortfall was insufficient to establish a MAC. The Court reasoned IBP's had a historical

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

(Cite as: 2002 WL 31112430, *4 (Del.Super.))

Page 44

performance of cyclical falls. [FN10] Based on market analyst views and predictions, IBP appeared to be in sound enough shape to deliver results of operations in line with the company's recent cyclical falls, as the company was a consistently but erratically profitable company. [FN11] Thus, the courts underlying holding was that two quarters of down profits was not sufficient to establish a MAC. In the case *sub judice*, Providian did not meet its projections for more than a full year in a line of business that does not have cyclical downfalls. In addition, Commonwealth has calculated the decrease in profits to have a devastating impact for several years on Providian. Moreover, Commonwealth shows this impact in its 1998 Offering Memo which predicts substantially lower profits and sales than the 1997 Offering Memo.

FN10. *Id.* at *45.

FN11. *Id.*

Further, Commonwealth cites *Goodman Mfg. Co. v. Raytheon Co.* [FN12] for the proposition that MAC clauses do not warrant projections unless specifically stated. In *Goodman* a material adverse change was alleged because the washers were not ready in 1997 as projected but not until 1999. The clause in that contract stated no material adverse change of a business condition, which the contract defined as business assets or financial condition. [FN13] Commonwealth argues that the court ruled that since there was no mention of future prospects, they will decline to assert it into the contract. The Court stated that since the contract specifically disclaimed the existence of any warranty or representation as to "cost estimates, projections or other predictions" and agreed to take the company "as is", the breach of contract claim can not stand. [FN14] Commonwealth argues that the same result should occur here as Cendant acknowledges that no specific warranty for prospects or projections exists in the SPA. Cendant combats that the contract in *Goodman* did not encompass future expectations because no forward looking language existed in that contract. It further argues that an important distinction between the two cases is that the contract in *Goodman* specifically disclaimed all "cost estimates, projections or other predictions" and the buyer agreed to take the company "as is" [FN15], such is not the case here.

FN12. 1999 WL 681382 (S.D.N.Y. Aug. 31, 1999).

FN13. *Id.* at *13.

FN14. *Id.* at *13-14.

FN15. *Id.*

*5 Commonwealth also raises *Pacheco v. Cambridge Tech. Partners, Inc.* [FN16], a Massachusetts case, to support its aforementioned contentions. In that case, Excell and Cambridge were engaged in a stock for stock merger with no representations or warranties regarding future prospects. [FN17] The MAC clause, however, provided for no material change in prospects, which the contract defined as "events, conditions, facts or developments that are known to Excell and that in the reasonable course of events are expected to have an effect on future operations of the business as presently conducted by Excell." [FN18] The Court ruled that one quarter of failed projections was not a material adverse change as the warranties only ran to current operations not future operations. [FN19] This case differs from the instant case, as the MAC clause did not specify future expectations.

FN16. 85 F.Supp.2d 69, 74 (D.Mass.2000).

FN17. *Id.* at 73.

FN18. *Id.*

FN19. *Id.* at 74.

In *Pittsburgh Coke & Chem. Co. v. Bollo* [FN20], Pittsburgh Coke entered into a purchase agreement for Bollo's airline parts supply stores, Standard. The MAC clause warranted "no MAC in the financial condition or in the business or operations of Standard." [FN21] In entering into this contract, Pittsburgh Coke expected Standard to gain business based on the upcoming big jet business, this did not occur. The Court held that there was no MAC as the big jet business was non-existing and never occurred, it was due to extrinsic developments in the aviation industry that Standard's business did not increase as planned. [FN22] Cendant again argues that this outcome is understandable since the MAC clause contained no forward looking language, thus future expectations were not warranted.

FN20. 421 F.Supp. 908 (E.D.N.Y.1976).

FN21. *Id.* at 930.

FN22. *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Further, Commonwealth argues that the SPA's integration clause prevents projections from being added as warranties. Section 10.2 of the SPA states that the agreement constitutes the entire understanding of the parties and no warranties exist except as specifically made in this agreement. Moreover, Commonwealth argues that a breach of contract claim can only arise from the SPA, not the 1997 Offering Memo. To support this claim, Commonwealth cites *Longwood Elastomers, Inc. v. Aeroquip Corp.* [FN23] In that case, the Court held that a breach of contract claim can only arise from the purchase agreement and not the Offering Memo. [FN24] There the Offering Memo contained future projections but disclaimed all warranties or representations, subsequently a purchase agreement between the parties ensued with no projections contained therein, then the projections were not met. [FN25] The difference here arises by the fact that in the case *sub judice* the warranty period of the MAC clause encompasses the time period when the 1997 Offering Memo was made, whereas in *Longwood* the warranty period was for a period post the Offering Memo.

>    FN23. 1995 WL 1052245 (W.D.Va. Feb. 24, 1995), *aff'd* 165 F.3d 18 (4th Cir.1998).
>
>    FN24. *Id.* at *5.
>
>    FN25. *Id.* at *3.

Besides combating the above arguments by Commonwealth, Cendant asserts various own contentions to support its cause of action. Cendant challenges that the MAC clause encompasses reasonable expectations for Providian's future results of operations. It argues that Commonwealth's projections are representations about expectations for Providian's business, financial condition or results of operations. Since the SPA's MAC clause has forward looking language, i.e. "or could reasonably be expected to have," projections should be included. Cendant alleges that practitioners commonly use language about "reasonable expectations" as a substitute for the word "prospects:"

>    *6 MAC and MAE provisions often have some forward looking language. Without explicitly referring to future prospects, many MAC/MAE provisions extend to changes, events and circumstances that can 'reasonably be expected to have a Material Adverse Effect' in the future. Such forward looking language may have much the same effect as the inclusion of 'prospects' in the definition of a MAC or MAE. [FN26]
>
>    FN26. Rod J. Howard, *MAC and MAEs-Allocating the Risk of Changes Between Signing and Closing in Recent Technology M & A Agreements,* 128 2PLI/Corp. 329 (2001).

In fact, *Pacheco,* the Massachusetts case cited by Commonwealth, equates expectations with prospects. [FN27] Further, the *Pacheco* court does cite with approval the Howard law review article that supports the above cited excerpt. [FN28]

>    FN27. 85 F.Supp. at 77.
>
>    FN28. *Id.* at 74.

In addition, Cendant contends that the drafting history confirms the plain language that the MAC clause warrants projections. In the initial draft there was no forward looking language. Cendant proposed adding the word "prospects" to the clause, which Commonwealth rejected. Cendant countered with a phrase that included the forward looking language which Commonwealth accepted. At that same time, the parties agreed to strike a warranty that projections were not warranted in the SPA. Commonwealth's main response to this argument centers around the notion that since there is no mention or reference to prospects or projections in the SPA there can be no warranty for them.

Where more than one plausible construction of a contract exists or the contract is ambiguous because two or more provisions conflict, an issue of material fact arises and summary judgment must be denied. This seems to be the case here. There is no doubt that the parties rely on variant constructions of the Material Adverse Change clause. Depending on which construction the jury finds more plausible will determine how the case is resolved. There are issues of genuine fact surrounding whether the drafters intended the forward looking language off the MAC clause to include prospects, as well as whether the current future wording does include prospects. It seems that this will all boil down to whether a reasonable jury could determine, based upon the facts as it finds them to be, that the MAC clause warrants prospects.

For the aforementioned reasons, Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
(Cite as: 2002 WL 31112430, *6 (Del.Super.))

Page 46

2002 WL 31112430 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
2000 WL 776898 (Del.Ch.)  
(Cite as: 2000 WL 776898 (Del.Ch.))

Page 6

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.  
**George VON OPEL, Plaintiff,**  
v.  
**YOUBET.COM, INC., Defendant.**  
No. C.A. 17200.

Submitted April 17, 2000.  
Decided June 2, 2000.  
June 9, 2000.

Gregory P. Williams and Raymond J. DiCamillo of Richards, Layton & Finger, Wilmington, Delaware, Jack McKay, Marc Cohen, Cheryl Covello of Shaw Pittman, Washington, DC, for Plaintiff, of counsel.

Alan J. Stone and Jessica Zeldin of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Eric Landau and Laura D. Castner of Christensen, White, Miller, Fink, Jacobs, Glaser & Shapiro, Los Angeles, California, for Defendant, of counsel.

*MEMORANDUM OPINION*

STEELE, Vice Chancellor.

*1 Is a holder of stock and warrants to purchase stock entitled to summary judgment against the issuing company for damages arising from the company's failure to file a registration statement as promised where the stock and warrant holder has signed a document purporting to be a release from liability which refers to "shares" but not to "warrants or shares issuable upon exercise of a warrant?"

I conclude that no party is entitled to summary judgment where the record is unclear about the parties' intent in preparing and signing an ambiguous release susceptible to two distinct and inconsistent meanings.

Summary judgment is only appropriate where the moving party demonstrates that no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. [FN1] In that context, I must view all evidence in the light most favorable to the non-moving party. [FN2] With this in mind, I turn to the issues in dispute.

   FN1. Ch. Ct. R. 56.

   FN2. *Williams v. Geier*, Del.Supr., 671 A.2d 1368, 1388 (1996).

Von Opel, a resident of Switzerland and beneficial owner of Youbet.com [FN3] common stock and warrants to purchase shares of common stock, moves for summary judgment on his complaint alleging that Youbet.com, a Delaware corporation, failed to file a registration statement with the Securities and Exchange Commission covering common stock issuable on the exercise of warrants according to the terms of a Private Placement Memorandum and Warrant Certificates.

   FN3. Youbet.com is a developer of interactive software providing individual personal computer users with both race handicapping and sports oddsmaking information. The software package enables users to connect to Youbet.com's host computer system to place wagers on horseracing and other sports contests.

Von Opel, through a private placement offering to non-U.S. investors, agreed to purchase 80 Regulation ("Reg") S Units. [FN4] Each Unit consisted of 10,000 shares of no par value common stock and warrants to purchase 5,000 shares of common stock at a price of $5.25 per share. Consistent with the agreement, Youbet.com issued 800,000 shares of common stock and Warrant Certificates for 400,000 warrants to Von Opel.

   FN4. A maximum of 200 Reg S Units were offered. Reg S Units receive an exemption from registration with the SEC under the Securities Act of 1933 because they are offshore offerings.

Pursuant to the offering, Youbet.com agreed to file registration statements with the SEC after the completion of the Reg S offering. [FN5] Because of its declining financial condition, Youbet.com could not fulfill its obligation. Amid concern of the possibility of a shareholder lawsuit, Youbet.com sought waivers from its investors of all registration rights relating to the Reg S Units. On February 24, 1998, Von Opel received a letter from the Chairman and Chief Operating Officer of Youbet.com, David M. Marshall, regarding the Youbet.com securities which Von Opel had purchased in the Reg S offering. [FN6] Youbet.com asked Von Opel to sign and return a copy of the letter acknowledging his agreement to

Not Reported in A.2d  Page 7
(Cite as: 2000 WL 776898, *1 (Del.Ch.))

waive the registration requirement of the Private Placement Memorandum and Warrant Certificates. Von Opel, by signing and returning the letter to Youbet.com, arguably also agreed to release Youbet.com, its officers and directors, from any liability because of its failure to file registration statements. Von Opel signed and returned a copy of the letter.

> FN5. In its Private Placement Memorandum, Youbet.com agreed to file a registration statement with the SEC "as soon as practicable after the completion of the Regulation S Offering." In addition, Youbet.com agreed to file a registration statement with the SEC within 10 months of the initial closing to cover the common stock issuable on the exercise of the warrants. The Warrant Certificates issued also reiterate Youbet.com's obligation to file a registration statement. The Certificates state in relevant part that Youbet.com shall:
> Within ten (10) months of the initial issuance of Series S Warrants, file with the Commission a registration statement on an appropriate form, including the Registrable[sic] Securities among the securities being registered pursuant to such registration statements.
> Youbet.com later reduced the exercised price for the 400,000 warrants purchased by Von Opel from $5.25 per share to $2.50 per share. Youbet.com amended, signed and delivered a Warrant Certificate to Von Opel incorporating the price reduction and repeating Youbet.com's obligation to file a registration statement.

> FN6. (Letter from David M. Marshall, Chairman & CEO of Youbet.com, Inc. to Georg Von Opel of 2/24/98 at 2.)

The parties decidedly disagree about the scope of the release contemplated in the February 1998 letter. The letter states in relevant part "in the 1995 private placement, [Youbet.com] had agreed to file a registration statement with the SEC as soon as practical covering the *resale of the shares*. Because of the financial condition of [Youbet.com], [Youbet.com] was unable to satisfy that obligation." *emphasis added*. It was from this described obligation that Youbet.com sought a release.

*2 Von Opel disputes the scope of the release arguing it only addresses Youbet.com's obligation to file a registration statement for the shares issued initially (to be done as soon as "practical") and not its obligation to register the warrants or the shares issuable upon exercise of the warrants (to be done within 10 months of closing). The letter neither mentions a timeframe of ten months nor does it differentiate between warrants, shares issuable upon exercise of the warrants or shares issued at the time of the private placement. Von Opel argues that Youbet.com breached a valid contract for the purchase of securities when it failed to file a registration statement and that material fact can not be in dispute. Von Opel believes that he is therefore entitled to specific performance of the promise to file and damages that he may have incurred as a result of the failure to file the registration statement promised within 10 months of the closing.

Youbet.com presented the affidavit of Marshall for the purpose of setting forth a material, disputed issue of fact for trial. The Marshall affidavit indicates Youbet.com believed that the release extinguished its obligations concerning all of the securities subject to registration under the Memorandum and Warrant Certificates. The Marshall affidavit states that Youbet.com intended that the Von Opel release would foreclose the possibility of a shareholder lawsuit for not registering securities issued in the Reg S offering.

Does the fact that the parties disagree about the proper interpretation of the release create an ambiguity? No. Contract terms are not ambiguous simply because the parties disagree on a common meaning. [FN7] Rather, ambiguity exists when the provisions in controversy are reasonably susceptible to two or more different meanings. [FN8] Under the unique facts of this case, there is ambiguity on the face of the release. There is uncertainty about the scope, meaning, and application of the term *shares*. Based on the record before me it is fair to say that the term *shares* is ambiguous and that there is room for interpretation about the intended meaning as proposed in the release.

> FN7. *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, Del.Supr., 616 A.2d 1192, 1196 (1992).

> FN8. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, Del.Supr., 702 A.2d 1228, 1232 (1997) (citing *Rhone-Poulenc Basic Chemical Co. v. American Motorists Ins. Co.*, Del.Supr., 616 A.2d 1192, 1196 (1992)).

Youbet.com undertook two arguable obligations to

file registration statements. First, the offering Memorandum committed Youbet.com to file a registration statement with the SEC "as soon as practicable after the completion of the Regulation S offering." Presumably, this made the offer more attractive to prospective buyers. Second, the Warrant Certificates committed Youbet.com to file with the SEC a registration statement "including the Registrable [sic] Securities" within 10 months of the initial issuance of Series S Warrants. Youbet.com has never filed a registration statement.

Von Opel claims that the filing of the registration statement is necessary for him to be able to sell shares issuable upon exercise of the warrants. Von Opel contends that the promise to register the shares issued at the time of the original offering is distinct from the promise to register the warrants or the shares issuable upon exercise of the warrants.

*3 The Marshall letter stated in part that Youbet.com had "agreed to file a registration statement with the SEC as soon as practicable covering the resale of the shares." The letter requested that Von Opel release Youbet.com from any liability arising from its "failure to file a registration statement as soon as practicable covering the shares." Von Opel signed and returned the letter. Von Opel now argues that the letter clearly could be referring only to the shares being sold in the initial offering and not to registration of the warrants or shares issuable upon exercise of the warrants which was promised on a different timetable (within 10 months as opposed to as soon as practicable) and in both the Memorandum and the Warrant Certificates themselves.

Youbet.com contends that the very same Memorandum upon which Von Opel relies states that "[t]he Company has no present intention of filing a registration statement with respect to the resale of the Reg S Warrants" and that the Certificates confirm this fact by reference to "Registrable [sic] Securities which are further defined as "the Warrant Shares issued or issuable upon the exercise of a Warrant." Youbet.com contends that Von Opel knowingly and intentionally waived any right to rely upon the promise to register the shares when he signed and returned the release. Youbet.com has raised by affidavit whether, as a matter of fact, Von Opel waived his contract right, either expressly or by his conduct. Youbet.com takes the position that conversations with Marshall before the letter of February 28, 1998, as well as the plain meaning of the term "resale of the shares" establishes that the waiver and release of liability applied to both shares of Common Stock issued through the Memorandum and the warrant shares issued or issuable upon the exercise of the warrants.

Von Opel has himself done no more than raise a disputed issue of material fact when he contends that the release's reference to "shares" may have caused a reasonable person to believe that he was only releasing Youbet.com from liability to file a registration statement on the shares issued initially but not on the warrants or the shares issuable upon the exercise of the warrants. The term in question may relate to both. In any event, a waiver of a known right uniquely involves inferences to be drawn from subjective assessments of the totality of the circumstances surrounding the purported action alleged to constitute a release. Matters of this kind are not generally appropriate for summary judgment. [FN9]

> FN9. See *Allstate Ins. Co. v. Lazarczyk*, Del.Super., C.A. No. 96C-05-300, Quillen, J. (Dec. 17, 1996).

In retrospect it appears that I should have granted defendant's Rule 56(f) request for discovery to explore the facts surrounding Von Opel's signing of the release. I apologize for any inconvenience that may have caused the parties.

Von Opel's request for summary judgment is *denied*.

IT IS SO ORDERED.

2000 WL 776898 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.