Not Reported in A.2d  
2004 WL 1739522 (Del.Ch.)  
(Cite as: 2004 WL 1739522 (Del.Ch.))

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.  
BAE SYSTEMS NORTH AMERICA INC. and Bae Systems Information and Electronic Systems Integration Inc., Plaintiffs,  
v.  
LOCKHEED MARTIN CORPORATION, Defendant.  
No. Civ.A. 20456.

Submitted June 7, 2004.  
Decided Aug. 3, 2004.  
Richard L. Horwitz, and Erica L. Niezgoda, of Potter Anderson & Corroon LLP, Wilmington, Delaware and Daniel Slifkin, and Antony L. Ryan, of Cravath, Swaine & Moore LLP, New York, New York, for Plaintiffs.

Samuel A. Nolen, Jeffrey L. Moyer, and Anne Shea Gaza, of Richards, Layton & Finger, P.A., Wilmington, Delaware, for Defendant.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

*1 Plaintiffs BAE Systems North America Inc. ("BAE") and BAE Systems Information and Electronic Systems Integration Inc. and Defendant Lockheed Martin Corporation ("Lockheed") are defense and aerospace contractors. In 2000, BAE purchased the assets of Lockheed's Sanders division. At the time of the transaction, Lockheed, through its unincorporated Sanders division and its wholly-owned subsidiary, Lockheed Martin Federal Systems, Inc. ("Federal"), was a defendant in an action pending in California. In accordance with the agreement by which BAE bought the Sanders division, BAE undertook the defense of the action. That agreement was intended to allocate any liability that might result from the California action. For BAE and Lockheed, that action turned out rather badly, and BAE filed suit in this Court to sort out where that liability, as between BAE and Lockheed, falls. In response to BAE's complaint, Lockheed filed a counterclaim relying upon theories of breach of contract, breach of fiduciary duty, equitable fraud, and reformation. Before the Court are the parties' cross-motions for partial judgment on the pleadings and the Plaintiffs' motion to dismiss Lockheed's counterclaims.

I. BACKGROUND  
A. *The Transaction*

In July 2000, Lockheed agreed to sell its Aerospace and Electronic Systems business (the "AES Business") to BAE for $1.67 billion. The central component of the AES Business was the unincorporated business unit of Lockheed known as "Sanders." [FN1] This agreement was formalized in the Transaction Agreement, dated July 13, 2000. The transaction was structured as a sale of assets. In order to effect the sale of assets, Lockheed and its affiliates and BAE executed the Bill of Sale, Assignment and Assumption Agreement at closing on November 27, 2000.

> FN1. Sanders, as a result of the acquisition and subsequent events, is essentially now BAE Systems Information and Electronic Systems Integration, Inc. In fact, that company was formerly known as BAE Systems Sanders, Inc. Compl. ¶ 3.

B. *The CCT Litigation*

At the heart of the dispute arising out of the Transaction Agreement is litigation (the "CCT Litigation") initiated by Cable and Computer Technology, Inc. ("CCT") in June 1997 against Lockheed, Federal, and Sanders. CCT's complaint, alleging breach of contract, promissory estoppel, fraud, intentional interference with prospective economic advantage, unfair business practices, and violation of California's Cartwright Act, sought both compensatory and punitive damages. Following its acquisition of the AES Business, BAE undertook the defense of the CCT Litigation.

The CCT Litigation was based on the following facts. CCT and Federal were competing for a contract with Boeing Corporation involving a computer system upgrade for the B1-B bomber. Sanders had joined in a teaming arrangement with CCT under which CCT would be the bidder and Sanders would provide subcontract work to CCT. Sanders withdrew from the arrangement shortly before the deadline to submit bids, and Federal subsequently won the contract.

CCT alleged that Lockheed, Federal, and Sanders acted in concert to deprive CCT of an opportunity to win the contract. Specifically, CCT alleged that

Not Reported in A.2d  
(Cite as: 2004 WL 1739522, *1 (Del.Ch.)) Page 2

Lockheed and Federal induced Sanders to withdraw from the teaming agreement. On April 13, 1998, the United States District Court for the Central District of California granted summary judgment on all counts to the defendants. In a May 31, 2000 decision, the United States Court of Appeals for the Ninth Circuit reversed the District Court, reinstated all but the unfair business practices and Cartwright Act counts, and remanded the case for trial. [FN2]

> FN2. *Cable & Computer Tech., Inc. v. Lockheed Sanders, Inc.,* 214 F.3d 1030 (9th Cir.2000).

*2 The Transaction Agreement, under which the AES Business (including the Sanders business) was transferred to BAE, was entered into less than two months thereafter. After closing in November 2000, BAE took control of the defense of the CCT Litigation. Trial began in February 2001, and on March 28, 2001, a jury verdict was entered for CCT against all three defendants as to liability. During the damages phase of the trial, the defendants proposed a special verdict form that allowed the jury to allocate liability to Sanders and Federal separately. [FN3] On April 5, 2001, the jury awarded CCT compensatory damages of $11,270,902 (with the defendants jointly and severally liable) and punitive damages totaling $53,276,000--half of which was assessed against Sanders/Lockheed and half against Federal. The trial judge, upon the defendants' motion, reduced these amounts to $5,762,902 in compensatory damages (jointly and severally) and $12,867,500 in punitive damages against Sanders/Lockheed and the same against Federal (the "CCT Liability"). [FN4]

> FN3. The alternative would have been to have combined all of the Lockheed liability, including both Sanders and Federal, together.
>
> FN4. *Cable & Computer Tech, Inc. v. Lockheed Sanders, Inc.,* No. CV 97-5315 CM (C.D.Cal. Oct. 15, 2001) (revised judgment).

On January 27, 2003, following an unsuccessful appeal [FN5] BAE paid $33,809,512.44, for satisfaction of the CCT judgment against all defendants. Whether Lockheed must reimburse BAE for some or all of that payment is the question posed in this proceeding.

> FN5. *Cable & Computer Tech, Inc. v. Lockheed Sanders, Inc.,* 2002 WL 31689043 (9th Cir. Nov. 27, 2002).

C. *The Transaction Agreement*

As a general matter, with its acquisition of Sanders' assets, BAE, in accordance with the Transaction Agreement, also acquired Sanders' liabilities. BAE took responsibility for those obligations defined by the Transaction Agreement as "Assumed Liabilities," but responsibility for the obligations defined as "Excluded Liabilities" remained with Lockheed. The parties dispute whether the CCT Liability is among "Assumed Liabilities" or "Excluded Liabilities."

> The Transaction Agreement provides in part:
> "Assumed Liabilities" means all liabilities and obligations of Seller Companies of any kind, character or description, ... to the extent relating to or arising out of the operation, affairs or conduct of the AES Business or the Transferred Assets, including but not limited to the following (other than Excluded Liabilities):
> (i) all liabilities and obligations, ... at or prior to the Closing, that ... (b) are disclosed in any of the Disclosure Schedules delivered hereunder ...
> (ii) all liabilities and obligations arising under Contracts ..., including, without limitation, liabilities and obligations arising from or relating to the performance or nonperformance of the Contracts by the AES Business, a Buyer Company or any other Person, whether arising prior to, on or after the Closing Date;
> (xi) all liabilities and obligations arising from or relating to governmental, judicial or adversarial proceedings (public or private), [or] litigation ... arising from or directly or indirectly relating to the AES Business or any Transferred Assets, ... [FN6]

> FN6. Transaction Agreement at A-2-3, Transmittal Aff. of Anne Shea Gaza Ex. A.

The term "Seller Companies" is defined as Lockheed and its subsidiaries. The AES Business includes Sanders, but not Federal. The CCT Litigation is listed on Disclosure Schedule B.09.

*3 The Excluded Liabilities that the definition of Assumed Liabilities references are defined to include:
> (v) all liabilities or obligations, whether presently in existence or arising after the date of this Agreement, relating to or arising primarily out of Excluded Assets or any business of Seller Companies other than the AES Business; [FN7]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN7. *Id.* at A-8.

Excluded Assets include Federal assets.

D. *The Current Litigation*

BAE's complaint seeks reimbursement from Lockheed for the amount it paid in satisfaction of the CCT Liability, in addition to attorneys' fees and expenses incurred in the CCT Litigation. Its complaint is based on breach of contract and unjust enrichment. The breach of contract claim relies on the indemnification provision in the Transaction Agreement requiring Lockheed to indemnify BAE for any damages incurred by BAE relating to the contractually defined Excluded Liabilities. [FN8] BAE argues that the CCT Liability is among those Excluded Liabilities because, *inter alia,* it "relat[es] to Federal."

> FN8. The indemnification provision is set forth at section 11.02(b) of the Transaction Agreement. It states, "[e]ffective as of the Closing ... Seller hereby indemnifies Buyer ... from, any and all Damages incurred or suffered by any of them arising out of, resulting from or related in any way to ..., (ii) any Excluded Liabilities...."

Lockheed's answer asserts five counterclaims. The first of the counterclaims seeks a declaratory judgment that the CCT Liability is contractually defined as one of the Assumed, as opposed to Excluded, Liabilities and, thus, is for BAE's account. Counterclaim Count V seeks reformation of the Transaction Agreement if its language is found to exclude the CCT Liability from the definition of Assumed Liabilities. Counterclaim Counts II-IV, based on breach of contract, equitable fraud, and breach of fiduciary duty respectively, are rooted in the decision to seek a special verdict form in the damages phase of the CCT Litigation.

Both sides have moved for partial judgment on the pleadings. [FN9] The Plaintiffs also seek dismissal of Lockheed's counterclaims. The Plaintiffs' claim for unjust enrichment is not contested at this stage.

> FN9. BAE has moved for partial judgment on the pleadings with respect to its contract claim as set forth in Count I of its Complaint. Lockheed has moved for partial judgment on the pleadings with respect to its Counterclaim Count I in which it seeks a declaratory judgment regarding the proper interpretation of the contract between the parties, a claim which mirrors Count I of BAE's Complaint.

II. STANDARDS

In considering a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court is required to accept as true all of the nonmoving party's well-pleaded factual allegations and to draw all reasonable inferences in the light most favorable to the nonmoving party. The motion may not be granted unless it appears with reasonable certainty that the nonmoving party would not be entitled to relief under any set of facts that it could prove at trial. [FN10]

> FN10. *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l. Fund, L.P.,* 829 A.2d 143, 149 (Del. Ch.2003); *Orman v. Cullman,* 794 A.2d 5, 15-16 (Del. Ch.2002).

Judgment on the pleadings under Court of Chancery Rule 12(c) [FN11] "may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law." [FN12] In deciding cross-motions for judgment on the pleadings, the Court will take the well-pleaded facts contained in the complaint and the counterclaim and "view the facts pleaded and the inferences to be drawn from such facts, in a light most favorable to the non-moving party." [FN13]

> FN11. Court of Chancery Rule 12(c) states in part: "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."

> FN12. *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.,* 624 A.2d 1199, 1205 (Del.1993).

> FN13. *Id.* "[C]ourts generally apply the same standard of review to motions for judgment on the pleadings and summary judgment." *Id.* at 1205, n. 9 (citing Wright & Miller, Federal Practice & Procedure, Civil 2d § 1369 at 534-35), *But see Acierno v. Goldstein,* 2004 WL 1488673, at *2 (Del. Ch. June 25, 2004) ("The Rule 12(c) standard has been described as 'almost identical' to the 12(b)(6) standard and favors the claimant.") (quoting *Cantor Fitzgerald, L.P. v. Cantor,* 2001 WL 1456494, at *4 (Del. Ch. Nov. 5, 2001). Although apparently at odds with each other, these different formulations of the standard governing Rule 12(c) are contextual. When

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the question is whether to dismiss a claim in the context of a motion for judgment on the pleadings, the inquiry follows the procedures established by Rule 12(b)(6) jurisprudence. If affirmative relief is sought, the analysis is substantially the same, although subject to the constraint of a more limited record, as that for summary judgment motions.

### III. ANALYSIS

A. *Contract Interpretation--BAE's Contract Claim and Lockheed's Declaratory Judgment Application* [FN14]

> FN14. Through Count I of its Complaint, BAE seeks judgment, as a right under the Transaction Agreement, against Lockheed for the sums which it paid to discharge the CCT Liability (in addition to other related expenditures). Conversely, Lockheed seeks a declaratory judgment to the effect that the Transaction Agreement, by its terms, does not obligate it to reimburse BAE. The claims mirror each other, but the procedural differences are attributable to the fact that BAE, unlike Lockheed, is out of pocket some $33 million. BAE has suggested that Lockheed's declaratory judgment counterclaim should be dismissed because, if BAE loses on its direct claim, that result, in effect, would confer upon Lockheed the relief which it seeks. BAE, however, has offered no cognizable reason why both sides should not be able to seek affirmative relief. Also, by allowing Lockheed to seek declaratory relief, the possibility that Lockheed might leave this litigation without an answer as to its responsibility is reduced. BAE has not suggested that Lockheed's claim is not otherwise the proper subject of an action for declaratory judgment under 10 *Del. C.* Ch. 65.

Because the transaction was structured as a sale of assets, the parties agree that, under the present circumstances, the liabilities associated with those assets are transferred only by operation of the Transaction Agreement. Thus, it is necessary to apply the Transaction Agreement to the alleged facts.

*4 In passing on a contract dispute, the Court first looks to the express terms of the contract to see "whether the parties' intent can be discerned" from those terms. [FN15] If the terms of the contract are clear on their face, the Court will give those terms the meaning that "would be ascribed to [them] by a reasonable third party." [FN16] If, however, a contract's provisions are "reasonably susceptible to two or more meanings," [FN17] the Court will deem that contract ambiguous and will consider extrinsic evidence to discern the "reasonable shared expectations of the parties at the time of contracting." [FN18] In making this determination, the Court "must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole." [FN19]

> FN15. *Comrie v. Enterasys Networks, Inc.,* 837 A.2d 1, 13 (Del. Ch.2003).
>
> FN16. *True North Communications, Inc. v. Publicis, S.A.,* 711 A.2d 34, 38 (Del. Ch.1997), *aff'd,* 705 A.2d 244 (Del.1997).
>
> FN17. *Amtower v. Hercules, Inc.,* 1999 WL 167740, at *11 (Del.Super.Feb. 26, 1999).
>
> FN18. *Comrie,* 837 A.2d at 13.
>
> FN19. *Council of Dorset Condo. Apartments v. Gordon,* 801 A.2d 1, 7 (Del.2002).

Under the terms of the Transaction Agreement, BAE took on the "Assumed Liabilities." Assumed Liabilities, for purposes of the current litigation, are "all liabilities and obligations of [Lockheed] ... to the extent relating to or arising out of the operation, affairs or conduct of [Sanders]." There is a carve out to this definition, however. The parenthetical in the definition of Assumed Liabilities, "(other than Excluded Liabilities)," means that a liability that may initially be categorized as an Assumed Liability, may be removed from that category if it falls within "Excluded Liabilities." [FN20] Excluded Liabilities, again for purposes of this litigation, include "all liabilities ... relating to or arising primarily out of [Federal]."

> FN20. This exclusion applies with equal force to those liabilities categorized as Assumed Liabilities because they appear on the list of specifically enumerated liabilities following the general definition of Assumed Liabilities as it does to those liabilities categorized as Assumed Liabilities solely through the general definition of Assumed Liabilities.

Thus, to the extent a liability is "relating to or arising out of" Sanders, it is an Assumed Liability unless it is

"relating to or arising primarily out of" Federal, in which case it is an Excluded Liability. BAE argues that although the CCT Liability relates to Sanders, it also relates to Federal and, therefore, is an Excluded Liability. [FN21] Lockheed argues the CCT Liability is not excluded because, while it may relate to Federal, it does not "arise primarily out of" Federal.

> FN21. If the CCT Liability is an "Excluded Liability," not only did BAE not acquire that burden under the Transaction Agreement, but also BAE would be entitled to indemnification by Lockheed for that obligation.

Accordingly, both parties agree that at least some of the CCT Liability "relates to" and "arises out of" Sanders. Both parties also agree that at least some of the CCT Liability "relates to" and "arises out of" Federal. [FN22] But the critical definition of Excluded Assets is not "relating to or arising out of"; instead, it is "relating to or arising *primarily* out of." While both parties agree the CCT Liability "relates to" Federal, it is unclear whether the CCT Liability "arises *primarily* out of" Federal.

> FN22. The improper severing of the CCT teaming agreement, the immediate wrong leading to the CCT Litigation, was accomplished by those Lockheed employees managing the Sanders assets. The impetus for severing the relationship appears to have come from the Federal business segment and, perhaps significantly, the benefits from the severing accrued not to the Sanders business segment but to Federal, which was then able to secure the contact. In short, as of now, the onus is with Sanders (*i.e.,* BAE) and the bonus is with Federal.

This, then, requires the Court to interpret the phrase "relating to or arising primarily out of." Clearly, anything "arising primarily out of" Federal would also be "relating to" Federal. But something "relating to" Federal may not always be "arising primarily out of" Federal. Thus, to the extent "relating to" has independent meaning, it nullifies the independent narrowing effect of "primarily" in "arising primarily out of." To the extent "arising primarily out of" has independent meaning, however, it precludes "relating to" from having independent significance.

*5 *Motorola, Inc. v. Amkor Technology, Inc.,* [FN23] teaches Delaware courts the proper approach for resolving such issues. In that case, a "patent license agreement" provided Amkor (the licensee) with an undivided one-half interest in two of Motorola's patents. The agreement precluded Amkor from *licensing* its rights under that agreement to any third party who was also a licensee of Motorola (the licensor). The agreement, however, allowed Amkor to *assign* its rights under the agreement to "a successor in ownership of all or substantially all of the assets of" Amkor. [FN24] Amkor proceeded to "assign" its rights under the agreement, including its undivided one-half interest in the Motorola patents, to Citizen. At that time, Citizen was a licensee of Motorola.

> FN23. 849 A.2d 931 (Del.2004).

> FN24. *Id.* at 931.

In disputing whether such an "assignment" was valid under that agreement, Amkor argued that "because the terms 'license' and 'assignment' have distinct meanings," [FN25] the agreement permitted an assignment. Motorola argued that in the context of the agreement, the term " 'license' [was] subsumed within an 'assignment.' " [FN26] While the Superior Court on cross-motions for summary judgment concluded that the clear meaning of the agreement permitted the assignment, the Supreme Court, despite the fact both parties before the Superior Court had taken the position that there were no material facts in dispute, held that since both interpretations of the agreement "may be reasonable," summary judgment should have been denied. [FN27]

> FN25. *Id.* at 934-35.

> FN26. *Id.* at 937.

> FN27. *Id.* Although the Supreme Court was applying Illinois law, the standards set forth in *Motorola* for contract interpretation under Illinois law do not differ materially from those guiding Delaware courts. Specifically, in applying Illinois law, the Supreme Court wrote, "[w]here more than one plausible construction of a contract exists or the contract is ambiguous because two or more key provisions conflict, an issue of material fact arises and summary judgment must be denied." *Id.*

Based on this reasoning, the cross-motions for partial judgment on the pleadings with respect to the meaning to be given to the contractual language are denied. [FN28] The parties have set forth "more than one plausible construction of" [FN29] the meaning of Excluded Liabilities. BAE's reading would give no

independent significance to "arising *primarily* out of." Lockheed's reading would give no independent significance to the general phrase of "relating to." The parties, by utilizing the phrase "arising out of" in their definition of Assumed Liabilities, but defining Excluded Liabilities to contain the phrase "arising *primarily* out of," seem to have demonstrated an intent to afford the word "primarily" an independent meaning. The significance of "primarily," a term of the contract to which some effect should be ascribed, if possible, [FN30] however, is unclear at this stage. [FN31]

>FN28. This is not to say that this case will necessarily proceed beyond any possible summary judgment motions. Although "[c]ross-motions for summary judgment are not the procedural equivalent of a stipulation of decision on a paper record," *id.* at 935-36, the Court may be presented with sufficient uncontroverted evidence at the summary judgment stage to decide this issue. Indeed, at the summary judgment stage, the Court may consider events that the sides have addressed here, but which the Court could not, at the pleadings stage, take into account in resolving any ambiguity in the Transaction Agreement (*e.g.*, history of negotiations and the parties' conduct before and after closing of the Transaction Agreement) because the record has not been, and, as a practical matter, could not have been, sufficiently developed.

>FN29. *Id.* at 937.

>FN30. *Council of Dorset Condo. Apartments,* 801 A.2d at 7.

>FN31. Another aspect of the mechanism for allocating liabilities between BAE and Lockheed also merits mention. The drafters' use of the phrase "to the extent" in the definition of Assumed Liabilities prompts the following possible reading of the agreement. Even if the CCT Liability is an Assumed Liability, but not an Excluded Liability, BAE would be responsible only "to the extent" that the CCT Liability "relat[es] to or aris[es] out of" the Sanders operations. If that is a proper reading, it would suggest that a fact-intensive analysis may be required. This type of complication was anticipated by the drafters of the Transaction Agreement who defined the term "Shared Assumed Liabilities" and created a formula for sharing some liabilities, but excluded certain disclosed liabilities, such as the CCT Litigation, from its scope.

For the above reasons, and following *Motorola,* the cross-motions for partial judgment on the pleadings as to the interpretation of the Transaction Agreement are denied.

B. *Mistake--Lockheed's Claim for Reformation*

Lockheed pleads that if "the Agreement were found to provide that liability for the CCT Litigation did not pass to BAE, the Agreement fails to express the parties' mutual understanding and agreement on this issue and Lockheed ... is entitled to reformation of the Agreement to reflect the parties' mutual understanding at the time the Agreement was executed." [FN32] Lockheed, then, would seek reformation of the Transaction Agreement based on the theory of mistake.

>FN32. Countercl. ¶ 61.

*6 In *Interactive Corp. v. Vivendi Universal, S.A.,* this Court noted the limited nature of mistake claims: "Though mistake is a necessary legal tool to reform contracts that do not reflect the parties' intent because of problems such as scriveners' errors, it must be applied narrowly so as to ensure to contracting parties that in only limited circumstances will the court look beyond the four corners of a negotiated contract." [FN33] Thus, Court of Chancery Rule 9(b), [FN34] working in conjunction with the substantive requirements of both the mutual and unilateral theories of mistake, [FN35] requires a pleading of mistake, to survive a pleadings stage motion, to allege with particularity some form of *specific* prior agreement. [FN36] Lockheed's shallow pleading that invites the Court to read the Transaction Agreement as not in conformity with a prior "mutual understanding and agreement," without more, takes the form of "conclusory factual allegations [that] do not suffice for a claim of mistake to survive a motion [to dismiss.]" [FN37]

>FN33. *Interactive Corp. v. Vivendi Universal, S.A.,* 2004 WL 1572932, at *15 (Del. Ch. June 30, 2004).

>FN34. Court of Chancery Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN35. Mutual mistake requires both parties to be mistaken as to a material portion of a written agreement. Unilateral mistake requires that one party be mistaken and that the other party know of the mistake but remain silent. *Cerberus Int'l Ltd. v. Apollo Mgmt., L.P.,* 794 A.2d 1141, 1151-52 (Del.2002). Both theories of mistake, however, require a showing that "the parties came to a specific prior understanding that differed materially from the written agreement." *Id.*

FN36. *See Interactive Corp,* 2004 WL 1572932, at *15-*16. In addition, a party pursuing a mistake claim will be required to satisfy the "clear and convincing evidence" standard. *Cerberus Int'l Ltd.,* 794 A.2d at 1149.

FN37. *Interactive Corp,* 2004 WL 1572932, at *16.

While none alone is dispositive of the current motion, there is a distinct shortfall in the allegations as to which individuals came to the specific prior agreement, the terms of the specific prior agreement, at what point the mistake was introduced, or any negotiating history. Moreover, pleading that Lockheed disclosed the CCT Litigation on draft disclosure schedules or that BAE conducted due diligence investigations prior to closing does not make up for the lack of pleading of a specific prior agreement. Finally, the pleading of actions taken *after* closing is not substitutable for an express pleading that the parties came to a specific *prior* agreement. [FN38] Simply put, a claim for reformation based on mistake must be based on something more than a conclusory allegation of a mutual understanding and agreement on the issue. Lockheed's Counterclaim V, therefore, is dismissed.

FN38. *Cf. id.* at *17 ("While the nature of mistake claims allows parol evidence to be used as *proof* of a mistake at the summary judgment or trial stage, it is unclear whether such evidence, when properly before the court at the pleadings stage, may be used to *discern an allegation* of a specific prior agreement in the absence of an explicit allegation.... This is not the type of inquiry a motion on the pleadings typically invites.").

C. *BAE's Conduct in Defending the CCT Litigation-- Lockheed's Claims of Breach of Contract and Breach of Fiduciary Duty*

Lockheed's breach of contract and breach of fiduciary duty counterclaims are both based on allegations that defense counsel in the then-BAE-controlled CCT Litigation structured the damages verdict form in a way so as to enhance BAE's position in the current litigation. Whether or not BAE did so is a question of fact that may not be decided in a motion to dismiss. What must be decided here is whether, viewing Lockheed's allegations as true and drawing all reasonable conclusions flowing from them in Lockheed's favor, Lockheed presents a viable claim under one of the two legal theories.

Lockheed's breach of contract counterclaim is premised on an alleged breach of section 11.03(b)(i) of the Transaction Agreement. That section provides that since BAE was controlling the CCT Litigation, it had the duty to "at all times act as if all Damages relating to the [litigation] were for its own account and [to] act in good faith and with reasonable prudence to minimize Damages therefrom." [FN39] If BAE acted as, and with the intent that, Lockheed claims, it may have breached this provision of the Transaction Agreement. [FN40] This is a question of fact. Lockheed's breach of contract counterclaim, therefore, survives BAE's motion to dismiss.

FN39. Transaction Agreement § 11.03(b)(i).

FN40. BAE argues that if Lockheed's interpretation of the Transaction Agreement is correct, there would be no harm because everything flowing from the CCT Litigation would be an Assumed Liability. In substance, Lockheed's claim is the mirror image of BAE's direct claims. Thus, this dispute is fairly joined.
Second, BAE argues that because the jury had already decided liability on a verdict form identifying the various defendant entities, proposing a similar verdict form for damages could not cause harm. The possibility that a separate verdict form for damages may have caused jurors to award a higher amount of punitive damages or allocated them in a particular direction cannot be discounted in considering a motion to dismiss.
Finally, BAE argues that the punitive damages award could not be assessed against the CCT defendants collectively because courts could not then conduct a meaningful review of the constitutionally of the award under the rubric set out in *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559 (1996). That rubric requires an analysis of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

party's "degree of reprehensibility." *Id.* at 575. What is before this Court is whether BAE, in instructing defense counsel to push for the separate damages verdict, breached its duty under the Transaction Agreement.

*7 Lockheed's breach of fiduciary duty counterclaim, however, will be dismissed. That counterclaim is based on the same operative facts as its breach of contract counterclaim. As this Court has previously held, claims sounding in fiduciary duty that cannot be brought independently of claims based on breach of contract will not survive a motion to dismiss. [FN41] Here, BAE's duties in conducting the CCT Litigation are set forth in Section 11.03 of the Transaction Agreement.

> FN41. *See Madison Realty Partners 7, LLC v. AG ISA, LLC,* 2001 WL 406268, at *6 (Del. Ch. Apr. 17, 2001) (dismissing a breach of fiduciary duty claim because "the contract and fiduciary claims overlap" and "are based on the same underlying conduct"); *Gale v. Bershad,* 1998 WL 118022, at *5 (Del. Ch. Mar. 4, 1998) ("To allow a fiduciary duty claim to coexist in parallel with [a contractual] claim, would undermine the primacy of contract law over fiduciary law in matters involving ... contractual rights and obligations."), *quoted in Madison Realty Partners 7, LLC,* 2001 WL 406268, at *6.

Lockheed argues that its "fiduciary duty claim is based on more than just BAE's contractual duty to defend" since "BAE's fiduciary duty arose out of the totality of the relationship between the parties--not only out of BAE's contractual obligations as set forth in Section 11.03." [FN42] But, in the same breath, Lockheed admits that "both claims are rooted in Section 11.03 of the Transaction Agreement." [FN43] The language of the pleadings shows that the actions underlying Lockheed's breach of contract counterclaim are the same as the actions underlying Lockheed's breach of fiduciary duty counterclaim. [FN44] Therefore, the Court will address the actions under "contract principles," [FN45] and Lockheed's Counterclaim Count IV is dismissed.

> FN42. Lockheed Martin's Opening Br. in Supp. of Def.'s Mot. for Partial J. on the Pleadings and Answering Br. in Opp'n to BAE's Mot. for Partial J. on the Pleadings and Mot. to Dismiss Countercls., at 45.

> FN43. *Id.*

> FN44. *Compare* Countercl. ¶ 37 ("Under the Agreement, once BAE assumed control and defense of the CCT Litigation, it had an obligation to at all times act as if all Damages relating to [CCT's] claim were for its own account and [to] act in good faith and with reasonable prudence to minimize damages therefrom.") (citations and internal quotations omitted), *with* Countercl. ¶ 54 ("Pursuant to the Agreement, BAE assumed responsibility to control and defend the CCT Litigation"), *and* Countercl. ¶ 55 ("Lockheed Martin was lulled into believing that its interests would be fully defended by virtue of the special relationship formed with BAE *by the Agreement* and as evidenced by BAE's conduct after closing the sale of the AES Business.") (emphasis added). *Compare also* Countercl. ¶ 42 ("Having so manipulated the jury special verdict form, BAE asserts that that [sic] Lockheed Martin retained liability for the CCT Litigation. This contention would not have been available had the jury special verdict form not artificially separated out particular business units (Lockheed Martin Sanders and Lockheed Martin Federal Systems) of a single entity (Lockheed Martin Corporation)."), *with* Countercl. ¶ 57 ("By surreptitiously changing the jury special verdict form, BAE breached its fiduciary obligation to Lockheed Martin. In doing so, BAE failed to defend the case for the full benefit of Lockheed Martin pursuant to Section 11.03.").

> FN45. *See Moore Bus Forms, Inc. v. Cordant Holdings Corp.,* 1995 WL 662685, at *6 (Del. Ch. Nov. 2, 1995) ("[D]isputes that relate to obligations expressly treated and rights [that are] created by contract will be governed by contract principles.") (citations and internal quotations omitted). There is no suggestion that any special relationship had developed before the Transaction Agreement was negotiated; indeed, BAE and Lockheed were competitors. They freely agreed to the terms of their relationship; nothing in Lockheed's counterclaim affords a basis for imposing duties on BAE, as sought by Lockheed, beyond those which were negotiated.

D. *Lockheed's Claim of Equitable Fraud*

Lockheed's third counterclaim is labeled "equitable fraud." "To state a *prima facie* case for equitable fraud, [a] plaintiff must ... satisfy all the elements of

common-law fraud with the exception that [the] plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly." [FN46] Thus the elements of equitable fraud are the same as those for common-law fraud, except that no showing of scienter need be made.

> FN46. *Zirn v. VLI Corp.,* 681 A.2d 1050, 1061 (Del.1996).

There are three types of common law fraud: 1) representing false statements as true; [FN47] 2) actively concealing facts which prevents the plaintiff from discovering them; [FN48] or 3) remaining silent in the face of a duty to speak. [FN49] Expressing opinions or predictions about the future, however, "cannot give rise to actionable common law fraud." [FN50]

> FN47. In order to make out a claim for equitable fraud based on a false representation, one must show, in addition to a false representation: 1) an intent to induce the plaintiff to act or refrain from acting; 2) that the plaintiff's action (or inaction) was taken in justifiable reliance upon the representation; and 3) damage to the plaintiff from her reliance on the representation. *Gaffin v. Teledyne, Inc.,* 611 A.2d 467, 472 (Del.1992).

> FN48. *See Metro Communication Corp. BVI v. Advanced Mobilecomm Techs. Inc.,* 2004 WL 1043728, at *15 (Del. Ch. Apr. 30, 2004) ("In order to state a claim of fraud by active concealment, [a plaintiff] must show that a 'defendant took some action affirmative in nature designed or intended to prevent, and which does prevent the discovery of facts giving rise to the fraud claim, some artifice to prevent knowledge of the facts or some representation intended to exclude suspicion and prevent inquiry." ') (quoting *Lock v. Shreppler,* 426 A.2d 856, 860 (Del.Super.1981), *superseded by statute on other grounds* ).

> FN49. *Id.* at *11.

> FN50. *Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d 544, 554 (Del.2001). This is not to say that providing a false representation of one's opinion cannot constitute actionable fraud. "A statement of belief may be open to objection ... solely as a misstatement of the psychological fact of the speaker's belief in what he says." *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1095 (1991).

Lockheed essentially makes two arguments under the "equitable fraud" heading. The first is fundamentally a rehash of Lockheed's breach of contract argument. Lockheed argues that "BAE was in complete control of the litigation and did not express any belief or contention to Lockheed Martin that any potential liability in the CCT case had not been fully assumed by BAE under the Agreement," [FN51] and that by crafting the special jury verdict the way it did, BAE "positioned itself to try to shift all or part of the liability to Lockheed Martin." [FN52] Lockheed best summarizes this line of argument, alleging that "[b]ecause of BAE's failure to disclose the material fact that it was no longer willing fully and faithfully to defend Lockheed Martin's interests, Lockheed Martin now faces a potential liability for which it is not and should not be held responsible under both law and at equity." [FN53]

> FN51. Countercl. ¶ 49.

> FN52. *Id.* ¶ 50.

> FN53. *Id.* ¶ 51.

*8 In essence, Lockheed argues that BAE committed fraud by not disclosing its intent not to perform its obligations (to defend as if all damages were for its account) under (Lockheed's interpretation of) the Transaction Agreement. This Court has expressly rejected that type of argument. "One cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations." [FN54] Couching an alleged failure to comply with the Transaction Agreement as a failure to disclose an intention to take certain actions arguably inconsistent with that agreement is exactly the type of bootstrapping this Court will not entertain. Thus, a fraud claim based on this alleged nondisclosure, in light of the express terms of the Transaction Agreement, does not survive a motion to dismiss.

> FN54. *IOTEX Communications, Inc. v. Defries,* 1998 WL 914265, at * 4 (Del. Ch. Dec. 21, 1998) (applying New York law); *see Tristate Courier & Carriage, Inc. v. Berryman,* 2004 WL 835886, at *11 (Del. Ch. Apr. 15, 2004).

Lockheed's second argument is based on alleged statements (and omissions) made by BAE outside of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the promises contained in the Transaction Agreement itself. Specifically, Lockheed alleges:

> . At various times prior to the entry of the CCT Judgment, representatives of Lockheed Martin, and in particular Maryanne Lavan, communicated with BAE regarding the status of the CCT trial. On these occasions, representatives of BAE confirmed that the trial was going well and that there was a high likelihood of success. [FN55]

> FN55. Countercl. ¶ 47.

> . Near the end of trial, Ms. Lavan was informed by Kevin Perkins, counsel for BAE, that due to the strength of BAE's case no settlement offer would be made. During this conversation, BAE did not disclose that it intended to object to CCT's proposed jury special verdict form because it did not provide space for the assessment of damages against each of the defendants individually. Nor did it disclose its intent to propose a different jury special verdict form which artificially separated out Lockheed Martin Sanders and Lockheed Martin Federal Systems. Instead, BAE concealed this fact from Lockheed Martin. [FN56]

> FN56. *Id.* ¶ 48.

Lockheed does not make an allegation that BAE *actively* concealed information. [FN57] Nor does it argue that BAE made any statements that are by themselves false. [FN58] Rather, it bases its argument on silence in the face of a duty to speak.

> FN57. While Lockheed, in paragraph 48 of its Counterclaim, alleges that "BAE concealed this fact from Lockheed Martin," Lockheed does not allege *active* concealment. To state a claim of fraud by active concealment, the plaintiff must allege an affirmative action. *Supra* note 45.

> FN58. A statement that the trial is going well and that there is a high likelihood of success is a statement of opinion and prediction that, by itself, cannot constitute equitable fraud. Lockheed does not allege that the BAE representatives falsely stated their opinions.

In *Matthews Office Designs, Inc. v. Taub Investments,* the Supreme Court cited the Restatement (Second) of Torts for a list of circumstances that would create a duty to speak. [FN59] Under the Restatement, such a duty to speak arises when necessary to make a previous statement not misleading or when, because of a "fiduciary or other similar relation of trust and confidence," such information should be disclosed. [FN60]

> FN59. 1994 WL 267479, at *2 (Del.1994).

> FN60. Restatement (Second) of Torts § 551(2). The Restatement also requires disclosure when a previous representation was made and information subsequently acquired would make that statement untrue or misleading; when a false statement is made that the speaker did not anticipate would be relied upon, but subsequently learns another party is relying on it, and when "facts basic to [a] transaction, if [the speaker] knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." *Id.* § 551(2)(e). None of these issues is present in the current case.

Lockheed alleges that BAE stated that the case was going well, that there was a high likelihood of success, and that "due to the strength of BAE's case no settlement offer would be made." The first two statements are statements of opinion and prediction. The third statement is a factual statement that due to BAE's opinions and predictions on the outcome of the CCT Litigation, BAE would not make a settlement offer. In effect, Lockheed argues that it was reasonable for it to infer from BAE's statement that BAE would not take any action to protect its own interests in the event that the jury returned an unfavorable verdict. [FN61] This is an unreasonable inference to take from that statement. BAE's alleged statement went to its perception of the likelihood of success in an adversarial proceeding. Nothing in that statement supports any inference about what BAE would do if its prediction turned out to be incorrect. BAE said it would not make a settlement offer and it did not. That statement was neither false nor misleading, and Lockheed's equitable fraud counterclaim must be dismissed. [FN62]

> FN61. This reading, the only reading of Counterclaim Count III that could attempt to state a claim for equitable fraud, overlaps Lockheed's breach of contract counterclaim. This is noted to highlight that the conduct about which Lockheed complains will

continue to be a focus of this litigation. This memorandum opinion merely determines under which legal theory this set of facts could plausibly state a claim.

FN62. The Restatement also requires disclosure of matters that the plaintiff is "entitled to know because of a fiduciary or other similar relation of trust and confidence" in order to avoid a claim for fraud. How this purported "duty to disclose" fits within our already complex jurisprudence on fraud, equitable fraud, and in some contexts, a corporate director's duty to disclose is unclear. Moreover, it is unclear what constitutes a "special relationship of trust and confidence."

Clearly, the Transaction Agreement, itself a product of negotiation between two extremely sophisticated parties, did not create a fiduciary relationship. Such a relationship would require "confidence reposed by one side and domination and influence exercised by the other." *Gross v. Univ. of Chi.*, 302 N.E.2d 444, 453-54 (Ill.App.Ct.1973). *Lehner v. Crane Co.*, 448 F.Supp. 1127, 1131 (E.D.Pa.1978), one of the few cases to deal expressly with this provision of the Restatement as it pertains to fraud outside of the securities context, implies that a "special relationship of trust and confidence" would also have to meet the standard for a fiduciary relationship spelled out in *Gross*. Regardless, even if such a relationship existed here, it would not require BAE to disclose each and every decision of litigation strategy. To hold otherwise would lead to perverse results. Essentially, the opposite result would allow the elements of the tort of equitable fraud to be used to write additional terms into a contract between two highly sophisticated business entities.

Moreover, the Restatement only requires reasonable care to disclose information. "Under the rule stated in this Subsection the person under a duty of disclosure is not subject to liability merely because he has failed to bring the required information home to the person entitled to it. His duty is to exercise reasonable care to do so. If reasonable care is exercised, the fact that the information does not reach the person entitled to it does not subject him to liability." Restatement (Second) of Torts § 551 cmt. (d). I note this in light of the fact that the alleged "nondisclosure" occurred during a public trial.

## IV. CONCLUSION

*9 For the reasons set forth above, the Plaintiffs' motion to dismiss Counts III, IV, and V of Lockheed's Counterclaim is granted, but it is denied in all other respects. The motions for partial judgment on the pleadings are denied.

IT IS SO ORDERED.

2004 WL 1739522 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d        Page 1
2004 WL 2694912 (Del.Ch.)
(Cite as: 2004 WL 2694912 (Del.Ch.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
THE LIQUOR EXCHANGE, INC.
v.
TSAGANOS
No. Civ.A.19312-NC.

Submitted Sept. 8, 2004.
Decided Nov. 16, 2004.

Dear Counsel:

NOBLE, Vice Chancellor.

*1 This case arises out of a dispute between Defendant Nicholas Tsaganos ("Tsaganos"), landlord of the Summit Village Shopping Center ("Shopping Center") near Middletown, Delaware, and Plaintiff The Liquor Exchange, Inc. (the "Tenant"), a tenant in the Shopping Center. The Tenant is seeking specific performance of paragraph 28 of the original Agreement of Lease (the "Lease"), which the Tenant believes operates as a right of first refusal with respect to units that become available during its tenancy in the Shopping Center.

For the reasons set forth below in this post-trial letter opinion, I find for Tsaganos and deny the Tenant all requested relief.

I. BACKGROUND FACTS
The Tenant and Tsaganos signed the Lease for Unit # 103 of the Shopping Center on November 30, 1998. Paragraph 28 of the Lease reads:
> Right of First Refusal: In the event other leaseable space becomes available for rent in the Summit Village Shopping Center at any time during the first one year term and any of the four one year option periods, if any, of this Lease, the Tenant shall have the first chance and opportunity to rent the additional leaseable space provided the Landlord and Tenant agree upon all terms of the lease for the additional leaseable space.

The Tenant, owner and operator of a liquor store, sought a right of first refusal as to other available space in the Shopping Center primarily because liquor distributors sell merchandise at a quantity discount; thus, the more merchandise purchased from distributors, the cheaper the merchandise on a unit basis becomes. Obviously, the cheaper the merchandise because, the more profit a store owner can make. Unsure of how the new store would perform, the Tenant wanted the opportunity to acquire additional space if the store was successful in order to have more space to stock additional merchandise, and thereby take advantage of quantity discounts. The unit leased to the Tenant is not large enough for the Tenant to take advantage of many of the quantity discounts that otherwise would be available.

Various units have become available since the Lease commenced; however, the Tenant has never entered into a lease for any other unit in the Shopping Center. The Tenant and Tsaganos disagree as to why an additional lease was never consummated. The Tenant contends that, while a number of units became available during its tenancy, Tsaganos either presented unreasonable lease terms or never presented the available units at all. Although not stated in the Lease, the Tenant believed that it was entitled to a five year lease on additional space because it thought the new lease should match up with the original lease in duration. [FN1] The Tenant was unwilling to compromise on a lease for less than 5 years. Furthermore, the Tenant, in one instance, objected to purchasing restaurant equipment located in one of the units at a cost of $20,000 as requested by Tsaganos because it only wanted an empty unit. The Tenant did not view Tsaganos as reasonable in asking it to absorb the cost of such equipment.

> FN1. It should be noted that there is disagreement as to the length of the original lease.

*2 Tsaganos contends that he did in fact present available space to the Tenant with leases in duration of two years, one year, or on a month-to-month basis. None of these proposed leases, however, contained a right of renewal. Tsaganos was unwilling to extend the duration of any lease offered to the Tenant beyond the initial term because of Tsaganos' desire not to lock up units for a long time in what he believes to be a high growth area with potential for national tenants. According to Tsaganos, no new lease was consummated because the Tenant insisted on a five-year lease. The Tenant, however, balked at such short leases because they were not consistent with the duration of the lease the Tenant already had and, therefore, it made little sense to acquire additional space under a lease that could expire

Not Reported in A.2d 
(Cite as: 2004 WL 2694912, *2 (Del.Ch.))

Page 2

shortly.

The Tenant seeks an order from the Court requiring specific performance of paragraph 28 of the Lease, which would force Tsaganos to provide it with a lease for a larger rental unit.

## II. ANALYSIS
### A. *Principles of Contract Interpretation*

For any court, the primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract. [FN2] When a contract is clear on its face, the court should rely solely on the clear, literal meaning of the words contained in the contract. [FN3] "Where parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party." [FN4] When the contract language is clear, the court may not consider parol or extrinsic evidence to determine the intent of the parties. [FN5] Essentially, when parties have agreed, and the contract is clear on its face, the court may look only to the words chosen by the parties to determine the contract's meaning.

> FN2. *See Bell Atlantic Meridian Systems v. Octel Communications Corp.*, 1995 WL 707916 (Del.Ch.).

> FN3. *See Myers v. Myers*, 408 A.2d 279, 281 (Del.1979).

> FN4. *Demetree v. Commonwealth Trust Co.*, 1996 WL 494910, at *4, (Del. Ch.) (citing *City Investing Co. v. Continental Cas. Co.*, 624 A.2d 1191, 1198 (Del.1993).

> FN5. *See E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (1997); *Citadel Holding Corp. v. Raven*, 603 A.2d 818, 822 (Del.1992).

Situations arise however, where terms of the contract are not clear on its face, and the court is forced to look outside the contract for meaning. When terms are "fairly susceptible [to] different interpretations", they are considered ambiguous. [FN6] "Ambiguity may exist if the terms of the contract are inconsistent, or when there is a reasonable difference of opinion as to the meaning of words or phrases." [FN7] When a court determines that there is ambiguity in the terms of a contract, the court is empowered to look to extrinsic evidence to determine the parties' reasonable intent at the time of the contract. [FN8] The extrinsic evidence the court may consider includes "overt statements and acts of the parties, the business context [of the contract], prior dealings between the parties, business custom and usage in the industry." [FN9]

> FN6. *Comrie v. Enterasys Networks, Inc.*, 837 A.2d I, 13 (Del. Ch.2003)(quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997)).

> FN7. *Mell v. New Castle County*, 2004 WL 1790140, at *3 (Del.Super.).

> FN8. *See Comrie*, 837 A.2d 13 (quoting *Eagle Indus., Inc.*, 702 A.2d 1232).

> FN9. *Comrie*, 837 A.2d 13 (quoting *Supermex Trading Co., Ltd. v. Strategic Solutions Group*, 1998 WL 229530, at * 3 (Del. Ch.)).

Finally, situations arise when the contract itself is missing terms. While it "is not the proper role of a court to rewrite or supply omitted provisions to a written agreement," [FN10] "[i]n cases where obligations can be understood from the text of a written agreement but have nevertheless been omitted in the literal sense, a court's inquiry should focus on 'what the parties likely would have done if they had considered the issues involved." ' [FN11] Where a court cannot determine what the parties would have agreed to had they considered the issues and terms omitted, a court is not permitted to insert its own judgment and terms. However, "in the narrow context governed by principles of good faith and fair dealing, this Court has recognized the occasional necessity of implying such terms in an agreement so as to honor the parties' reasonable expectations." [FN12] Additionally, "it is a fundamental principle of equity that the remedy of specific performance will only be granted as to an agreement which is clear and definite and as to which there is no need to ask the court to supply essential terms." [FN13]

> FN10. *Weston Investments, Inc. v. Domtar Industries, Inc.*, 2002 WL 31011141, at *6 (Del.Super.)(quoting *Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Sys.*, 708 A.2d 989, 992 (Del.1998)).

> FN11. *Cincinnati SMSA Ltd. Partnership*, 708 A.2d at 992.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN12. *Id.; see Weston Investments, Inc.* 2002 WL 31011141, at * 6.

FN13. *Baynard v. Jervey,* 1984 WL 21123, a *3 (Del. Ch.); See M .F. v. F.,* 172 A.2d 274, 276 (Del. Ch.1961).

B. *The Lease*

***3** Paragraph 28 of the Lease is titled as "Right of First Refusal," but it reads:

> In the event other leaseable space becomes available for rent in the Summit Village Shopping Center at any time during the first one year term and any of the four one year option periods, if any, of this Lease, the Tenant shall have the first chance and opportunity to rent the additional leaseable space provided the Landlord and Tenant *agree upon all terms* of the lease for the additional leaseable space. [FN14]

FN14. Emphasis added.

The Tenant asserts that paragraph 28 should be read as a traditional right of first refusal which would grant it the right to match the terms of any proposed lease for additional space that became available in the Shopping Center. The Tenant further contends that paragraph 28 required Tsaganos not only to act in good faith when dealing with the Tenant, but that it also required Tsaganos to engage in good faith negotiations with the Tenant in order to come to mutually agreeable terms on any lease for new space. At trial, the Tenant argued that Tsaganos failed to act in good faith with respect to lease negotiations because he was unwilling to compromise on various terms (length, renewal) of leases that were presented to the Tenant in connection with available units in the Shopping Center . [FN15] Additionally, the Tenant argued that many of the terms presented by Tsaganos were unreasonable, and therefore not in good faith. The Tenant also asserted that, in direct violation of its rights under paragraph 28, some available units were never presented to the Tenant.

FN15. While there was a dispute at trial as to the term of the Lease, the Tenant made clear that it was seeking a five-year lease on any unit because it wanted a lease that would match the original lease as the Tenant understood it. Tsaganos, with respect to any unit offered to the Tenant, only wanted to offer a one year lease, as was his preference with respect to the Shopping Center and its potential for new tenants and general neighborhood growth. The Court does not resolve the actual duration of the Lease because it is not necessary to reach its conclusion.

The Court rejects the Tenant's characterization of paragraph 28 of the Lease as a right of first refusal. Despite the fact that paragraph 28 is titled "Right of First Refusal," the Court finds that paragraph 28 does not in fact entitle the Tenant to a traditional right of first refusal. Instead, paragraph 28 simply entitles the Tenant to what may be referred to as a "right of first negotiation": an agreement to try to come to a future agreement. [FN16] The Tenant was given the right to negotiate with Tsaganos regarding any open units in the Shopping Center prior to other potential tenants in order to reach terms agreeable to both parties. Tsaganos, under paragraph 28, contracted only to give the Tenant an opportunity to negotiate with him to come to agreeable terms for vacant units. Tsaganos, despite the Tenant's assertion, was not required to alter his desired terms. In fact, as will be discussed below, Tsaganos' only obligation under the Lease was to present and discuss terms to the Tenant in good faith.

FN16. The "right of first refusal," nevertheless is expressly conditioned upon whether "[Tsaganos] and [the] Tenant *agree upon all terms* of the lease for the additional space." (emphasis added). *See The Liquor Exchange, Inc. v. Tsaganos,* 2004 WL 1254166, at *1 (Del. Ch.).

C. *Good Faith and Fair Dealing*

Turning to the Tenant's good faith argument, the Court concludes that, while not explicitly contained in the Lease, there exists a covenant of good faith and fair dealing. The covenant springs from fundamental notions of fairness that, in the context of the Lease, Tsaganos would negotiate with the Tenant in good faith with respect to a larger unit. The covenant of good faith and fair dealing is "designed to protect the spirit of [the] agreement, when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." [FN17] When applying the covenant of good faith and fair dealing, the Court will "extrapolate the 'spirit' of the contract from its express terms, and 'determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose." ' [FN18]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN17. *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1016 (Del. Ch.2004) (quoting *Chamison v. Healthtrust, Inc.*, 735 A.2d 912, 920 (Del. Ch.1999)). See *ACE & Co. v. Balfour Beatty PLC*, 148 F.Supp.2d 418, 426 (D.Del.2001).

FN18. *PAMI-LEMB*, 857 A.2d at 1016 (quoting *Chamison*, 735 A.2d at 920-21).

*4 However, while an implied covenant of good faith and fair dealing may exist, the covenant "cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract." [FN19] When applied to the Lease and specifically paragraph 28, the covenant requires only that Tsaganos, in good faith, give the Tenant the opportunity to negotiate for new space and that Tsaganos present and discuss good faith terms at any negotiation. There is no requirement that Tsaganos must alter his good faith terms to reach an agreement with the Tenant.

FN19. *Chamison*, 735 A.2d at 921.

The Court's analysis with respect to good faith stops at this juncture, because the determination of whether Tsaganos acted in good faith is not necessary to resolve this dispute. [FN20] Instead, the Court finds that specific performance, the Tenant's requested relief, is inappropriate with respect to the Tenant's right of "first negotiations" because the Court would be forced to supply material terms for the new lease. As noted, the Court is reluctant to supply terms to an agreement and will only do so when it can be determined what the parties agreed to, or would have agreed to. Similarly, the Court will not order specific performance when it would be necessary for the Court to supply essential terms to the agreement.

FN20. To the extent it may be appropriate, the Court notes that the Tenant has not demonstrated that Tsaganos' clear desire not to rent another unit to the Tenant interfered with his duties under the Lease. While Tsaganos' conduct was hostile and, indeed, at times, inappropriate, the fundamental obstacle to reaching an agreement was caused by the Tenant with its demands for a longer term lease. As long as the Tenant insisted upon something to which it was not entitled--and which Tsaganos was not making available to other tenants (or prospective tenants)--it is difficult to conclude that the failure to reach agreement can be blamed, in an actionable sense, on Tsaganos, especially in light of his reasonable concerns about long-term leases in general.

In this instance, the Court is unable to conclude from the Lease what the parties would have agreed to had they chosen to address the terms of a lease for additional or larger space. It is clear that the parties did not agree to any such terms, but, instead, the language of paragraph 28 indicates that the parties, at best, agreed only to discuss the issue of an additional lease at a later date. [FN21] Even the most basic terms with respect to additional space cannot be found in the Lease. There are no terms in the Lease regarding how rent for any additional space would be calculated, or what the duration of a new lease would be. The Tenant asks the Court to assume that the intention was for the additional lease to match the original lease in duration, and therefore the Lease was only ambiguous, and not completely lacking terms relating to a new lease. In addition, the Tenant urges the Court to look at extrinsic evidence to conclude that at least some of the terms of a new lease were agreed to. The Court finds that, in fact, this is not a situation where an agreement was reached but ambiguity remained in the contract with respect to terms; instead, it is a situation where material terms did not exist because no agreement was reached. In short, the extrinsic evidence does not provide a sufficient basis for imposing lease terms.

FN21. See *The Liquor Exchange, Inc.*, 2004 WL 1254166, at *2 n. 10.

The Court is unable to grant specific performance in a situation where it would be required to supply the essential terms of the agreement, and surely the rental rate and duration of a lease are essential terms. Because the Lease provides the Court with none of the necessary terms for a lease of an additional unit, and because the evidence does not suggest to the Court that the parties had agreed to but failed to memorialize these terms, the Court is unwilling and unable to supply these terms and therefore must deny the Tenant's application for specific performance.

### III. CONCLUSION

*5 For the foregoing reasons, judgment is entered in favor of Tsaganos and against the Tenant. Costs are awarded to Tsaganos.

IT IS SO ORDERED.

2004 WL 2694912 (Del.Ch.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.