FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

2005 JUL 12  P 3: 27

U.S. DISTRICT COURT
BRIDGEPORT CONN

UNIROYAL CHEMICAL COMPANY, INC., :
d/b/a CROMPTON MANUFACTURING :
COMPANY :
       :  Civil Action No.
     Plaintiff, :  3:02CV02253 (AHN)
       :
     v. :
       :
SYNGENTA CROP PROTECTION, INC. :
       :
     Defendant. :  JULY 12, 2005

### DEFENDANT SYNGENTA CROP PROTECTION, INC.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

#### Preliminary Statement

Plaintiff Uniroyal Chemical Company, Inc.'s ("Uniroyal") memorandum opposing summary judgment fails to raise any genuine issues of material fact. Plaintiff attempts to create an issue of material fact regarding the language of the Development Agreement by improperly relying on the self-serving testimony of Uniroyal representatives who have no first-hand knowledge about the supposed intent of that agreement. That effort fails in light of the ordinary, common sense meaning of the contract language at issue. Furthermore, Uniroyal admits the very issue for which Syngenta seeks at least partial summary judgment: i.e., that Uniroyal's claims are limited to those new uses that are specifically set forth in the Development Agreement and Supply Agreement. Accordingly, defendant Syngenta Crop Protection, Inc. ("Syngenta") is entitled to summary judgment as a matter of law.

## POINT I

### UNIROYAL FAILS TO RAISE ANY ISSUE OF MATERIAL
### FACT AS TO THE MEANING OF THE DEVELOPMENT AGREEMENT

**A.    The Language in the Development Agreement is Clear
and Unambiguous (Replying to Plaintiff's Opposition Memorandum, pp. 10-14)**

Uniroyal concedes, as it must, that a contract "should be read as a whole and, if possible, interpreted to reconcile all of the provisions of the document." See Kaiser Aluminum Corp. v. Matheson, 681 A.2d 392, 395 (Del. 1996) (citations omitted); Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp."), at 10.  Nevertheless, Uniroyal can provide no credible explanation of how the five year limitation on Uniroyal's rights to Bonzi, which is clearly set out in Paragraph 4 of the Development Agreement, can be reconciled with Uniroyal's claim to perpetual rights to Bonzi.[1]  To the contrary, Uniroyal takes each sentence of Paragraph 4 out of context, ignores the provision limiting Uniroyal's rights to five years, and instead focuses exclusively on the two sentences that immediately follow the five year limitation.  See Pl. Opp. at 11-12.

Specifically, while Uniroyal acknowledges that the second sentence of Paragraph 4 of the Development Agreement grants Uniroyal rights for only a five year period, it suggests that, following the expiration of that five year term, the third and fourth sentences further extend those rights in perpetuity.  See  Pl. Opp. at 12.  Uniroyal's myopic interpretation makes no sense.  It

---

[1]    Although Uniroyal claims perpetual rights to new uses of Bonzi, Uniroyal does not and cannot point to any provision in either the Supply Agreement or the Development Agreement that specifically provides for a grant of "perpetual" or "permanent" rights to Uniroyal.

offers no reasonable explanation why, in one sentence, Syngenta would grant Uniroyal rights for five years, and in the following sentences, extend those same rights in perpetuity at the expiration of five years. If Uniroyal's explanation were plausible, there would be no reason to include the initial five year term in Paragraph 4. If the parties had intended to grant Uniroyal perpetual rights to new uses of Bonzi, the Development Agreement simply would say so, and would not include a "meaningless" provision granting those same rights for only five years.

There is only one interpretation of Paragraph 4 that gives meaning and effect to every sentence in that paragraph: Uniroyal was granted marketing and sales rights to Bonzi for five years from the date of Uniroyal's registration of any new use or formulation. Pursuant to the third and fourth sentences of Paragraph 4, the five year grant of rights applied to any new use or formulation which Uniroyal developed under the Development Agreement, and Uniroyal would retain those rights for five years even if the Development Agreement terminated before that five-year period had expired. See Defendant's Memorandum of Law in Support of Motion for Summary Judgment at 16, fn 7.

Uniroyal further attempts to support its claim for perpetual rights to new uses of Bonzi with apparent "fairness" arguments, such as Uniroyal's alleged "substantial financial commitment" to the development, advertising and promotion of Bonzi, and Uniroyal's acceptance of a " drastic limitation" of defendant's liability for future claims. See Pl. Opp. at 7. Even if these characterizations were true (which Syngenta denies), Uniroyal's belief that the Development Agreement **should** grant Uniroyal perpetual rights to Bonzi is irrelevant to the issue of whether the

Development Agreement **does** grant such rights.  As set forth above, the clear and unambiguous language of the Development Agreement provides that those rights survive, at most, for only five years.

**B.    Uniroyal Cannot Create A Material Issue of Fact by Relying on Extrinsic Evidence (Replying to Plaintiff's Opposition Memorandum, pp. 14-20)**

It is well-recognized that "the intent of the parties must be ascertained from the language of the contract.  Only when there are ambiguities may a court look to collateral circumstances." Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992) (citations omitted).  Where the meaning of a written document is "plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." City Investing Co. Liquidating Trust v. Continental Casualty Co., 624 A.2d 1191, 1198 (Del. 1993), citing Citadel Holding, 603 A.2d at 822.  "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." Eagle Indus. v. DeVilbiss Health Care, 702 A.2d 1228, 1232 (Del. 1997).

As explained above, there is no ambiguity in the language of the Development Agreement.  Uniroyal was granted rights to new uses of Bonzi for five years.  Accordingly, the Court should not consider extrinsic evidence to determine the parties' intent in drafting Paragraph 4 of the Development Agreement.  Uniroyal's proffered extrinsic evidence is irrelevant and should not be considered.

Even if extrinsic evidence were properly considered on this Motion -- which it should not -- the extrinsic evidence offered by Uniroyal cannot support Uniroyal's opposition.  It is well-

settled that a party contesting a motion for summary judgment cannot rely on deposition testimony, affidavits or other evidence that would be inadmissible at trial. See Fed. R. Civ. P. 56(e); see also Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir. 1988) (hearsay affidavits insufficient in motion for summary judgment context because "a hearsay affidavit is not a substitute for the personal knowledge of a party"). Further, for summary judgment purposes, it is the non-moving party's burden to submit admissible evidence demonstrating that the non-moving party could carry its burden of proof at trial. See Maier-Schule GMC, Inc. v. General Motors Corp., 154 F.R.D. 47, 57-58 (W.D.N.Y. 1994), citing Trebor Sportswear Co., Inc. v. The Limited Stores, Inc., 865 F.2d 506, 510 (2d Cir. 1989).

Specifically, the Second Circuit has held that a corporate officer's deposition testimony regarding the scope of an agreement was "not relevant, competent or admissible" in an opposition to summary judgment where that officer "had no personal knowledge of the parties' intent at the time" the agreement was being negotiated, and the individual who negotiated on behalf of plaintiff did not discuss the scope of the agreement with that corporate officer. Nycal Corp. v. Inoco PLC, 1998 U.S. App. LEXIS 31216, *10-11 (2d Cir. Dec. 9, 1998) (disregarding deposition testimony of plaintiff's then Chief Financial Officer and General Counsel regarding the scope of a settlement agreement and release; granting summary judgment for defendant);[2] see also Russo v. City of Hartford, 2004 U.S. Dist. LEXIS 21092, *16-17 (D. Conn. Sept. 30, 2004), cert. denied, 537 U.S. 879, 154 L. Ed. 2d 134, 123 S.Ct. 79 (2002) (striking deposition testimony cited in

---

[2]     Copies of all unreported decisions are attached hereto, in alphabetical order.

5

support of plaintiff's Rule 56(a)(2) Statement where the deponent had no personal knowledge of the facts asserted).[3]

In support of its position, Uniroyal offers deposition testimony of Laureen Treu, Vice President of Uniroyal's Specialty Agricultural Products Group. The cited testimony references Ms. Treu's interpretation of Paragraph 4 of the Development Agreement. However, Ms. Treu was not involved in the negotiation of that agreement, nor was she even aware that such negotiations were taking place. See Depo. of Laureen Treu, Jan. 12, 2004 at 14, Exh. A to the accompanying Affidavit of R. Michael Meo, Jr. dated July 12, 2005 (the "Meo Aff."). Thus, Ms. Treu has absolutely no first-hand knowledge of the parties' intent with respect to the Development Agreement. Uniroyal also references a letter by its in-house attorney, Richard Weiss, which was authored in response to Syngenta's termination of the Supply Agreement. That letter is dated August 23, 2002, *over eleven years after the execution of the Development and Supply Agreements*. These self-serving statements made by Uniroyal's own counsel offer no insight into the parties' intent in drafting the Development Agreement. Indeed, the person at Uniroyal most knowledgeable of the negotiations concerning the Development Agreement, Mr. Kevin Kelley, testified that he had no

---

[3]    Because the admissibility of evidence in support of, or in opposition to, a motion for summary judgment is a procedural issue, this Court should be guided by precedent from the District of Connecticut. The substantive issues in dispute are governed by Delaware, pursuant to the Agreements. Similar precedent for excluding deposition testimony based on the deponent's lack of personal knowledge exists in the District of Delaware. See King v. City of Phila., 66 Fed. Appx. 300, 304-05 (3d Cir. 2003) (stating that because "deposition testimony [was] not based on personal knowledge, it should not be considered on a summary judgment motion"); 800 Servs. v. AT&T Corp., 30 Fed. Appx. 21, 24 (3d Cir. 2002) (affirming district court's determination that deposition testimony was based on speculation, conjecture and industry "buzz" and therefore was not sufficient to oppose summary judgment because it would not carry the burden of proof at trial) (copies of all unreported decisions are attached hereto).

knowledge or recollection of the negotiations or meaning of Paragraph 4. <u>See</u> Depo. of Kevin Kelley, Nov. 17, 2003 at 127-28, 131, 138-39, Exh. B. to Meo Aff.

Neither Ms. Treu nor Mr. Weiss has demonstrated any personal knowledge regarding the negotiation and drafting of the Development Agreement. Therefore, their comments cannot properly be considered in determining the parties' intent in drafting that Agreement.

Uniroyal also relies on remarks purportedly made by Dr. James Barrett to a gathering of Uniroyal employees on April 11, 1991. Uniroyal describes Dr. Barrett as a "Florida academic who was familiar with the early history of paclobutrazol" and who is a professor at the University of Florida in Gainesville. <u>See</u> Pl. Opp. at 19. It is undisputed that Dr. Barrett is not a party to the Development Agreement, took no part in drafting it, and does not claim to have any knowledge of Uniroyal's or Syngenta's intent in drafting it. Indeed, there is absolutely no connection between Dr. Barrett's opinions, which were tailored to an audience of Uniroyal employees, and the meaning of the Development Agreement between Syngenta and Uniroyal. Accordingly, like the rest of Uniroyal's proffered "extrinsic evidence," the Court should not consider Dr. Barrett's opinions in determining the meaning of the Development Agreement.

Even if extrinsic evidence were properly considered in this case -- which it is not -- Uniroyal has failed to offer any such evidence sufficient to oppose summary judgment. Uniroyal cannot prove the parties' intent with self-serving statements made by individuals who had nothing to do with, and have demonstrated no knowledge of, the drafting or negotiation of the Development Agreement. Accordingly, Syngenta is entitled to summary judgment.

**POINT II**

**UNIROYAL CONCEDES THERE IS NO ISSUE OF MATERIAL
FACT THAT ITS CLAIMS ARE LIMITED TO THOSE PLANTS
AND PRODUCT USE SITES DESIGNATED BY THE AGREEMENTS
(Replying to Plaintiff's Opposition Memorandum, pp. 20-24)**

In the alternative, Syngenta's motion for partial summary judgment seeks a ruling

from this Court on a wholly legal issue arising from the undisputed language of the Agreements that

any remaining rights of Uniroyal to market and sell Bonzi are limited to those "new uses"

specifically authorized by the Supply and Development Agreements. Uniroyal concedes this point

by its admissions in paragraphs 4, 7, 8 and 11 of its Rule 56(a)(2) Statement. Nevertheless,

Uniroyal still attempts to create a genuine issue of fact by citing to non-relevant snippets of

deposition testimony by various individuals concerning the use of ornamental plants in interiorscapes

and landscapes, and other extraneous documents. Admittedly, the question of whether any particular

labeled Bonzi use falls within the Agreements' "Development Field" may be a fact issue for trial.

However, the fact that Uniroyal's claims **are limited to** that Development Field is not.

Uniroyal concludes its Memorandum of Law with the syllogism that Syngenta is not

entitled to partial summary judgment because "... Uniroyal makes no claim here for rights to new

uses outside the scope of the Development Agreement." Pl. Opp. at 24. However, because

Syngenta has demonstrated as a matter of law that the scope of those rights is significantly narrower

than what Uniroyal alleges -- both in its Amended Complaint and in its responses to interrogatories --

Syngenta is entitled to partial summary judgment as to those claims.

For example, plaintiff admits that "[a]ll of the Bonzi 'new uses' that Uniroyal claims it developed **that are at issue in this case** were registered with and approved by the United States Environmental Protection Agency (the "EPA") on July 15, 1993."  Uniroyal's Local Rule 56(a)(2) Statement, ¶ 15 (emphasis added).  Thus, the scope of the new Bonzi uses at issue in the case must be limited to those uses that appear on Uniroyal's July 15, 1993 Bonzi label.  That scope is much narrower than that set forth in the ten page chart that Uniroyal annexed to Plaintiff's Supplemental Responses to Defendant's First Set of Interrogatories and Second Request for Production of Documents (which is attached to Uniroyal's Local Rule 56(a)(2) Statement as Exhibit A).  In that chart, Uniroyal alleges that it retains in perpetuity the marketing and sales rights to virtually every new use for Bonzi it claims to have developed over the 1991-2001 period.  Regardless of whatever evidentiary significance they may have, the myriad post-1993 field studies referenced by Uniroyal in that chart cannot be the basis of any damages claim at trial.  It is not disputed that all of the Bonzi uses "at issue in this case" were registered with EPA on July 15, 1993 and reflected on Uniroyal's label of the same date.  Thus, the trial of this action can be limited to Bonzi development which took place between January 29, 1991 (the date of the Agreements) and the July 15, 1993 EPA registration, rather than over a much longer period.

Moreover, Uniroyal admits that "the Development Agreement did not grant Uniroyal marketing and sales rights for new Bonzi uses it developed, **except** on 'woody ornamentals, shrubs, shade trees, ornamental fruit trees, interiorscapes and landscapes in the U.S. and its territories, excluding turf and commercial rights of way.'"  Uniroyal's Local Rule 56(a)(2) Statement, ¶ 11

(emphasis added).  Uniroyal concedes this significant limitation, not only in response to Paragraph 11, but also in response to Paragraphs 4, 7, and 8 of Syngenta's Local Rule 56(a)(1) Statement.

Thus, as a matter for law there is no dispute as to both the relevant time period at issue and the particular Bonzi uses and use sites for which Uniroyal can potentially lay claim to any entitlement to Bonzi marketing and sales rights.  Granting partial summary judgment on these two issues will significantly narrow the scope of expert discovery, which is presently scheduled to conclude on March 15, 2006, and the length of the trial.

## CONCLUSION

Syngenta is entitled to summary judgment dismissing each count of the Complaint, together with such other and further relief as the Court deems proper.

In the alternative, Syngenta is entitled to partial summary judgment restricting each of Uniroyal's claims to uses of Bonzi that are specifically set forth in the Supply Agreement and Development Agreement, together with such other and further relief as the Court deems proper.

DEFENDANT
**SYNGENTA CROP PROTECTION, INC.**

By: _____
    William A. Ruskin (Fed. Bar No. ct20898)
    R. Michael Meo, Jr. (Fed. Bar No. ct16318)
    Shipman & Goodwin LLP
    300 Atlantic Street, Third Floor
    Stamford, Connecticut 06901
    Telephone: (203) 324-8100
    Facsimile: (203) 324-8199
    E-mail: wruskin@goodwin.com
    E-mail: rmeo@goodwin.com
    Its Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of July 2005, a copy of the foregoing

Defendant's Reply Memorandum in Support of Motion for Summary Judgment or, in the

Alternative, Partial Summary Judgment, was mailed, via First Class Mail, postage pre-paid, to:

Charles R. Corcoran, III, Esq.
Carmody & Torrance LLP
195 Church Street
P.O. Box 1950
New Haven, CT 06509-1950


R. Michael Meo, Jr.

123078 v.03

LEXSEE 30 FED. APPX. 21

**800 SERVICES INC., a New Jersey corporation, Appellant v. AT&T Corp., a New York corporation**

**No. 00-3519**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*30 Fed. Appx. 21; 2002 U.S. App. LEXIS 2389*

**December 7, 2001, Submitted Pursuant to Third Circuit Lar 34.1(a)
February 12, 2002, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of New Jersey (D.C. Civil Action No. 98-cv-01539). District Judge: Honorable Nicholas H. Politan.

**DISPOSITION:** Affirmed.

**LexisNexis(R) Headnotes**

**JUDGES:** Before: MANSMANN, ROTH and FUENTES, Circuit Judges

**OPINIONBY:** Jane R. Roth

**OPINION:** [*22]

MEMORANDUM OPINION

ROTH, Circuit Judge:

Plaintiff 800 Services Inc. appeals from the August 3, 2000 Final Order and the subsequent September 18, 2000 interest calculation Order of the United States District Court for the District of New Jersey.

800 Services was an "aggregator" of telecommunications services provided by AT&T. Aggregators pool telecommunications service in order to provide discounted service to their customers. AT&T is a provider of interstate long-distance telecommunications

service. The relationship [*23] between aggregators and providers is contractual in nature, but the relationship is conducted within the confines of federal law, particularly Title 11 of the Communications Act of 1934; as amended. See *47 U.S.C. § 201,* et seq. (West 2000). A contract between the [**2] parties required 800 Services to compensate AT&T for any shortfall between the anticipated volume of usage and the actual volume of services provided by AT&T.

Plaintiff's complaint advanced twelve counts. The Counts included allegations of unjust enrichment, slander and libel under New Jersey state law, intentional interference with prospective economic advantage and similar interference with contractual relations, unfair competition/trade libel and various claims under 201, 202 and 203 of the Communications Act. AT&T counterclaimed for unpaid telephone usage charges, shortfall charges resulting from contractual obligations and prejudgment interest. The Final Order granted AT&T's motion for summary judgment and awarded judgment on the counterclaim. Our review of a District Court's Final Order to grant summary judgment is plenary. See *Nelson v. County of Allegheny, 60 F.3d 1010, 1012 (3d Cir.1995),* cert. denied, *516 U.S. 1173, 116 S. Ct. 1266, 134 L. Ed. 2d 213 (1996).*

Summary judgment on the allegations under the Federal Communications Act was properly granted by the District Court, as their prosecution was barred by the applicable statute of limitations. [**3] Suits under the Communications Act must be filed within two years of "the time the cause of action accrues." *47 U.S.C. § 415*(b) (West 2000). 800 Services filed its complaint, which alleged violations between September 1990 and July 1995, on April 6, 1998.

800 Services argues, however, that although the most recent alleged violation of the Communications Act occurred more than two years prior to the complaint, the claims are not barred due to the continuing wrong doctrine. The continuing wrong doctrine applies to toll the statute of limitations if there is continuing affirmative wrongful conduct. See *Brenner v. Local 514, United Broth. of Carpenters and Joiners of America, 927 F.2d 1283, 1296 (3rd. Cir. 1991);* see also 287 *Corporate Center Associates v. Township of Bridgewater 101 F.3d 320, 324 (3rd Cir. 1996)* (not applying the doctrine when there was no affirmative act by the defendant within the statutory period). The District Court correctly found the doctrine inapplicable in this matter because there was no continuing affirmative wrongful conduct during the statutory two year period prior to 800 Services filing of the complaint. [**4]

The District Court also properly granted summary judgement on the state law claims. Under New Jersey Law, slander and libel claims must be brought within one year. See *N.J. Stat. ANN. 2A:14-3* (West 2000). 800 Services argues that a six year statute of limitations for trade libel, as opposed to the one year statute of limitations for slander and libel, was applicable. The District Court correctly characterized the statements at issue as slander and libel, not as trade libel. The statements did not constitute trade label since there is no evidence that AT&T made any false statements regarding 800 Services or its affairs. As such, 800 Services' claims sound in slander and libel which are barred by the statute of limitations.

The District Court properly granted summary judgement on the unjust enrichment and tortious interference state law claims as the claims were unsupported by the evidence. To survive a motion for [*24] summary judgment, "the non-moving party must make a showing sufficient to establish the existence of each element of his case on which he will bear the burden of proof at trial." *Huang v. BP Amoco Corp, 271 F.3d 560, 564.* (3rd Cir. 2001); see *Fed.Rules Civ. Proc.Rule 56(c),* [**5] 28 U.S.C.A. To support its unjust enrichment claim, 800 Services alleged that AT&T improperly used its customer lists and profited from such conduct without apportioning profits to 800

Services. The District Court found that 800 Services offered no admissible evidence in support of this contention and that the deposition testimony was based on speculation, conjecture and industry "buzz." Such evidence was properly found insufficient, as it would not carry the burden of proof at trial. Plaintiff's brief on appeal does allege that AT&T would not have been able to switch customers from 800 Services's accounts to AT&T's without abuse of the customer lists. However, the brief does not set forth any causal connection between the customer list abuse and the switching of telecommunications providers. An individual consumer's choice to switch providers could be based on a number of different factors and, therefore, does not necessarily evidence any impropriety on the part of AT&T.

Similarly, the District Court found a lack of evidence in support of 800 Services's tortious interference claims. Although 800 Services presumptively argues on appeal that the business would have continued [**6] to flourish but for AT&T's actions, it offers no details to support that contention.

Finally, 800 Services contests the District Court's award of damages under AT&T's counterclaim. The agreement between the parties was controlled by the Tariff No. 2. Tariff No. 2 requires that the aggregator pay the provider for usage and shortfall charges. 800 Services has not contested incurring usage charges or the amounts thereof. Rather, 800 Services claims that AT&T violated an implied covenant of good faith and fair dealing in the contract execution. As discussed above, the District Court found a lack of evidence of slander, libel and tortious interference. Accordingly, we find that the District Court did not err in awarding damages for unpaid usage and shortfall charges to AT&T. These counterclaim defenses offered by 800 Services mirror the claims offered in the complaint; the defenses similarly lack the requisite evidentiary foundation.

For the reasons above we affirm the District Court.

By the Court,

/s/ Jane R. Roth

Circuit Judge

LEXSEE 66 FED. APPX. 300

## RICHARD A. KING, JR., Appellant v. CITY OF PHILADELPHIA

### NO. 02-2845

### UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*66 Fed. Appx. 300; 2003 U.S. App. LEXIS 6290*

### March 13, 2003, Submitted Under Third Circuit LAR 34.1(a)
### April 1, 2003, Filed

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. Civil No. 99-cv-06303). District Judge: Hon. James T. Giles.

*King v. City of Philadelphia, 2002 U.S. Dist. LEXIS 10276 (E.D. Pa., June 4, 2002)*

**LexisNexis(R) Headnotes**

**COUNSEL:** For Richard A. King, Jr., Appellant: Olugbenga O. Abiona, Law Office of Oluabiona, Philadelphia, PA.

For City of Philadelphia, Appellee: Elise M. Bruhl, City of Philadelphia Law Department, Philadelphia, PA.

**JUDGES:** Before: SLOVITER, NYGAARD, and ALARCON *, Circuit Judges.

 * Hon. Arthur L. Alarcon, Senior Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

**OPINIONBY:** Arthur L. Alarcon

**OPINION:**

[*302] OPINION OF THE COURT

ALARCON, Circuit Judge.

Richard A. King, Jr. appeals from the order granting summary judgment in favor of the City of Philadelphia (the "City") and the dismissal of his statutory claims under Title VII of the Civil Rights Act, *42 U.S.C. § § 2000e to 2000e-17 (1981 & Supp. 1994)* ("Title VII"), and his constitutional causes of action under *42 U.S.C. § 1983* [**2] for alleged violations of his First and *Fifth amendment* rights, as applicable to the City under the *Fourteenth amendment.* King contends that he presented sufficient evidence to demonstrate that he was disciplined and ultimately terminated from his employment because he is African-American. We affirm because we conclude that the district court did not err in granting summary judgment.

**I**

Inasmuch as the parties are familiar with the factual and procedural background of this case, we refer only to those facts as are pertinent to the issue under consideration. In December 1996, Officer Woltemate and another officer called King a "nigger." King immediately contacted the EEO Officer of Philadelphia Police Department and filed a discrimination complaint regarding the incident with the EEOC on August 8, 1997 and with the EEO Officer on October 20, 1997. After his first contact with the EEO Officer, he was suspended on three occasions. King's employment was terminated on April 2, 1998 following his arrest for allegedly making a false report that his pistol was stolen during the burglary of his home and for obstructing justice.

[*303] The City presented evidence in support of its motion for [**3] summary judgment regarding the bases for each suspension. The first suspension, ordered on May 22, 1997, was allegedly for insubordination,

neglect of duty and disobedience to orders, because of King's failure to report to work, late arrival, and a failed sick check. The second suspension, ordered January 29, 1998, was allegedly for conduct unbecoming an officer and was ordered because the police department was notified that King had been involved in an off-duty automobile accident where he identified himself as a police officer, asked the other driver not report the accident, agreed to pay any damages and then refused to reimburse the other driver. The third suspension, ordered March 18, 1998, was allegedly for insubordination and neglect of duty because King was denied the use of sick time by a superior officer and then resubmitted the request to a lower ranking officer without informing that officer about the previous denial.

The City also offered evidence to demonstrate that it has a policy of terminating the employment of any officer who is arrested, whether or not he or she is ultimately convicted.

## II

King contends that he submitted evidence that he was subjected to [**4] a hostile work environment because he is African-American and that he was suspended and ultimately terminated from his employment because of his race and his complaint of racial discrimination. He asserts that he has demonstrated that reasons proffered by the City to justify the suspensions and the termination of his employment are pretextual and were retaliatory because he complained of racial discrimination. We exercise plenary review of the district court's grant of summary judgment and assume that facts asserted by the nonmoving party are true, where supported by affidavits or other evidentiary material. *Simpson v. Kay Jewelers, 142 F.3d 639, 643 (3rd Cir. 1998)*.

If a plaintiff presents sufficient evidence to establish a prima facie case of a violation of Title VII, the burden of production shifts to the employer to offer a legitimate, non-discriminatory reason for its personnel action. *Fuentes v. Perskie, 32 F.3d 759, 763 (3rd Cir. 1994)*. "Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a [**5] preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." *Id.* To avoid summary judgment, the plaintiff's evidence of pretext must either meaningfully discredit each of the employer's proffered non-discriminatory reasons or show, by a preponderance of the evidence, that discrimination was a motivating or determinative reason for the employer's acts. *Id. at 764*.

The parties do not dispute that King has established a prima facie case of racial discrimination. In arguing that his arrest was a pretext to terminate him for racially discriminatory reasons, King claims that the arrest was "malicious." The City presented evidence that eight-five officers have been terminated after they were arrested pursuant to the City's policy. King offers no evidence regarding the termination of employment of these officers. Instead, King presented evidence that the police failed to investigate one potential witness to the alleged burglary and did not notify him that his pistol was found two days before the Internal Affairs Division ("IAD") concluded its investigation. This evidence does not demonstrate [*304] that the [**6] City's reason for terminating King were pretextual. King's pistol was found after he was arrested. King has failed to demonstrate that he would not have been terminated had the IAD promptly notified him of the discovery.

The City produced evidence that none of the officers who investigated the alleged burglary of King's home had any knowledge of his discrimination complaints. King has offered no evidence to the contrary. His claim that the investigating officers must have known about his complaint is sheer speculation.

Lieutenant Brad Christy's deposition testimony that King had a "very long history in his short five years on the job" does not demonstrate that the officer was aware of King's discrimination complaint. Lieutenant Christy stated that King's disciplinary record was relevant in determining whether King might have falsified the burglary report. Lieutenant Christy asserted that he did not know King had filed a discrimination claim.

William Tarrance testified during King's post-termination arbitration hearing that an unidentified police detective stated he would see that King "rots in jail." This hearsay statement does not show that the declarant was aware of King's [**7] discrimination complaints or the basis for his or her animus.

King states that Lieutenant Ludd told Captain Jack Gattens, "this asshole files charges against ... Woltemate. We will fix him. He will never get promoted." This statement reflects Lieutenant Ludd's state of mind. It does not demonstrate that Captain Gattens' participation in the Police Board of Inquiry hearing board's discipline proceedings was improper because of a bias against King.

King also argues that, in terminating his employment because he was arrested, the City has treated him differently from the manner in which it handled allegations of criminal conduct concerning Captain Brady and Captain DiLacqua of the Philadelphia Police Department. King offered a newspaper article that reported that Captain Brady and Captain DiLacqua

attempted to cover up a drunk driving accident. King has not demonstrated that Captain Brady and Captain DiLacqua were arrested but, nevertheless, retained their employment. Thus, this evidence does not demonstrate that the City does not have a policy of terminating the employment of officers who are arrested. See *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 359 (3rd Cir. 1999) [**8] (holding that in reviewing evidence of alleged discrimination, "our focus is on the particular criteria ...identified by the employer as the reason for the adverse action").

King contends that the City's reasons for ordering his suspensions are also pretexts for racial discrimination. King offered the deposition of Clyde Williams in which he testified that he heard of complaints regarding the treatment of African-American police officers in Philadelphia. He did not identify the declarants of these extrajudicial statements or their position within the Philadelphia Police Department, nor did he testify that he had personal knowledge of discriminatory treatment of African-American police officers. "Hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony ...." *Williams v. Borough of West Chester*, 891 F.2d 458, 466 n. 12 (3d Cir. 1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)). Because Williams' deposition testimony is not based on personal knowledge, it should not be considered on [**9] a summary judgment motion. See [*305] *Brown v. Muhlenberg Township*, 269 F.3d 205, 212 n. 5 (3d Cir. 2001) (citing *Fed. R. Civ. P. 56(e)* requirements for admissible affidavits); *Blackburn v. United Parcel Serv.*, 179 F.3d 81, 95 (3d Cir. 1999) ("[A] hearsay statement that is not capable of being admissible at trial should not be considered on a summary judgment motion.").

King's contention that the sick-leave logbook was allegedly manipulated to justify his suspensions is insufficient to overcome the City's explanation of the cause for such discipline. King's first suspension began before the alleged tampering with the logbook occurred. The first suspension was initiated by a recommendation from Lieutenant Clifford Ludd, who is also of African-American ancestry. King's other suspensions do not relate to information in the sick-leave log book. King's allegations that he was singled out for suspension because of his race is too unspecific to give rise to a reasonable inference that the City's justification is a pretext. See *Billet v. CIGNA Corp.*, 940 F.2d 812, 816 (3rd Cir. 1991) ("Indirect evidence must be enough to support a reasonable [**10] inference that the reasons given for the employment decision are pretextual. Merely reciting that [race] was the reason for the

decision does not make it so."). King has failed to demonstrate that the City's proffered non-discriminatory reasons for taking adverse employment action against him were pretextual.

King's hostile work environment claim is based on the incident in December 1996 when he was subjected to a racial epithet by Officer Woltemate, and the evidence that Woltemate physically pushed him and, on another occasion, threatened to sabotage his work record. These are isolated and sporadic incidents. They do not demonstrate the pervasive atmosphere of harassment required to prove a Title VII violation. See *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998) (cautioning that "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.").

## III

In support of his *§ 1983* claim, King contends that the City violated his *First Amendment* right to free speech by terminating his employment in response to his discrimination complaint, and deprived [**11] him of his constitutional right to due process by failing to inform him that his service revolver had been located.

"[A] local government may not be sued under *§ 1983* for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under *§ 1983*." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).

King has failed to produce any evidence of the existence of a policy or custom to retaliate against African-American police officers who complain of discrimination. Though King named individuals whom he asserts the City retaliated against because of their discrimination complaints, he has provided no specific facts to support this claim. The one incident that is clearly alleged is that Corporal Woltemate and another officer used a racial epithet. This evidence is not enough to establish a municipal custom or policy. See *Groman v. Township of Manalapan*, 47 F.3d 628, 637 (3rd Cir. 1995) [**12] (holding that vague assertions combined with one incident of illegal behavior do not establish a custom).

[*306]    The judgment of the district court is AFFIRMED.

/s/ Arthur L. Alarcon

Circuit Judge

FOCUS - 1 of 12 DOCUMENTS

**NYCAL CORPORATION, Plaintiff-Appellant, v. INOCO PLC and DOWNSHIRE N.V., Defendants-Appellees.**

No. 98-7058

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*1998 U.S. App. LEXIS 31216*

**December 9, 1998, Decided**

**NOTICE:** [*1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**

Reported in Table Case Format at: *1998 U.S. App. LEXIS 37702.*

**DISPOSITION:** AFFIRMED, AS MODIFIED.

**LexisNexis(R) Headnotes**

**COUNSEL:** Appearing for Appellant: WILLIAM McGUINNESS, Deforest & Duer, New York, NY.

Appearing for Appellees: LAWRENCE A. BLATTE, Rosen & Reade, LLP, New York, NY.

**JUDGES:** PRESENT: HON. GUIDO CALABRESI, HON. ROBERT D. SACK, HON. SONIA SOTOMAYOR, Circuit Judges.

**OPINION:**

SUMMARY ORDER

UPON DUE CONSIDERATION of this appeal from a judgment of the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge*), it is hereby

ORDERED, ADJUDGED AND DECREED that the judgment be and it hereby is AFFIRMED, AS MODIFIED.

Plaintiff-Appellant Nycal Corporation ("Nycal") brought this action against Defendants-Appellees Inoco PLC and Downshire N.V. (collectively "Inoco") in connection with Nycal's purchase of stock in Gulf Resources and Chemical Corporation ("Gulf"). Nycal claimed that it was fraudulently induced into signing both the stock purchase agreement [*2] and a subsequent settlement agreement. n1 After completion of discovery, Inoco moved for summary judgment. The district court (Kaplan, *J.*) granted the motion and dismissed the complaint. Nycal appeals, arguing that there are disputed issues of material fact precluding the grant of summary judgment. We affirm the judgment of the district court.

n1 Not at issue in this appeal is Nycal's third cause of action for breach of warranty, which the district court dismissed on collateral estoppel grounds in an earlier opinion. *Nycal Corp. v. Inoco PLC and Downshire, N.V., 968 F. Supp. 147 (S.D.N.Y. 1997).*

**BACKGROUND**

In early 1991, Nycal contacted Inoco about purchasing Inoco's 37% interest in Gulf. Graham Lacey, Nycal's Chief Executive Officer, President and Chairman, represented Nycal during the negotiations. David Rowland, a director of both Inoco and Gulf and Gulf's President, represented Inoco. Nycal conducted a due diligence investigation into Gulf, but was limited to reviewing public [*3] records because Rowland denied Nycal access to Gulf's internal books and records. After Nycal completed its due diligence investigation, the parties entered into a written stock purchase agreement

on May 24, 1991 (the "SPA"), pursuant to which Nycal agreed to buy Inoco's entire interest in Gulf for $ 34 million in cash and stock. The transaction closed on July 12, 1991, and problems developed almost immediately thereafter.

On July 15, 1991, Lawrence Mehl, Gulf's General Counsel, informed Lacey that a Gulf subsidiary, Gulfpac, had received a $ 5.6 million loan from Interallianz Bank Zurich ("IBZ") prior to the closing. Lacey believed that this loan (the "Gulfpac loan") violated the terms of the SPA, which required that Inoco and its subsidiaries to have $ 48 million in cash at the time of the stock purchase. Gulf also identified five other potentially fraudulent self-dealing transactions by Rowland with respect to Gulf, which Lacey believed affected the value of Gulf's shares. After learning of these transactions, Lacey stopped payment on a check to Inoco, prompting a lawsuit by Inoco in the United Kingdom against a Nycal subsidiary. Inoco plc v. Nycal (U.K.) Ltd., No. I7569 (1991). [*4]

On October 4, 1991, Inoco entered into separate settlement agreements with Nycal, Gulf and CRL Realities Limited ("CRL"). CRL was another corporation involved in the questioned self-dealing transactions by Rowland. Under the terms of these agreements, Nycal's purchase price for the Gulf shares was reduced and a variety of stock exchanges and transfers were made to address the effects of the alleged self-dealing transactions. In addition, the parties entered into settlement agreements releasing claims between them.

Five years after entering into the Settlement Agreement, Nycal filed suit against Inoco, alleging in part that Inoco had fraudulently induced Nycal to enter into both the SPA and the Settlement Agreement. After discovery, Inoco moved for summary judgment, contending that the Settlement Agreement contained a full release that precluded Nycal from claiming that it was fraudulently induced to enter into the SPA. In response, Nycal argued that the release was limited only to the two claims arising from the SPA (i.e., the Inoco suit on the stopped check and the Gulfpac IBZ loan), and that the release did not extend to claims of fraudulent inducement.

In an Opinion and Order [*5] dated December 12, 1997, the district court granted Inoco's motion for summary judgment and dismissed the complaint. *Nycal Corp. v. Inoco PLC, 988 F. Supp. 296 (S.D.N.Y. 1997).* This appeal followed.

## DISCUSSION

### I. The Settlement Agreement and Its Scope

The first issue in this appeal is whether the Settlement Agreement was ambiguous in including or

excluding fraudulent inducement claims. The question of whether a contract's language is ambiguous is a question of law, *Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 429 (2d Cir. 1992),* and this Court reviews the district court's determination of this issue de novo.

The Settlement Agreement pertinent to this appeal between Inoco and Nycal contained the following language:

> Following the aforesaid [price] reduction, each party to the Stock Purchase Agreement hereby acknowledges that it has no further claims arising out of the Stock Purchase Agreement or the transactions contemplated thereby or any guarantee given in relation thereto by any person against any other party or guarantor or any officer or any other party or guarantor and hereby waives any such claim as may [*6] now exist or as may arise after the date hereof.

Judge Kaplan concluded that the waiver in the Settlement Agreement was ambiguous because its "arising out of the SPA" language could reasonably be construed, "if read in pristine isolation . . . as extending only to claims of breach of the SPA and not claims of fraud in the inducement of the SPA, although the broader reading is at least equally tenable." *Nycal Corp. v. Inoco PLC, 949 F. Supp. 1115, 1120-21 (S.D.N.Y. 1997);* see also *Nycal Corp. v. Inoco PLC, 988 F. Supp. 296, 299 (S.D.N.Y. 1997)* ("In light of the broad language employed in the release, a reasonable person could conclude that it encompasses more than just claims which presuppose the validity of the SPA. On the other hand, Nycal suggests that the language 'arising out of' does not extend to claims attacking the validity of the SPA, which arguably is a reasonable interpretation as well.").

In many areas of law, however, the use of "arising out of" language in a contract is considered unambiguous and viewed as reasonably supporting only a broad reading. For example, in the arbitration context, the language "arising out [*7] of" of a specified contract is considered "broadly worded, and hence, encompasses [a plaintiff's] claims of fraudulent inducement directed at the agreement itself." *Cologne Reinsurance Co. of Am. v. Southern Underwriters, Inc., 218 A.D.2d 680, 630 N.Y.S.2d 548, 549 (2d Dep't. 1995)* (citing *Prima Paint Corp., 388 U.S. 395, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1967),* and *Weinrott v. Carp, 32 N.Y.2d 190, 344 N.Y.S.2d 848, 298 N.E.2d 42 (1973));* see also *Collins &*

*Aikman Prod. Co. v. Bldg. Systems Co., 58 F.3d 16, 20 (2d Cir. 1995)* (holding that a clause submitting to arbitration "'any claim or controversy arising out of . . . the agreement,' is the paradigm of a broad clause." (citation omitted) (alterations in original).

The same analysis of the phrase "arising out of" is found in insurance law cases. See, e.g., *Mount Vernon Fire. Ins. Co. v. Creative Housing Ltd., 88 N.Y.2d 347, 350-51, 645 N.Y.S.2d 433, 668 N.E.2d 404 (1996)* ("arising out of" language in an insurance exclusion clause is unambiguous and is to be applied broadly in the form of a "but-for" test in determining coverage); [*8] *New Hampshire Ins. Co v. Jefferson Ins. Co. of New York, 213 A.D.2d 325, 624 N.Y.S.2d 392, 395 (1st Dep't 1995)* (when used in an insurance policy exclusion, the words "arising out of" are deemed to be "broad, general, comprehensive terms ordinarily understood to mean originating from, incident to, or having connection with" the operations performed by an independent contractor for the insured.).

Finally, in a case involving the scope of a choice of law clause, we agreed with a Texas district court, which had originally ruled on the issue, that either separately or together the language "arising out of" and "relating to" a stock subscription agreement was "sufficiently broad to cover" both tort and contract claims. See *Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309-10 (2d Cir. 1994)*.

In light of the broad reading "arising out of" is unambiguously presumed to convey in many areas of the law, we have some question as to whether a narrow reading of the waiver, which was identified by the district court as plausible, is in fact a reasonable interpretation of the Settlement Agreement. As we explained in another case, a "contract is ambiguous [*9] where reasonable minds could differ on what a term means, but no ambiguity exists where the alternative construction would be unreasonable." *Readco, Inc., R.D.P. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996)* (internal citations omitted).

We need not, however, decide whether the Settlement Agreement's "arising out of" language was ambiguous because, even if ambiguous, we conclude that Nycal did not come forward with sufficient evidence to create a genuine issue of material fact in dispute regarding the scope of the waiver. We agree with the district court that the circumstances surrounding the settlement negotiations between the parties, which involved resolution of multiple claims about self-dealing and fraudulent concealment, lead "inexorably to the conclusion that the Settlement Agreement released all claims relating to the SPA, including claims for fraudulent inducement." *Nycal Corp, 988 F. Supp. at*

*304.* Nycal has proffered no evidence that raises a genuine issue of material fact on this question.

First, we agree with the district court that any differences in the wording used in the three contemporaneous settlement agreements can [*10] only be reasonably viewed as a "consequence of the different relationships and dealings between the respective companies" and not as an indication of a different intent with respect to the Nycal-Inoco release. Id. Second, we also agree with the district court that the differences in describing the various settlement negotiations among the parties in the October 14, 1991 minutes of the Inoco Board meeting simply do not permit any reasonable inference concerning the parties' intent with respect to the subsequently executed SPA. Finally, the deposition testimony of William Horn, Nycal's then Chief Financial Officer and General Counsel, regarding the scope of the release is not relevant, competent, or admissible, given that he testified that he had no personal knowledge of the parties' intent at the time the settlement was being negotiated and that Lacey had not discussed the scope of the release with him. To survive a motion for summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986),* and [*11] in this case, Nycal simply has not met its burden.

We note that the proposition of law that the district court drew from *Wells v. Shearson Lehman/American Express, 72 N.Y.2d 11, 530 N.Y.S.2d 517, 526 N.E.2d 8 (1988),* regarding the admissibility of evidence concerning subjective as opposed to objective intent in interpreting contracts, may not be as clearly settled in New York as the district court indicates. In Wells, the plaintiff argued on appeal that, contrary to the lower court's ruling, her release contained an ambiguity because it was her subjective intent not to release the defendants. The court rejected her argument, holding that "uncommunicated subjective intent alone cannot create an issue of fact where otherwise there is none." *Id. at 24.* Wells does not, however, appear to address the admissibility of subjective extrinsic evidence in cases such as this, in which the district court found the contract ambiguous and thus required extrinsic evidence to interpret the contract. See *Hudson-Port Ewen Assocs. v. Kuo, 165 A.D.2d 301, 566 N.Y.S.2d 774, 777 (3d Dep't 1991)* (Yesawich and Harvey, JJ., dissenting) ("Prior case [*12] law . . . merely indicates that where there is no ambiguity in the document, uncommunicated subjective intent alone cannot create it.").

Two New York appellate courts have read Wells in the same manner as the district court. See *Sally v. Sally, 225 A.D.2d 816, 638 N.Y.S.2d 832, 834 (3d Dep't 1996)*

1998 U.S. App. LEXIS 31216, *

(applying Wells in explaining that parties' interpretations of stipulation are "nothing more than expressions of uncommunicated subjective intent, which are insufficient to create a question of fact"); *Padovano v. Vivian, 217 A.D.2d 868, 629 N.Y.S.2d 844, 846* (3d Dep't 1995) (even if phrase in contract were ambiguous, "extrinsic evidence of the parties uncommunicated subjective intent would be irrelevant"). We need not decide whether this issue is clear under New York law, however, because we have already determined that Horn's testimony must be excluded from consideration on relevancy and competency grounds in deciding the summary judgment motion.

II.  Fraudulent Inducement of the Settlement Agreement

Nycal also appeals from the district court's dismissal of its claim that it was fraudulently induced to enter into the Settlement Agreement by [*13] Inoco's failure to disclose a money transfer of which Nycal lacked knowledge. This "new" fraud alleged by Nycal is simply a species of the same undisclosed frauds that prompted the Settlement Agreement. We therefore agree with the district court's conclusion, based upon the holdings of *Alleghany Corp. v. Kirby, 333 F.2d 327, 333 (2d Cir. 1964)* and *Bellafonte Re Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523 (2d Cir. 1985)*, that Nycal was precluded from asserting a claim for fraudulent inducement of the Settlement Agreement when it settled with Inoco, knowing that Inoco had already fraudulently withheld information.

For the reasons stated above, we affirm the district court's decision.

FOCUS - 2 of 12 DOCUMENTS

**NICHOLAS O. RUSSO, JR., Plaintiff, v. CITY OF HARTFORD, ET AL,
Defendants.**

**CIVIL ACTION NO. 3-97-cv-2380 (JCH)(Lead Case); Consolidated With 3-00-cv-
2382 (JCH) and 3-00-cv-1794 (JCH).**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*2004 U.S. Dist. LEXIS 21092*

**September 30, 2004, Decided**

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by *Russo v. City of Hartford, 341 F. Supp. 2d 85, 2004 U.S. Dist. LEXIS 21093 (D. Conn., Sept. 30, 2004)*

**PRIOR HISTORY:** *Russo v. City of Hartford, 184 F. Supp. 2d 169, 2002 U.S. Dist. LEXIS 2555 (D. Conn., 2002)*

**DISPOSITION:** Plaintiff's motions to strike documents submitted by defendants, denied. Defendants' motions to strike documents submitted by plaintiff, granted in part and denied in part.

**COUNSEL:** [*1] James S. Brewer, Brewer & O'Neil, West Hartford, CT, for Plaintiff NICHOLAS O. RUSSO, JR.

Charles L. Howard, Derek L. Mogck, Gregg Peter Goumas, and Kara L. Van Ausdall, Shipman & Goodwin-ConstPlza-Htfd, Hartford, CT, for Defendant BRUCE P. MARQUIS, Chief of Police, I/O.

Helen Apostolidis, Corporation Counsel's Office, Hartford, CT, Jill Hartley, John P. Shea, Jr., Lori Rittman Clark, and Michael G. Albano, Sabia & Hartley, LLC, Hartford, CT, Michael C. Collins, Halloran & Sage - Hartford, Hartford, CT, and Ryan P. Berry, Moukawsher & Walsh - Htfd, Hartford, CT, for Defendant CITY OF HARTFORD.

**JUDGES:** Janet C. Hall, United States District Judge.

**OPINIONBY:** Janet C. Hall

**OPINION:**

**RULING RE: PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 482 and 150] AND DEFENDANTS' JOINT MOTIONS TO STRIKE [DKT. NOS. 493, 162 and 56]**

In Russo v. City, Action No. 3-97-cv-2380 and Russo v. Bailey, Action No. 3-00-cv1794, Russo has moved to strike all those portions of the Police Defendants' Local Rule 56(a)(1) Statement that rely on memoranda written by Roberts and Lilley [respectively, Dkt. Nos. 482 and 150]. The basis for his Motions is that the memoranda are not admissible under either Fed.R.Civ.P. 56(a)(3) [*2] or (e) or Fed.R.Evid. 802 or 803 in that they are not Affidavits or otherwise certified documents, and that they are hearsay under Rule 801.

The court denies Russo's Motion to Strike. First, the Police Defendants respond by stating that neither memorandum is being offered to prove the truth of the documents, and thus are not hearsay. Rather, the Police Defendants offer them to prove what Chief Croughwell was aware of at the time he made various decisions pertinent to this case. Alternatively, the court would not strike the documents or the Rule 56(a)(1) Statements that rely upon them because, although not yet established as records under Fed.R.Evid. 803(8), they have the appearance of, and thus would purport to be, public records. The memoranda were clearly prepared by both Roberts and Lilley in connection with their duties as police officers. The Hartford Police Department ("HPD") drug testing policy requires the preparation of such memorandum. They clearly have been preserved as part of the HPD records. Deposition testimony in these cases lay a foundation for their admission [*3] as business or

public records. Finally, Russo has not offered any evidence, or even suggestion thereof, that the memoranda were fabricated, created or are in any other way fraudulent. That he disagrees with the contents of the documents is not a basis to exclude them. Under Local Rule 56(a)(3), these memoranda "would be admissible at trial."

In each of the three consolidated cases, all defendants have moved jointly to strike portions of the Russo's Joint Local Rule 56(a)(2) Statement and, material submitted in support thereof. n1 (respectively, Dkt. Nos. 493, 162 and 56).

> n1 Russo submitted a Joint Local Rule 56(a)(2) Statement in opposition to all of the defendants' motions in each of the three consolidated cases. Defendants object to this as violative of the rule, arguing that a separate one should have been filed in response to each summary judgment motion, or in each case. The court finds nothing inherently wrong with it and certainly no reason why it was inappropriate for Russo to do so in these cases. Therefore, to the extent defendants' motion sought to strike the Local Rule 56(a)(2) Statement in its entirety because it was "joint," that portion of the Motion is denied.

[*4]

First, defendants move to strike Exhibits A through O and Q through Z, offered by Russo in opposition to the defendants' summary judgment motions, and cited in support of the plaintiff's Joint Local Rule 56(a)(2) Statement. The court grants this part of the Motion, in part, as to Exhibits G, K and L. Exhibit G is "a comprehensive management study of the Hartford Police Department," which was prepared by Carroll Buracker & Associates, Inc. The court is aware of no deposition testimony by the author of this study, and it would appear to be hearsay. Russo does not oppose this Motion by suggesting that the Report is offered for some other purpose or providing a basis for its admission.

With respect to Exhibit K, the court observes that it is a hand-written memorandum, which is signed by "B." The court has nothing before it to authenticate it, let alone to identify this covering memorandum. The court, however, will not grant the Motion to Strike as to the attached "Arbitration Award" for reasons which will be discussed below.

Finally, the court will grant the Motion to Strike with respect to Exhibit L, which is hand-written. The author is not known to the court, and no offer has been

[*5] made to authenticate it by Russo, other than to flatly assert that all of these have been authenticated, without any citation or attached documents to support that assertion.

With the remaining Exhibits A through O and Q through Z, and the remaining portion of Exhibit K, the court denies the Motion. The remaining documents are all type-written, identify themselves, and, assuming their relevance, likely authenticate and admissible at trial. (See, for example, Exhibit A, "Agreement between the City of Hartford and the Hartford Police Union"). Defendants do not specifically attack any of these remaining documents by suggesting that they are fraudulent or "created" for purposes of litigation. Therefore, for all of these reasons, this aspect of the Motion to Strike is granted and denied in part.

Defendants next move the court to strike Exhibits 1 through 35, which exhibits were submitted by Russo in support of his Opposition to the Motions for Summary Judgment. The court notes that numerous of these numbered exhibits (Exhibit 22, 25, 27-30, 32) are documents written by Nicholas Russo. These documents would certainly not be admissible at trial by Russo if offered for the truth. However, [*6] the court will treat the contents of the documents as evidence which he could give at trial even though Affidavits are normally required under Rules 56. With respect to the remaining documents, they appear to be records or letters or documents written by members of the HPD or defendant/parties to this lawsuit, and therefore are exhibits that would appear to be admissible at trial. Local Rule 56(a)(3).

The defendants also move to strike certain portions of the Affidavit of Russo: paragraphs 5, 6, 11 and portions of 7 and 8. They make this motion on the ground that these portions of the Affidavit are not based upon Russo's personal knowledge or contradict his sworn testimony. The court grants this aspect of the Motion to Strike in part, and denies it in part. With respect to paragraph 5, the court grants the Motion to the extent Russo sought to offer this paragraph for the truth. Russo acknowledges it is hearsay. To the extent he offers this paragraph for some other purpose then the truth, the motion is denied. With respect to paragraph 6, the Motion is granted. There is no evidence or foundation offered to support this assertion by Russo. With respect to paragraph 7, it is granted [*7] as to that part of 7 that the Motion is directed to: the sentence is really nothing more than argument, as opposed to an assertion of a fact. With respect to paragraph 8, it is denied. With respect to paragraph 11, the Motion is denied.

The defendants further move to strike Exhibit 36 along with the transcripts of Huertas, Lyons, Roberts,

Edelwich, Croughwell and Reynolds because they are not properly certified by a court reporter and are unreliable. The court denies the Motion to Strike in this respect. The court does so because it accepts what is implicit in the submission, that is, counsel's representation that these transcripts are what they purport to be and have not been tampered with. If they are not what they purport to be, and have been in some respect altered from the official record, opposing counsel should have brought that to the court's attention by specifics and with a copy of the certified transcript.

Next, the defendants moved to strike portions of a large number of the paragraphs contained in Russo's Joint Rule 56(a)(2) Statement, on various grounds.

**1. Statements unsupported by relevant or admissible evidence.**

Defendants move to strike a portion of [*8] paragraph 2 that alleges: "Head investigator" and "The Hartford Police Department ('HPD') had arrested the wrong person." The court grants this Motion as to these portions of paragraph 2 on the ground it is not supported by the cited deposition.

The defendants move to strike portions of paragraph 5 as alleges: "Over his career, Russo had 28 investigations leading to 28 convictions for homicide." The Motion is granted to the extent that the cited deposition pages were not submitted and thus the Statement is unsupported.

The defendants move to strike a portion of paragraph 20, which is granted because the cited deposition pages were not submitted.

The defendants move to strike a portion of paragraph 27, which is denied because the allegation is supported by the cited deposition.

The defendants move to strike paragraph 29, which is denied because the Statement is supported by the cited testimony.

The defendants move to strike a portion of paragraph 47, which the court grants because the cited depositions do not support the statement.

The defendants move to strike a portion of paragraph 48, which is denied.

The defendants move to strike a portion of paragraph 56, which is granted. [*9]

The defendants move to strike a portion of paragraph 57, which is granted on the grounds that the cited depositions do not support the statement.

The defendants move to strike a portion of paragraph 60, which is granted because the cited Croughwell deposition does not support the statement.

The defendants move to strike paragraph 66, which the court grants because the cited Croughwell deposition does not support the statement.

The defendants move to strike a portion of paragraph 74, which the court grants because the (corrected) cited deposition page does not support the statement.

The defendants move to strike a portion of paragraph 76, which the court denies.

The defendants move to strike a portion of paragraph 82, which the court grants because the page cited from the Croughwell deposition was not submitted.

The defendants move to strike paragraph 86, which the court denies.

The defendants move to strike paragraph 88, which the court denies.

The defendants move to strike a portion of paragraph 112, which the court grants with respect to the words "Casati, and Croughwell" as well as "discussed illegal disclosures of Russo's medical treatment" because these portions are [*10] not supported by the cited depositions and the cited pages of the Croughwell deposition are not provided.

The defendants move to strike paragraph 113, which the court denies because the cited deposition supports the statement.

The defendants move to strike paragraph 114, which the court similarly denies.

The defendants move to strike a portion of paragraph 116, which the court grants.

The defendants move to strike a portion of paragraph 120, which the court grants because the citations do not support the statement.

The defendants move to strike paragraph 123, which the court grants because the cited page of Roberts deposition does not expressly support the statement, and testimony directly contrary to the statement appears within a page of the cited page.

The defendants move to strike paragraph 127, which the court grants because the cited deposition page was not submitted.

The defendants move to strike paragraph 138, which the court grants because the cited deposition page was not submitted, and Exhibit 21 alone does not support the statement.

The defendants move to strike a portion of paragraph 147, which the court grants because the cited deposition does not support that [*11] portion.

The defendants move to strike a portion of paragraph 151, which the court grants because the cited deposition does not support that portion.

The defendants move to strike paragraph 152, which the court grants because the cited Exhibit does not support the paragraph.

The defendants move to strike a portion of paragraph 153, which the court grants because certain of the cited pages were not submitted, and of those submitted, the statement in paragraph 153 is not supported by them.

The defendants move to strike a portion of paragraph 158, which the court grants because the cited deposition page was not submitted.

The defendants move to strike paragraph 162, which the court grants.

The defendants move to strike paragraph 164, which the court denies because the cited reference supports the statement.

The defendants move to strike paragraph 167, which is granted. The court views this statement of "fact" as really nothing more than argument. To the extent the plaintiff would suggest that it is "fact," the citation to "Plaintiff's 56(a)(2) Statement, Sections I-IX, is unavailing because it references "facts" which are unrelated to this statement of "fact."

The defendants [*12] move to strike a portion of paragraph 173, which is granted.

The defendants move to strike paragraph 187, which is granted in part. The phrase "around April or May 2002" is not supported by the cited Exhibit nor is the portion "Russo was unpaid at this time." These portions are stricken. The argument inserted in the middle (implied in letter that it was not safe to go to HPD, they sent him to Manchester) is also stricken as not supported by the cited reference and as argument. The remainder of paragraph 187 is denied as the statements are supported by the cited reference.

The defendants move to strike paragraph 189, which is denied except with respect to the word "August" which is stricken. The cited Exhibit supports the paragraph, except that the Exhibit references a September date.

The defendants move to strike paragraph 191, which is denied except to the extent that it alleges that the letter stated that "Russo cannot work." The Exhibit supports paragraph 191 except that it states that Dr. Hall "advises Russo not to work."

The defendants move to strike paragraph 192, which the court grants.

The defendants move to strike paragraphs 193 and 194, both of which are denied on [*13] the grounds that they are supported by the cited reference.

The defendants move to strike paragraphs 195 and 197, which the court grants on the grounds that the statement is unsupported by the documents cited (or that the document cited cannot be discerned by the court on their face to support the statement).

The defendants move to strike paragraphs 196 and 198, which the court denies on the grounds that the cited Exhibits support the statements in those paragraphs.

The defendants move to strike paragraph 199, which the court grants. The plaintiff has cited nothing in support of this statement, and while the court is aware of what it did, the statement contains further allegations of fact as to which the court cannot take judicial notice.

The defendants move to strike paragraph 207, which the court denies on the grounds that the paragraph is supported by the cited Exhibit.

The defendants move to strike paragraph 214, which the court grants on the grounds that the plaintiff cited nothing to support the statement.

The defendants move to strike paragraph 216, which the court denies except to the extent that the statement asserts that "John Shea . . ." assisting . . . ." There is [*14] no basis for this assertion in the Exhibit cited.

The defendants move to strike paragraph 218, which the court grants in part as to the portion "appeal the Commissioner's decision" and denies with respect to the remaining portion as it is supported by the cited Exhibit.

The defendants move to strike paragraph 219, which the court denies because the statement is supported by the cited Exhibits.

The defendants move to strike paragraph 220, which the court denies on the grounds that the statement is supported by the cited Exhibits.

The defendants move to strike paragraph 221, which the court grants in part to the extent of the portion "since 1997" and "repeatedly." In all other respects, the Motion is denied.

The defendants move to strike paragraph 222, which the court grants on the grounds that the statement is unsupported by the cited Exhibit.

The defendants move to strike paragraph 223, which the court grants as the statement is not supported by the cited Exhibit.

The defendants move to strike paragraph 235, which is granted with respect to "in violation of G.O. 8-1" and "which Russo was not," but denied with respect to the remainder.

The defendants move to strike paragraph [*15] 236, which the court grants in part as to "Flaherty," and otherwise denies.

The defendants move to strike paragraphs 237 and 238, which the court denies.

The defendants move to strike paragraph 239, which the court grants.

The defendants move to strike paragraph 240, which the court grants on the grounds that there is no basis for the assertion concerning "was violated" and the court is unable to comprehend what the rest of the statement of fact is, i.e., "and, will assure . . . ."

The defendants move to strike paragraph 241, which the court denies.

The defendants move to strike paragraph 243, which the court denies with respect to the first sentence, but grants with respect to the second sentence.

The defendants move to strike paragraph 244, which the court grants as the statement is unsupported by the Exhibit.

The defendants move to strike paragraph 245, which the court denies as to the portion of the statement up to the word "and" and granted with respect to the rest of the statement as unsupported by the cited Exhibit.

The defendants move to strike paragraph 246, which the court denies as to the first portion of the statement, but is granted as to the portion which [*16] begins "Russo was never . . ." as that portion is unsupported by the cited Exhibit.

The defendants move to strike paragraph 260, which the court denies.

The defendants move to strike paragraphs 266 through 270, which the court grants as there is no cited support for any of these paragraphs, except paragraph 269, the cite for which was not submitted.

The defendants move to strike paragraph 273, which the court grants. No material from these cases (or reported case cites) is provided by the plaintiff to enable the court to determine if they support the asserted "fact."

**2. Cited deposition testimony not based on personal knowledge.**

Defendants move to strike various other paragraphs of the Plaintiff's Joint 56(a)(2) Statement on the grounds that these paragraphs are supported by cited deposition testimony, which testimony defendants argue is not based upon personal knowledge.

With respect to a portion of paragraph 36, the Motion is granted on the grounds that the cited deposition transcript includes no personal knowledge of the fact asserted.

With respect to a portion of paragraph 57 which the defendants move to strike, the Motion is granted.

With respect to the Motion [*17] to Strike paragraph 60, the Motion is granted. The cited deposition page was not submitted.

With respect to a portion of paragraph 147, the Motion is granted. Russo admitted that he had no personal knowledge of the matters contained in the portion of the paragraph to be stricken.

With respect to a portion of paragraph 148, the Motion is granted. The plaintiff acknowledged that he does not have personal knowledge of the "fact" set forth in that portion of the paragraph.

With respect to paragraph 156, the Motion is granted on the grounds that Russo does not have personal knowledge of the matters contained herein.
With respect to paragraph 157, the Motion is granted on the same grounds. With respect to portions of paragraph 253, the Motion is granted on the grounds that neither of the persons whose depositions are cited had personal knowledge of what the plaintiff sets forth.

With respect to paragraph 255, the Motion is granted. Croughwell only testified that he was aware of "allegations."

**3. Evidence not previously disclosed.** Defendants move to strike portions of various paragraphs of the joint Local Rule 56(a)(2) Statement on the grounds that these paragraphs rely upon [*18] evidence which was not previously produced to the defendants despite requests for production.

With regard to paragraphs 19 and 21, they are stricken because they rely on an "FBI Sentencing Memo," which was not submitted to court. With regard to paragraphs 22, 23-5, 28, n2 91, 97, 99, 115, n3 117-8, 120 n4, 121, 125-6, 129 and 273, they are stricken because none of the referenced material was produced to the court.

n2 The first sentence only is stricken.

n3 One of the referenced items in support was submitted but it does not support the statement.

n4 One of the referenced items in support was submitted but it does not support the statement.

**SO ORDERED.**

/s/ Janet C. Hall

Janet C. Hall

United States District Judge